RACHEL LEDERMAN, SBN 130192
MARA VERHEYDEN-HILLIARD, D.C. Bar No. 450031 *admission pro hac vice pending*
Partnership for Civil Justice Fund
1720 Broadway, Suite 430
Oakland, CA 94612
415-508-4955
rachel.lederman@justiceonline.org
mvh@justiceonline.org

GABRIELA M. LOPEZ, SBN 288016
The Community Law Office
1720 Broadway, Suite 430
Oakland, CA 94612
415-952-0597
gabriela@oaklandclo.com

BOBBIE STEIN, SBN 113239
503 Dolores St., Suite 201
San Francisco, CA 94110
415-255-0301
Bstein8692@gmail.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOLINA TAWASHA, through her father and guardian SAMER TAWASHA; ERIBERTO JIMENEZ, through his mother and guardian SOPHIA CHUMLEY; LUCY RIOS, through her mother and guardian GWEN LEE; CARMEN LOPEZ, through her mother and guardian NAOMI LOPEZ, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,<br><br>        Plaintiffs,<br><br>    v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, WILLIAM SCOTT, THOMAS HARVEY, MATT SULLIVAN, and DOES 1-100,<br><br>        Defendants. | Case No: 3:23-cv-06524<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF**<br><br>**42 U.S.C. § 1983**<br><br>**JURY TRIAL DEMANDED** |

## I.     INTRODUCTION

1.      This is a civil rights action for damages, injunctive and declaratory relief arising from the CITY AND COUNTY OF SAN FRANCISCO Police Department's unconstitutional mass arrest of more than 100 children and youth on July 8, 2023, and their detention under abusive conditions. Named plaintiffs JOLINA TAWASHA, through her father and guardian SAMER TAWASHA; ERIBERTO JIMENEZ, through his mother and guardian SOPHIA CHUMLEY; LUCY RIOS, through her mother and guardian GWEN LEE; and CARMEN LOPEZ, through her mother and guardian NAOMI LOPEZ, suing as individuals and class representatives, seek redress for the violation of their rights to be free from unreasonable searches and seizures, and to freedom of assembly, association, familial association, expression, personal liberty, and freedom of movement, all guaranteed by the United States and California Constitutions. They also seek prospective and declaratory relief to clear their records and to prevent a recurrence of the constitutional violations at issue herein.

## II. JURISDICTION AND VENUE

2.      This action seeks damages, declaratory and injunctive relief under 42 U.S.C. § 1983. This Court has jurisdiction over the action under 28 U.S.C. §§ 1331 and 1343. It has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

3.      Venue properly lies within this District under 28 U.S.C. § 1391(b). The named defendants perform their official duties in this District, and the events and omissions giving rise to Plaintiffs' claims occurred in this District.

4.      Plaintiffs JOLINA TAWASHA, through her father and guardian SAMER TAWASHA; ERIBERTO JIMENEZ, through his mother and guardian SOPHIA CHUMLEY; LUCY RIOS, through her mother and guardian GWEN LEE; and CARMEN LOPEZ, through her mother and guardian NAOMI LOPEZ, have each filed administrative claims with the CITY AND COUNTY OF SAN FRANCISCO in compliance with California Government Code § 910 et seq., for themselves and all others similarly situated. All of the claims have been denied.

## III. INTRADISTRICT ASSIGNMENT

5.      Pursuant to Local Rule 3-2, this action is properly assigned to the San Francisco or Oakland Division of this Court.

## IV. PARTIES

**A. PLAINTIFFS**

6.      Plaintiff JOLINA TAWASHA is a 13-year-old child who sues through her father, SAMER TAWASHA. Jolina and Mr. Tawasha are San Francisco, California, residents.

7.      Plaintiff ERIBERTO JIMENEZ is a 17-year-old minor who sues through his mother, SOPHIA CHUMLEY. Eriberto and Ms. Chumley are San Francisco, California, residents.

8.      Plaintiff LUCY RIOS is a 15-year-old child who sues through her mother, GWEN LEE. Lucy and Ms. Lee are San Francisco, California, residents.

9.      Plaintiff CARMEN LOPEZ is a 15-year-old child who sues through her mother, NAOMI LOPEZ. Carmen and Ms. Lopez are San Francisco, California, residents.

**B. DEFENDANTS**

10.     Defendant CITY AND COUNTY OF SAN FRANCISCO ("SAN FRANCISCO") is, and at all times herein mentioned was, a municipal corporation duly organized and existing under the laws of the State of California.

11.     Defendant WILLIAM SCOTT is and was, at all times herein mentioned, the SAN FRANCISCO Police Chief and an authorized policymaker of SAN FRANCISCO. Chief SCOTT caused, set in motion, supervised, directed, approved, acquiesced in, and/or failed to intervene to stop his police officers' constitutional violations against the plaintiffs and class members, by approving or acquiescing in the mass arrest; and approving or acquiescing in the prolonged inhumane outdoor detention; and by failing to provide adequate policies, training, supervision and/or command of the officers assigned to the Dolores Hill Bomb event.

12.     Defendant THOMAS HARVEY is and was, at all times herein mentioned, a SAN FRANCISCO Police Captain who was the event commander for the Dolores Hill Bomb event. HARVEY caused, set in motion, supervised, directed, approved, acquiesced, and/or failed to intervene to stop his subordinate officers' constitutional violations against the plaintiffs and class members, by ordering the mass arrest, and ordering the prolonged inhumane outdoor detention, and by failing to provide adequate supervision and/or command of the officers assigned to the event.

13.     Defendant MATT SULLIVAN is and was, at all times herein mentioned, a SAN FRANCISCO Police Lieutenant who was the tactical unit commander at the event. SULLIVAN caused, set in motion, supervised, directed, approved, acquiesced, and/or failed to intervene to stop his subordinate officers' constitutional violations against the plaintiffs and class members, by ordering the mass arrest, ordering the prolonged inhumane outdoor detention, and by failing

to provide adequate supervision and/or command of the officers assigned to the event.

14.   All of the individual defendants are being sued in their individual and official capacities.

15.   Plaintiffs are ignorant of the true names and/or capacities of the defendants sued herein as DOES 1 through 100, inclusive, and therefore sue said defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. The Doe defendants include other individuals who participated in the conduct complained of herein. Plaintiffs are informed and believe and therefore allege that each of the Doe defendants is legally responsible and liable for the incident, injuries and damages hereinafter set forth, and that each of said defendants proximately caused said incidents, injuries and damages by reason of their negligence, breach of duty, negligent supervision, management or control, violation of constitutional and legal rights, or by reason of other personal, vicarious or imputed negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment, or control or upon any other act or omission. Plaintiffs will ask leave to amend this complaint to insert further charging allegations when such facts are ascertained.

16.   In doing the acts alleged herein, Defendants, and each of them, acted within the course and scope of their employment.

17.   In doing the acts and/or omissions alleged herein, Defendants, and each of them, acted under color of authority and/or under color of law.

18.   In doing the acts and/or omissions alleged herein, Defendants, and each of them, acted as the agent, servant, employee and/or in concert with each of said other defendants.

### V. FACTUAL ALLEGATIONS

19.   San Francisco has a unique youth skateboarding culture and community. Skateboarders see skateboarding as an expression of freedom and a way of reclaiming the urban landscape, resisting attempts to regulate it and to mold it into a mainstream sport. One time-honored hallmark of San Francisco skateboarding is skating down San Francisco's many hills at high speed, known as hillbombing.

20.   Every July, skateboarders take to the Dolores Street hill, from 21st to 18th Streets near Dolores Park in San Francisco's Mission District, in an informal event known as the Dolores Hill Bomb, typically organized by high school students. The annual event is an expression of San Francisco's youth skateboarding culture and values.

21.   At least as of June 17, 2023, three weeks in advance, the SAN FRANCISCO Police Department (SFPD) was aware that the Hill Bomb would occur again on July 8, 2023, and

planned for the event. Despite the fact that this is an annual event that occurs in July, and with three weeks advance notice of the exact date of this year's event, SFPD did not attempt to make contact with the skateboarding community to discuss any safety concerns or make known any planned restrictions on the event.

22.     On July 8, 2023, in the afternoon, the SFPD and the San Francisco Municipal Transportation Agency (SFMTA) set up barricades on Dolores Street at 20th Street and at Cumberland Street, blocking off the steepest part of the hill. However, there were no signs, announcements, or other indication that skateboarding or the Hill Bomb event were prohibited.

23.     When skaters began to arrive between 4 and 6pm, the police allowed and permitted skateboarding to take place. The crowd grew to about 200 people, mostly children and youth.

**The Arrests**

24.     Thirteen-year-old Plaintiff JOLINA TAWASHA went to watch the skateboarding with some friends. It was agreed that the father of one of JOLINA's friends would pick the children up before dark, at 17th and Valencia. But when it was time to meet their ride around 8:30-8:40pm, Jolina and her friends were corralled by SFPD officers dressed in apparent riot gear and holding shields. The police gave the children no orders or instructions.

25.     JOLINA communicated with an SFPD officer that her friend's dad was waiting on the corner to pick them up, but the officer would not allow them through the police line to meet him. She was told, "just listen to what we're going to say; we don't want to hurt you." Jolina was frightened by this implied threat. The police trapped her and her friends on 17th Street between Guerrero and Dolores and did not allow them to leave, even though the parent was waiting for the children one block away.

26.     Seventeen-year-old Plaintiff ERIBERTO JIMENEZ lives in the Mission District and is a skateboarder. He had attended the Hill Bomb previously. On July 8, 2023, ERIBERTO met friends at Dolores Park, skateboarded a bit and then was sitting in the park when he heard SFPD make an announcement for people to leave Dolores Street.  ERIBERTO complied with the directive to leave Dolores Street, first sitting in the park, and then walking up to Church Street. After skateboarding on Church Street briefly, they left. Later that evening, as they were heading home on 17th Street, ERIBERTO and his friends were met by a line of SFPD officers pointing weapons at them and blocking them from proceeding east toward Valencia Street. Despite the teens telling the officers that they were just trying to go home, the SFPD officers did not allow them to leave.

27.     Fifteen-year-old Plaintiff CARMEN LOPEZ lives near Dolores Park. The annual Hill Bomb usually goes past her home. On the afternoon of July 8, Carmen's mother noticed that barricades had been set up at Dolores and 20th, blocking off the steepest top part of the Hill. Ms. Lopez walked over and asked the SAN FRANCISCO police officers and SFMTA workers at the barricade whether the Hill Bomb event was being prohibited, or whether SFPD and SFMTA were just trying to make the skateboarding event safer by blocking the steepest part of the hill. The SAN FRANCISCO officers and workers said they did not know.

28.     Later that evening, CARMEN walked over to watch the skateboarders with some friends. At some point between 7:15 and 7:30pm, Carmen and her friends heard an SFPD announcement to leave Dolores Street. The police did not give specific instructions about how they could leave or where they should go. Carmen and her friends complied with the announcement by going out of the street and into the park. Once in the park, Carmen heard the police announce that Dolores Park was also closed. They left the park, but the way back to Carmen's home just south of the park was blocked by police. Suddenly police seemed to be everywhere, and the children were not sure which way to go. Around 8:15 – 8:30pm, SFPD officers began walking behind them, giving no further announcements or instructions, but moving everyone from 17th and Dolores toward 17th and Guerrero. Then, another line of SFPD officers blocked the way forward, trapping and surrounding them. The police did not allow Carmen and her friends to leave.

29.     Plaintiff LUCY RIOS, age fifteen, ate dinner at her fifteen-year-old friend Deven's home on Potrero Hill before she and Deven and another friend rented scooters at 8:18pm to go across town to a friend's house, taking the bike lane on 17th Street. At 17th and Guerrero, they paused for a few minutes to chat with someone they knew. Suddenly, SAN FRANCISCO police officers came running toward them on Guerrero Street, yelling at them to go the other way on 17th Street, toward Dolores. When Lucy and her friends complied and moved west up 17th as instructed, they saw a large number of young people coming east on 17th toward them. They tried to get off 17th Street and go north on Guerrero, but they were stopped by police. When they tried to explain that they were not involved in whatever was happening, the SFPD officers told them to go back toward Dolores Street. When they complied, they were trapped between police lines.

30.     Lucy and her friends realized they were not going to be allowed to leave despite telling the officers their situation. At 8:45pm, they parked their scooters.

31.     At some point, the police announced over a megaphone, "You are all under arrest, sit

down!" The children were confused. At first, Carmen thought it was a prank of some sort. Lucy and Jolina did not understand that they were actually being arrested until much later, when they were handcuffed. An officer initially told them they would be able to go home in about 40 minutes. Then they said it would be another 30 minutes. After sitting on the street for a while, some of the kids began to stand up, some needing to urinate, many asking the officers what was going on and when they would be allowed to leave. An officer told Carmen that she and others were being arrested because they had not all remained seated.

32.     Approximately 113 people were trapped and arrested in the 3500 block of 17th Street, between Dolores and Guerrero Streets, including the plaintiffs. Approximately 81 minors, and 32 adults were arrested. About half the minors were children under sixteen. The vast majority of the adults were eighteen- and nineteen-year-olds.

33.     There was no probable cause for the arrests of the plaintiffs and the approximately 109 others who were trapped and arrested with them.

34.     The majority of the arrestees were youth of color including 57 Latinx children, youth and adults, and 20 Black children, youth and adults. In comparison, San Francisco's population is only 15.9% Latinx and 5.7% Black.

35.     Defendants' actions of herding and trapping the plaintiffs and class members between police lines and arresting them all without warning or opportunity to disperse, far from the time and location where the police had made announcements for people to leave Dolores Street and Dolores Park, violated SFPD's own General Order 8.03, Crowd Control, which provides that "time to disperse and a safe and clear route for individuals must be provided and announced in the same manner as the order to disperse."

36.     The defendants used police lines and a show of authority to sweep, trap, kettle, detain and arrest all persons present at the location, without notice, warning or opportunity to disperse and in the absence of particularized probable cause.

**The Detention**

37.     Plaintiffs and most of the other children and adults were dressed for a sunny early evening. The arrests took place at sunset, and as the plaintiffs and other arrestees were kept sitting on the pavement, the temperature dropped and the night turned cold and windy. The SAN FRANCISCO Police did not provide Plaintiffs or any of the arrestees with shelter, coats or blankets, and in fact took some of the youths' hats. JOLINA, ERIBERTO, CARMEN, LUCY and their friends were freezing.

38.     Hours went by and Plaintiffs and other arrestees needed to urinate. Children implored the officers to allow them access to bathrooms but their requests were denied. They asked if they could relieve themselves behind a car, but the officers did not answer. At one point, police officers rushed at a youth who, after alerting nearby officers, went behind a car to urinate. Eventually, a sympathetic neighbor tossed a bucket down from her window. Some of the kids were able to urinate in the bucket or on the street. Others were forced to urinate in their pants, causing them shame, humiliation and embarrassment, and compounding their cold and discomfort.

39.     Soon after the children and young adults were detained on the street, parents began arriving and asking to take their children home. The police refused to release the children to their parents, and gave the parents little or no information. They did not allow the parents to talk to their children or give their children water, snacks, or, with limited exceptions, warm clothing. Carmen's family was eventually able to persuade an officer to give Carmen a jacket her sister had brought.

40.     After the children and young adults had been held on the street for at least two hours, the police began searching them, taking their phones, jewelry, belts and other property. The police handcuffed them behind their backs with painful plastic zip ties.

41.     Around 11pm, police transported the arrestees who were over 18 to the county jail.

42.     A Muni bus arrived to transport the minors, and the police placed the approximately 22 girls on the first bus. The girls sat on the bus for some time before being driven the one block to Mission Police Station at 17th and Valencia, arriving there at 11:30pm. The girls were then detained on the bus outside the police station for another 45 minutes. At first some of them were able to talk to their parents through the open bus windows, and Jolina's father talked to her through the open bus door, but then the police closed the windows and door and refused to open them even though girls pleaded for air. Jolina was very thirsty but there was no water. Some of the girls were crying and begging to use the bathroom.

43.     Parents waited on the street for hours. The SAN FRANCISCO police first told them that their children would be taken to the Ingleside Police Station, so that some drove to that location several miles away – but then the police said the children would be taken to Mission Police Station, one block from 17th and Guerrero where they were being detained. The parents continued to wait outside Mission Police Station, some from 9pm until 3 or 4am.

44.     When Carmen's mother told the SFPD officers that they lived a few blocks away and

Carmen was trying to go home, she was told the kids had failed to disperse and that there had been a "riot". When Lucy's parents told the police their children had simply been on their way to a friend's house and asked what the children had done to be arrested, an SFPD officer said ominously, "Every one of them is on video."

45.     Finally, at about 12:15am, approximately four hours after they were first detained, the police took some of the girls in small groups to the bathroom in the police station. An officer watched them use the toilet, causing them additional humiliation and embarrassment. The police then took thumbprints of the children and wrote them citations.

46.     Lucy and other high school students were very worried about how the arrests might affect their future. An officer told them that this would be on their record, and Lucy heard an officer say that they would have to "prove your innocence" in court. A star athlete, Lucy was scared that the arrest could ruin her chances for a college athletic scholarship.

47.     Meanwhile, Eriberto and the other boys were handcuffed and searched, and detained on the street until additional buses arrived.  Lucy's friend Deven and others were cold and asked the officers to zip up their jackets and put up their hoods because their hands were ziptied behind their backs, but they refused. Deven asked to use the bathroom but was refused. Many of the skaters were wearing baggy pants, and after their belts were taken, Eriberto and some of the other boys' pants were falling down and they struggled to hold them up while ziptied.

48.     One boy vomited, but the SFPD officers just told the children to move that boy away from the rest of the group and left them to care for their peer on the street. Eriberto gave the boy his water bottle. The police did not provide any water or food.

49.     The second bus to arrive quickly filled up with boys and Eriberto was not able to get on board. The remaining boys were told another bus was coming, but time went by with no bus.

50.     Around 1 or 1:30 a.m., after 4.5 to five hours on the street, officers finally walked Eriberto and a few others to the police station. The remaining boys were left waiting on the street. The police made them stand against a wall, zip tied, until another bus finally came at approximately 2:30 a.m.

51.     Once Eriberto arrived at the station, the officers put him on one of the buses where some of the other boys were already waiting, and then made him and the other approximately 58 boys all wait in an open air, concrete garage-like area. The police officers gave them no information about what was going on or what was going to happen to them. A sprinkler went off in this holding area and some of the boys got wet, but were not provided dry clothes.

52.     Like others, Eriberto was cold and desperately needed to urinate, but he was not allowed to go to the bathroom until he was already in line to be processed and released. Some other boys were taken to the bathroom between 3 and 3:30 a.m., approximately seven hours after they were first detained.

53.     Eriberto and others had not eaten since they arrived for the Dolores Hill Bomb in the afternoon. Although they were detained for many hours, the police provided no food or water.

54.     Jolina, Eriberto, Carmen and Lucy suffered pain, discomfort and injury as a result of having their hands tied behind their backs for an extended period of time and from overly tight plastic handcuffs. The SFPD officers refused to loosen or remove the handcuffs until the children had been processed and were about to be released, late that night or in the early morning. The plastic handcuffs left visible marks on some of the children, including Carmen, Lucy and Jolina.

55.     SFPD never notified Lucy's or Eriberto's parents that their minor children had been arrested. The police only notified Carmen and Jolina's parents of their arrests late that night, when they were about ready to release the girls.

56.     Lucy was one of the first to be released, about 12 or 12:30 a.m. Deven was not released until after 3 a.m. Jolina's father was finally able to take Jolina home around 1am. When Carmen was released to her parents at 1:15 a.m., she was in tears. Eriberto's family was finally able to pick him up around 2 a.m., after they got word from Eriberto that he was being released.

57.     In violation of their own written policy, the SFPD did not check the parents' identification or check that the adults picking up children were authorized to do so. At least one child ended up walking home alone from Mission Station in the wee hours of the morning.

58.     The last child was released from Mission Station at 4:15 a.m. Some children were given bottles of water as they finally walked out the door. No water had been provided before that.

59.     The adult arrestees were held in custody overnight, until the morning of July 9, 2023.

60.     The conditions of the plaintiffs' and other minors' detention were unreasonable and abusive, and violated SFPD's own Policies and Procedures for Juveniles Detention, Arrest, And Custody, General Order 7.01, which provides that the police should avoid bringing juveniles to district stations, and requires that children be provided access to toilets and washing facilities, water and snacks, and that police immediately notify parents or guardians and the Public Defender when juveniles have been taken into custody.

61.     Jolina, Eriberto, Carmen and Lucy and all of the other children who were arrested in the 3500 block of 17th Street were released with citations for violation of California Penal Code

sections 404.6(a), inciting a riot; 182(a)(1), conspiracy; and 409 (failure to disperse). The adults were given similar citations. "F" for felony was written on some of the juvenile and adult citations with regard to the inciting and conspiracy offenses; although it may have been crossed out, this was unclear and caused much alarm and anxiety for the children, their parents, and for the adult arrestees.

**The Aftermath**

62.     No juvenile petitions or adult charges were ever filed related to these alleged offenses or the mass arrest, but Juvenile Probation told the plaintiffs' parents that the charges were still under investigation, leaving the children and their parents worried and uncertain about whether they would be prosecuted, what would happen to them, and how this arrest might affect their futures. Parents had to keep calling to find out if their children were being prosecuted and whether they needed to appear for proceedings.

63.     The plaintiffs and other juvenile and adult arrestees were traumatized by the wrongful arrests and detention. When Jolina finally got home, she was exhausted, yet she couldn't sleep. She was nervous and afraid about what would happen and whether she would have to go to court, even though she had done nothing wrong. It was hard for Jolina to even talk about the experience. To this day, Jolina is very hesitant to attend large gatherings.

64.     Carmen had trouble sleeping for days afterward, and she, too, had difficulty talking about the arrest. She still has bad dreams about it. She feels scared around police, and would be hesitant to ask for help from a police officer because of her awful experience.

65.     Since the arrest, Eriberto is anxious and fearful if he encounters police officers on the street, knowing that he could be arrested for no reason.

66.     As a result of their mistreatment by SFPD, each of the plaintiffs feels unsafe if police are present at a youth gathering.

67.     Each of the plaintiffs continues to desire to peacefully and lawfully assemble and associate with other youth, and/or to skateboard and to express San Francisco skateboarding and youth culture. The defendants' wrongful arrests and detention, however, causes them to fear that if they participate in such associational and expressive activities, the defendants will arrest them again without probable cause and subject them to abusive conditions of confinement.

68.     Defendants' acts were willful, wanton, malicious, and oppressive, and done with conscious disregard and deliberate indifference for Plaintiffs' rights and safety, justifying an award of punitive damages.

69.     As a direct and proximate cause of the conduct described herein, the named individual plaintiffs and the class members have been denied their constitutional, statutory, and legal rights as stated herein, and have suffered general and special damages, including but not limited to, mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, inconvenience and anxiety and other damages in an amount according to proof.

## VI. *MONELL* AND SUPERVISORY LIABILITY ALLEGATIONS

70.     The constitutional violations alleged herein were the proximate result of decisions, orders, acts, and omissions of SAN FRANCISCO's authorized policymakers including but not limited to Defendant Chief SCOTT.

71.     SCOTT delegated authority to Defendants HARVEY and SULLIVAN to command the SFPD response to the Hill Bomb event, monitored the response as it was occurring, and on information and belief, approved HARVEY and SULLIVAN's decision to arrest and detain the plaintiffs and class members en masse, thus causing the constitutional violations complained of herein.

72.     SCOTT additionally ratified the SAN FRANCISCO Police Officers' constitutional violations, by publicly thanking the involved officers, and publicly disseminating a false narrative purporting to justify the arrests by claiming that the plaintiffs and class members were arrested because they vandalized an SFMTA Light Rail Vehicle and/or engaged in other property destruction, "put members of the public and our officers at risk of serious injury or worse", and "brazenly engaged in reckless and dangerous behavior and violated the law" -- despite the complete lack of probable cause to believe that any of the plaintiffs and class members had done any of these acts; and minimizing the abusive conditions of their detention.

73.     SCOTT also caused the SAN FRANCISCO Police Officers' constitutional violations complained of herein by failing to provide adequate policies, training, supervision, and command of the officers assigned to the July 8, 2023, event, to stop the officers from engaging in arrest without probable cause, racial profiling, racial discrimination, and deprivation of First Amendment rights.

74.     Plaintiffs further allege that the constitutional violations alleged herein were the proximate result of a repeated course of conduct by members of the SFPD tantamount to a custom, policy, pattern or repeated practice of condoning, ratifying and/or tacitly encouraging the abuse of police authority, and disregard for the constitutional rights of citizens, including the

rights of the plaintiffs and class members.

75.     The constitutional violations alleged herein were the proximate result of a custom, policy, pattern or practice of deliberate indifference by Defendant SAN FRANCISCO to the repeated violations of the constitutional rights of citizens by Defendant SAN FRANCISCO's Police Officers, which have included, but are not limited to, the repeated failure to properly and/or adequately train, supervise and/or discipline officers with respect to crowd control and the requirement of probable cause for arrest; the repeated failure to properly and/or adequately train, supervise and/or discipline officers with respect to racial bias and profiling; and the repeated failure by SAN FRANCISCO's high ranking officials, police department managers and/or supervisors to hold officers accountable for violating the rights of citizens; and/or other customs, policies and/or practices subject to continuing discovery.

76.     In 2016, following multiple SFPD shootings of Black, Indigenous and People of Color (BIPOC) and the exposure of racist text messages involving multiple SFPD officers, the U.S. Department of Justice (DOJ) entered into a Memorandum of Agreement with SAN FRANCISCO to assess, monitor, and assist the SFPD in implementing reforms. In 2020, SFPD additionally adopted a Racial Equity Action Plan. But SFPD has not completed the reforms recommended by the DOJ with regard to elimination of bias. Significant racial disparities have persisted in that SFPD stops, arrests, and uses force on BIPOC much more often than on white people in comparison to their relative populations. Chief SCOTT and SAN FRANCISCO have failed to implement proper policies, training and oversight to reduce or eliminate racial bias and constitutional violations. This deliberately indifferent failure to provide adequate policies, training and oversight resulted in the unconstitutional racially discriminatory arrests and mistreatment of the plaintiffs.

77.     Chief SCOTT and SFPD's policies and training with respect to crowd control, First Amendment rights, and the requirement of probable cause for arrest in crowd contexts are outdated and inadequate. This deliberately indifferent failure to provide adequate policies and training resulted in the unconstitutional arrests and mistreatment of the plaintiffs.

78.     Defendants SCOTT, HARVEY AND SULLIVAN, and DOES 1-50 police supervisors, caused the violations of the plaintiffs' and class members' constitutional rights by HARVEY, SULLIVAN, and DOES 1-50, with approval by SCOTT, ordering their subordinates to undertake dragnet arrests and to arrest the plaintiffs and class members without probable cause, and without giving the plaintiffs and class members adequate notice or opportunity to disperse.

79.     Defendants HARVEY, SULLIVAN, and DOES 1-50 police supervisors, with approval by SCOTT, ordered their subordinates to detain the plaintiffs and class members outdoors for hours for the sole purpose of eventually forcing them to give thumbprints and other identifying information, in order to try to justify their unlawful dragnet arrests and attempt to match the arrestees up with unknown other individuals who had damaged property earlier that evening at a different location. Thus, SCOTT, HARVEY AND SULLIVAN, and DOES 1-50 caused the plaintiffs' and class members' constitutional rights to be violated by abusive and unreasonable detention conditions.

80.     Defendants SCOTT, HARVEY AND SULLIVAN, and DOES 1-50 police supervisors, caused the violations of the plaintiffs' and class members' constitutional rights as a result of their supervisory malfeasance and/or deliberate indifference to the need for more or different training, supervision and/or discipline of the SAN FRANCISCO Police personnel assigned to the subject incident, to prevent the foreseeable violation of Plaintiffs' constitutional rights, as further discussed above.

## VII. CLASS ACTION ALLEGATIONS

81.     Plaintiffs JOLINA TAWASHA, through her father and guardian SAMER TAWASHA; ERIBERTO JIMENEZ, through his mother and guardian SOPHIA CHUMLEY; LUCY RIOS, through her mother and guardian GWEN LEE; and CARMEN LOPEZ, through her mother and guardian NAOMI LOPEZ, seek class certification pursuant to Fed.R.Civ.P. 23(a), Fed.R.Civ.P. 23(b)(2), and Fed.R.Civ.P. 23(b)(3) to pursue claims for damages, injunctive, and declaratory relief on behalf of themselves and all persons similarly situated.

### A. Class Definition

82.     The class is defined as all persons who were arrested in the 3500 block of 17th Street, San Francisco, on July 8, 2023, in the mass arrest that occurred at approximately 8:40pm.

### B. Rule 23 Prerequisites

#### i.  Numerosity

83.     This case satisfies the prerequisites of a Rule 23 class action. The class is so numerous that joinder of all members is impracticable. The class consists of approximately 113 people. Defendants have records showing the identities and contact information of all of the class members.

#### ii.      Questions of Law or Fact Prevail

84.     There are questions of law and fact common to the class, in that the named plaintiffs

claim that Defendants' unlawful mass arrest described herein was based on SAN FRANCISCO Police policies and orders that were unlawful and violated their First, Fourth and Fourteenth Amendment rights.

85. The questions of law and/or fact which predominate over any question affecting only individual members include, but are not limited to:

- Whether through the use of police lines and tactics applied to the class generally, the defendants arrested the class representatives and putative class members without probable cause;

- Whether the officers who took part in the arrests in question were properly trained in the requirement of individualized probable cause for arrests at a crowd event;

- Whether, where and when Defendants made dispersal announcements and whether Defendants provided directions, means, and opportunity to disperse before trapping and arresting the class and/or trapping people who were dispersing or obeying police orders;

- Whether Defendants engaged in racial discrimination;

- Whether these actions violated the class members' First, Fourth, and Fourteenth amendment rights and their California analogs;

- Did some or all of the conduct described above constitute a policy or custom of Defendant SAN FRANCISCO;

- Whether any individual defendants are entitled to qualified immunity on the federal claims;

- Whether any of the conduct alleged herein violated Cal. Civil Code, §§ 52.1 and/or 51.7;

- Whether general class wide damages are available; and

- Whether statutory damages under § 52.1 are available.

86. By ordering officers to arrest the class en masse in the absence of probable cause, using police lines and show of authority to trap, kettle and detain persons in a dragnet sweep; failing to provide notice and opportunity to disperse, failing to adequate adequately train the officers in the requirement of individualized probable cause, failing to adequately discipline and train officers accused of racist misconduct, and failing to adopt adequate policies and training to eliminate racial discrimination, Defendants have acted on grounds generally applicable to the class, so that injunctive and declaratory relief is appropriate respecting the class as a whole.

87.     The questions of law and fact common to the class, which are outlined above, predominate over any questions affecting only individual members.

### iii.      Typicality

88.     The claims of the named plaintiffs are typical of the claims of the class in that the named plaintiffs and class members claim that their First, Fourth and Fourteenth Amendment rights have been violated by the same misconduct, that Defendants' unlawful mass arrest without probable cause and that their First Amendment rights have been chilled by said misconduct. Plaintiffs seek redress for the past violations of their rights, protection to bar the repeat of those violations in the future, and to prevent the record of this arrest from affecting their future employment, education or other prospects.

89.     Thus, the named plaintiffs have the same interests and have suffered the same type of damages as the class members. The named plaintiffs' claims are based upon the same or similar legal theories as the claims of the class members. Each class member suffered actual damages as a result of being subjected to the violations enumerated above. The actual injuries suffered by the named plaintiffs are very similar to the actual damages suffered by each class member.

90.     The class representatives will fairly and adequately protect the interests of the class because they were subject to the unlawful law enforcement conduct complained of herein, and have no interests antagonistic to the class.

### iv.      Adequate Representation

91.     The class representatives will fairly and adequately represent the common class interest. The class representatives have a strong interest in achieving the relief requested in this Complaint, they have no conflicts with members of the plaintiff class, and they will fairly and adequately protect the interests of the class.

92.     The class representatives are represented by counsel who are well-experienced in federal civil rights class action litigation and are familiar with the issues in this case.

93.     Counsel for the class representatives know of no conflicts among or between members of the class, the named plaintiffs, or the attorneys in this action.

### v. Maintenance and Superiority

94.     In accordance with Fed.R.Civ.P. Rule 23(b)(1)(A), the prosecution of separate actions by individual members of the class would create a risk of inconsistent or incompatible standards of conduct for the defendants, thereby making a class action the superior method of adjudicating the controversy.

95.     In accordance with Fed.R.Civ.P. Rule 23(b)(1)(B), prosecutions of separate actions by individual members of the class would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

96.     In accordance with Fed.R.Civ.P. Rule 23(b)(2), Defendants have acted on grounds generally applicable to the class.

97.     In accordance with Fed.R.Civ.P. Rule 23(b)(3), the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Plaintiffs are informed and believe, and thereon allege, that the interests of class members in individually controlling the prosecution of a separate action is low in that most class members would be unable to individually prosecute any action at all. Plaintiffs are informed and believe, and thereon allege, that the amounts at stake for individuals are such that separate suits would be impracticable in that most members of the class will not be able to find counsel to represent them. Plaintiffs are informed and believe, and thereon allege, that it is desirable to concentrate all litigation in one forum because all of the claims arise in the same location, i.e., the 3500 block of 17th Street in San Francisco. It will promote judicial efficiency to resolve the common questions of law and fact in one forum rather than in multiple courts.

98.     Plaintiffs know the identities of a sizeable portion, but not all of the class members. The identities of all of the class members are easily ascertainable from SFPD records.

99.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. All of the class members were trapped and arrested pursuant to single determination by the defendants, and thus liability can easily be determined on a class-wide basis.

100.    General damages are fairly uniform or can be determined through the use of subclasses, such as juvenile and adult arrestees.

101.    In accordance with Fed.R.Civ.P. Rule 23(b)(3), class members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Plaintiffs contemplate that individual notice be given to class members at last known address by first class mail, email, phone, and if necessary social media outreach. Plaintiffs contemplate that the notice inform class members of the

following regarding their damages claims:

    a.    The pendency of the class action, and the issues common to the class;

    b.    The nature of the action;

    c.    Their right to 'opt out' of the action within a given time, in which event they will not be bound by a decision rendered in the class action;

    d.    Their right, if they do not 'opt out,' to be represented by their own counsel and enter an appearance in the case; otherwise, they will be represented by the named plaintiffs and their counsel; and

    e.    Their right, if they do not 'opt out,' to share in any recovery in favor of the class, and conversely to be bound by any judgment on the common issues, adverse to the class.

## VIII. CLAIMS FOR RELIEF

### COUNT ONE - 42 U.S.C. § 1983
### VIOLATION OF FOURTH AMENDMENT RIGHTS

102.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

103.    The acts and/or omissions of the defendants, and each of them, individually and/or while acting in concert with one another, violated Plaintiffs' and class members' rights to be free from unreasonable seizures, arrest, detention and imprisonment without probable cause, and from unreasonable conditions of confinement, under the Fourth Amendment to the United States Constitution.

104.    As a result of Defendants' wrongful conduct, the plaintiffs and class members suffered damages as alleged above.

105.    Wherefore, Plaintiffs pray for relief as hereinafter set forth.

### COUNT TWO – 42 U.S.C. § 1983
### VIOLATION OF FIRST AMENDMENT RIGHTS

106.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

107.    The acts and/or omissions of the defendants, and each of them, individually and/or while acting in concert with one another, was an unconstitutional interference with Plaintiffs' lawful First Amendment protected activities, and chilled the plaintiffs' and class members' rights to

freedom of speech, expression, assembly, and association, under the First Amendment to the United States Constitution. Plaintiffs' association or presumed association with youth skateboard culture was a substantial and motivating factor for the defendants to arrest the plaintiffs without probable cause, and to detain them for many hours in order to gather evidence to try to justify the wrongful mass arrest.

108.    As a result of Defendants' wrongful conduct, the plaintiffs and class members-suffered damages as alleged above.

109.    Wherefore, Plaintiffs pray for relief as hereinafter set forth.

## COUNT THREE- 42 U.S.C. § 1983
## VIOLATION OF FOURTEENTH AMENDMENT RIGHTS

110.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

111.    The defendants, and each of them, subjected the plaintiffs, who are people of color, and the majority of the class members who are people of color, to unlawful arrest and detention with discriminatory motive and intent and racial animus toward each plaintiff and toward the plaintiffs and class members as a group because of race, and therefore violated Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment.

112.    The acts and/or omissions of the defendants, and each of them, also violated the plaintiffs' and class members' Fourteenth Amendment rights to personal liberty and freedom of movement.

113.    As a result of Defendants' wrongful conduct, the plaintiffs and class members-suffered damages as alleged above.

114.    Wherefore, Plaintiffs pray for relief as hereinafter set forth.

## COUNT FOUR –Cal. Civ. Code, § 52.1
## VIOLATION OF THE CALIFORNIA BANE ACT

115.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

116.    The acts and/or omissions of the defendants, and each of them, individually and/or while acting in concert with one another, constituted interference, and attempted interference, by threats, intimidation and coercion, with Plaintiffs' peaceable exercise and enjoyment of rights secured by the Constitution and laws of the United States and the State of California, in violation of California Civil Code § 52.1.

117.    As a result of Defendants' wrongful conduct, the plaintiffs and class members suffered damages as alleged above.

118.    Wherefore, Plaintiffs pray for relief as hereinafter set forth.

### COUNT FIVE – Cal. Civ. Code, § 51.7
### VIOLATION OF THE CALIFORNIA RALPH ACT

119.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

120.    Plaintiffs are informed and believe bias against Plaintiffs' perceived race was a motivating reason for the defendants' above-described misconduct toward them.

121.    Defendants' above-described conduct violated Plaintiffs' rights to be free from violence and intimidation by threat of violence because of their actual or perceived race, color, ancestry, and/or national origin, in violation of California Civil Code § 51.7.

122.    As a result of Defendants' wrongful conduct, the plaintiffs and class members suffered damages as alleged above.

123.    Wherefore, Plaintiffs pray for relief as hereinafter set forth.

### COUNT SIX – FALSE ARREST AND FALSE IMPRISONMENT

124.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

125.    Defendants arrested the plaintiffs without probable cause to believe they had committed any crime.

126.    Defendants detained the plaintiffs under abusive and unreasonable conditions as described above.

127.    As a result of Defendants' wrongful conduct, all of the individual plaintiffs and class members suffered damages as alleged above.

128.    Wherefore, Plaintiffs pray for relief as hereinafter set forth.

### COUNT SEVEN – NEGLIGENCE

129.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

130.    Defendants, and/or each of them, individually and/or while acting in concert with one another, owed Plaintiffs the duty to use reasonable care to avoid causing foreseeable injury and

damage to Plaintiffs during the events described in this Complaint. The above-described acts and omissions of Defendants breached the duty of care Defendants owed to Plaintiffs.

131.    In doing the acts and/or omissions as alleged herein, Defendants and/or each of them, breached said duty to use reasonable care and said breach of duty caused, and/or contributed to the cause, of Plaintiffs' injuries and damages as alleged in this Complaint.

132.    Wherefore, Plaintiffs pray for relief as hereinafter set forth.

**COUNT EIGHT – INJUNCTIVE RELIEF**
**(First, Fourth And Fourteenth Amendments, 42 U.S.C. § 1983; California Constitution**
**Articles 1 §§ 2, 3, 7, 13; Cal. Penal Code**
**§ 835.5; Civil Code § 52.1; and Civil Code § 815.6)**

133.    Plaintiffs reallege and incorporate herein by reference the preceding paragraphs of this Complaint.

134.    The defendants engaged in violations of law, as outlined above, arresting the plaintiffs and class members without probable cause and without providing adequate notice, means and opportunity to disperse; detaining the plaintiffs and class members under abusive and unreasonable conditions; and targeting children and youth of color for these civil rights violations.

135.    Defendants' conduct described herein has created fear, anxiety and uncertainty among plaintiffs with respect to their exercise now and in the future of their constitutional rights to freedom of expression, association, and assembly.

136.    Plaintiffs fear that without intervention by this Court, the record of this wrongful arrest will negatively affect the plaintiffs' futures, including but not limited to their job, career, and college prospects.

137.    Plaintiffs have no plain, adequate or complete remedy at law to address the wrongs described herein, and to promptly eliminate the arrest records and show their factual innocence, and, without action by this court, will suffer irreparable injury, thereby entitling them to injunctive and declaratory relief.

138.    The defendants have acted and refused to act on grounds generally applicable to the class. Injunctive and declaratory relief for the class as a whole is appropriate.

139.    Plaintiffs therefore seek injunctive relief in the form of an order exonerating each of them and finding them factually innocent of all charges for which they were arrested; requiring that Defendants seal and destroy any and all records derived from Plaintiffs' arrests, including fingerprints, photographs, and other identification and descriptive information, and any and all

information, and biological samples and information obtained from such biological samples collected from the plaintiff class; and identify to the plaintiff class all entities and agencies to which such information has been disseminated; and requiring that all such disseminated records be collected and destroyed.

## COUNT NINE – DECLARATORY RELIEF

140.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

141.    An actual controversy exists between Plaintiffs and Defendants in that Plaintiffs contend that the policies, practices and conduct of Defendants alleged herein are unlawful and unconstitutional, whereas Defendants contend that said policies, practices and conduct are lawful and constitutional. Plaintiffs therefore seek a declaration of rights with respect to this controversy pursuant to 28 U.S.C. §§ 2201-2202.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.  For an order certifying the class defined herein pursuant to Fed.R.Civ.P. 23(b)(2) and (b)(3);

2.  For past, present, and future general damages for the named plaintiffs and class members, including but not limited to, pain, suffering, anxiety, and/or emotional distress, deprivation of liberty, and loss of constitutional rights, to be determined according to proof;

3.  For punitive damages against the individual defendants and/or each of them, for the named plaintiffs and class-members, to be determined according to proof;

4.  For statutory damages and exemplary damages pursuant to Cal. Civil Code §§ 52 and 52.1, to be determined according to proof, and for a $25,000 civil penalty per violation pursuant to Cal. Civil Code § 52, for the named plaintiffs and class members;

5.  For pre- and post-judgment interest as permitted by law;

6.  For an order exonerating the named plaintiffs and class members and finding them factually innocent of all charges for which they were arrested; requiring that Defendants seal and destroy any and all records derived from plaintiffs' arrests, including fingerprints, photographs, and other identification and descriptive information, and any and all information, and biological samples and information obtained from such biological samples collected from the plaintiff class; and identify to the plaintiff class all entities and agencies to which such information has been disseminated; and requiring that all such disseminated

records be collected and destroyed.

7. For a declaratory judgment that Defendants' conduct complained of herein violated Plaintiffs' rights under the Constitution and laws of the United States and California;

8. For attorneys' fees pursuant to 42 U.S.C. § 1988 and Cal. Civil Code §§ 52 and 52.1, and/or other authorities, to be determined according to proof;

9. For costs of suit;

10. For such other and further relief as the Court may deem just and proper.

## X. CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

## XI. JURY TRIAL DEMAND

Plaintiffs demand a jury trial.

Dated:   Dec. 19, 2023          Respectfully submitted,

/S/
By: Rachel Lederman
PARTNERSHIP FOR CIVIL JUSTICE FUND
Attorneys for Plaintiffs