UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.T., et al., | Case No.  23-cv-06524-LJC |
| Plaintiffs, | |
| v. | **ORDER REGARDING MOTION TO DISMISS** |
| CITY AND COUNTY OF SAN FRANCISCO, et al., | Re: Dkt. No. 42 |
| Defendants. | |

## I.      INTRODUCTION

This putative class action concerns a mass arrest in the wake of the 2023 "Dolores Hill Bomb," an unsanctioned skateboarding event that has taken place annually in recent years on one of San Francisco's steep city streets.  Plaintiffs J.T., L.R., and C.L. are three minors who were among approximately 113 people arrested the night of July 8, 2023, all of whom they seek to represent as a class.  Through their parents, who were previously appointed guardians ad litem, Plaintiffs assert claims under 42 U.S.C. § 1983 for violation of their rights under the First, Fourth, and Fourteenth Amendments, as well as related state law claims, against Defendants the City and County of San Francisco (the City) and three of its police officials, Chief William Scott, Captain Thomas Harvey, and Lieutenant Matt Sullivan.

Defendants now move to dismiss Plaintiffs' Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Notwithstanding Defendants' efforts to introduce new facts, the Court's review on a motion under Rule 12(b)(6) is generally limited to whether a plaintiff has offered sufficient allegations in their complaint to support a claim.  This Order proceeds accordingly.

The Court held a hearing on April 30, 2024.  Having considered all of the papers submitted

United States District Court
Northern District of California

1    by the parties and the oral arguments presented, for the reasons discussed below, Defendants'

2    Motion is GRANTED as to Plaintiffs' claims for violation of the First Amendment, the Fourteenth

3    Amendment, and California's Ralph Act, as well as aspects of Plaintiffs' *Monell* theory of liability

4    against the City on their Fourth Amendment claim.  The Motion is otherwise DENIED.  If

5    Plaintiffs intend to pursue any of the claims dismissed by this Order, they may file a second

6    amended complaint no later than July 5, 2024, or they may bring a motion for leave to amend at a

7    later date if subsequent discovery reveals grounds for such a claim.[1]

8    **II.     ALLEGATIONS OF THE AMENDED COMPLAINT**

9        Because a plaintiff's allegations are generally taken as true in resolving a motion to

10    dismiss under Rule 12(b)(6), this section summarizes Plaintiffs' allegations as if true.  Nothing in

11    this Order should be construed as resolving any question of fact that might be disputed at a later

12    stage of the case.

13        **A.     The Dolores Hill Bomb**

14        The Dolores Hill Bomb is an informal event held each July, typically organized by high

15    school students.  ECF No. 24 (Corrected Am. Compl.) ¶ 19.  According to Plaintiffs, it is "an

16    expression of San Francisco's youth skateboarding culture and values," which consider

17    skateboarding to be an "expression of freedom," as demonstrated in part through a tradition of

18    "skating down San Francisco's many hills at high speed, known as hillbombing."  *Id.* ¶¶ 18–19.

19        The San Francisco Police Department (SFPD) learned no later than June 17, 2023 that the

20    Hill Bomb would occur that year on July 8, 2023.  *Id.* ¶ 20.  SFPD did not reach out to

21    skateboarders to discuss safety concerns or any restrictions.  *Id.* ¶ 20.  Instead, on the day of the

22    event, SFPD and the San Francisco Municipal Transportation Agency (SFMTA) set barricades to

23    block off the steepest part of the hill.  *Id.* ¶ 21.  The City did not place signs or otherwise announce

24    that the event was prohibited, and SFPD allowed skateboarding to occur when a crowd started to

25    arrive in the late afternoon, which eventually grew to around 200 people.  *Id.* ¶¶ 21–22.

26

27

28    _____
     [1] All parties have consented the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

1

**B.      The Individual Plaintiffs' Experiences**

Plaintiff J.T., who was thirteen years old, went to watch the skateboarding with her friends, planning to meet a friend's father for a ride home before dark. *Id.* ¶ 23.  When it was time for them to go home around 8:30 PM, J.T. and her friends were surrounded by SFPD officers in riot gear, who gave them no instructions but did not let them leave. *Id.* ¶ 23.  When J.T. told an officer that her friend's father was waiting for them a block away, the officer did not let her pass through the police line, and instead told her to "listen to what we're going to say; we don't want to hurt you." *Id.* ¶ 24.

Plaintiff C.L., who was fifteen, lives near Dolores Park where the Hill Bomb is held. *Id.* ¶ 25.  Her mother, noticing the barricades that the City had set up, asked police officers and SFMTA workers whether the event was prohibited or if the barricades were only intended to make it safer, and they told her they did not know. *Id.* ¶ 25.

In the early evening, C.L. walked with friends to watch the skateboarders on Dolores Street. *Id.* ¶ 26.  Sometime between 7:15 and 7:30, police announced that attendees must leave Dolores Street, but did not provide further instructions as to how they should do so. *Id.* ¶ 26.  C.L. and her friends complied with that instruction by entering Dolores Park, but the police then announced that the park was closed. *Id.* ¶ 26.  They left the park and found the way back to C.L.'s house blocked by police officers, who suddenly "seemed to be everywhere," leaving C.L. and her friends unsure where to go. *Id.* ¶ 26.  SFPD officers began walking behind them without giving any instructions, moving the crowd along 17th Street from Dolores Street towards Guerrero Street, until another line of officers blocked the way forward and prevented the group from leaving. *Id.* ¶ 26.

Plaintiff L.R., who was also fifteen, had dinner at a friend's house in the Potrero Hill neighborhood before she and her friends rented scooters at 8:18 PM to travel across town to another friend's house. *Id.* ¶ 27.  They stopped at the intersection of 17th Street and Guerrero Street to talk to someone they knew. *Id.* ¶ 27.  SFPD officers ran towards them, yelling at them to go towards Dolores Street. *Id.* ¶ 27.  L.R. and her friends complied with that instruction and saw a group of young people approaching from the other direction. *Id.* ¶ 27.  They tried to leave the area

United States District Court
Northern District of California

United States District Court
Northern District of California

on Guerrero Street, but police officers stopped them and directed them back towards Dolores Street, despite their explanation "that they were not involved in whatever was happening". *Id.* ¶ 27. When L.R. and her friends followed that instruction, they were trapped by police with the group that had been corralled from the direction of Dolores Street. *Id.* ¶ 27. At 8:45, L.R. and her friends determined that they would not be allowed to leave, and parked their rented scooters. *Id.* ¶ 28.

### C.      The Arrest and Detention

At some point after SFPD officers surrounded the group, they announced, "You are all under arrest, sit down!" *Id.* ¶ 29. Around 113 people were arrested, including around 81 minors and 32 adults. *Id.* ¶ 30. Most of the adults were either eighteen or nineteen years old. *Id.* ¶ 30. Most of the arrestees were people of color, who were disproportionately represented as compared to the demographics of San Francisco as a whole. *Id.* ¶ 32.

Officers initially told Plaintiffs they would be able to go home in forty minutes, and later said it would be another thirty minutes. *Id.* ¶ 29. After at least two hours, SFPD officers began searching the arrestees, confiscating their property (including phones, jewelry, and belts), and "handcuff[ing] them behind their backs with painful plastic zip ties." *Id.* ¶ 38. Arrestees who needed to relieve themselves were not consistently allowed to do so; some urinated in a bucket tossed from a sympathetic neighbor's window, while others urinated in their pants. *Id.* ¶ 36. The arrestees were dressed for a summer day, and were provided no shelter or warm clothes when the night became cold and windy. *Id.* ¶ 35. Parents who arrived to take their children home were not allowed to do so and were given little information. *Id.* ¶ 37. Parents were generally not allowed to give their children water, snacks, or warm clothing, although an officer allowed C.L.'s family to give her a jacket. *Id.* ¶ 37.

Around 11:00 PM, SFPD transported the adult arrestees to the county jail, and brought an SFMTA bus to transport minor girls to the Mission Police Station, a block away from where they were being detained. *Id.* ¶¶ 39–41. Parents received conflicting information about where their children were being taken. *Id.* ¶ 41. The girls were held on the bus without water or an opportunity to use the bathroom until around 12:15 AM, around four hours after the arrest began,

when SFPD officers escorted small groups of girls to the bathroom, where an officer watched them use the toilet. *Id.* ¶ 43.

L.R. was among the first girls released, between 12:00 and 12:30 AM. *Id.* ¶ 54. J.T. was released around 1:00 AM, and C.L. was released at 1:15 AM. *Id.* ¶ 54.

Some of the minor boys who were arrested were put on a second bus after the bus that took the girls to the police station. *Id.* ¶ 47. SFPD officers walked other boys to the police station around 1:00 or 1:30 AM. *Id.* ¶ 48. Still others, including a friend of L.R., were kept standing against a wall, handcuffed, until a third bus arrived around 2:30 AM. *Id.* ¶ 48. The boys were then taken to a "an open air, concrete garage-like area," where a sprinkler went off and wet some of the boys' clothes. *Id.* ¶ 49. Police first allowed some of the boys to use the bathroom between 3:00 and 3:30 AM. *Id.* ¶ 50.

The last minor was released from custody around 4:15 AM. *Id.* ¶ 56. SFPD provided no food or water to the minors during their detention, except for bottles of water for some of them when they were released. *Id.* ¶¶ 51, 56. SFPD did not check parents' identification when they released the minors to them or otherwise confirm that the adults picking up the minors were authorized to do so. *Id.* ¶ 55. At least one minor was released to walk home alone. *Id.* ¶ 55. Adult arrestees were held overnight until the next morning. *Id.* ¶ 57.

The arrestees were released with citations for crimes including inciting a riot, conspiracy, and failure to disperse. *Id.* ¶ 59. No charges were filed, but the Juvenile Probation department told parents that charges were still under investigation. *Id.* ¶ 60.

### D.    Allegations Regarding Individual and Supervisory Liability

Defendant William Scott is the San Francisco Police Chief (Chief Scott). *Id.* ¶ 10. Defendant Thomas Harvey is San Francisco Police Captain who served as "the event commander for the Dolores Hill Bomb event." *Id.* ¶ 11. Defendant Matt Sullivan is a San Francisco Police Lieutenant who served as "the tactical unit commander for the event." *Id.* ¶ 12. Plaintiffs allege that Harvey and Sullivan ordered the mass arrest and the subsequent conditions of detention. *Id.* ¶¶ 11–12.

According to Plaintiffs, Defendant Scott delegated authority to Defendants Harvey and

Sullivan to manage SFPD's response to the Dolores Hill Bomb, monitored that response, and approved of the mass arrest. *Id.* ¶ 68. Scott also purportedly ratified SFPD's conduct at the event "by publicly thanking the officers involved, and by publicly disseminating a false narrative purporting to justify the arrest," including that the arrestees vandalized an SFMTA vehicle, placed officers and members of the public at risk, and "brazenly engaged in reckless and dangerous behavior and violated the law". *Id.* ¶ 69. Plaintiffs further allege that Scott and the SFPD's training, policies, and practices are inadequate with respect to crowd control, racial profiling, the First Amendment, and probable cause for arrest. *Id.* ¶¶ 70–74. Plaintiffs assert that the mass arrest was intended as a "dragnet" to obtain fingerprints from the crowd in the hope of identifying "unknown other individuals who had damaged property earlier that evening at a different location." *Id.* ¶¶ 75–76.

### E.    Claims Asserted

Plaintiffs assert nine claims: (1) a claim under 42 U.S.C. § 1983 for arrest without probable cause and unreasonable conditions of confinement in violation of the Fourth Amendment, *id.* ¶¶ 99–102; (2) a claim under § 1983 for violation of Plaintiffs' rights to freedom of speech, expression, assembly, and association under the First Amendment, *id.* ¶¶ 103–06; (3) a claim under § 1983 for discriminatory arrest based on race in violation of the Fourteenth Amendment's Equal Protection Clause, *id.* ¶¶ 107–11; (4) violation of California's Bane Act, codified as section 52.1 of the Civil Code, *id.* ¶¶ 112–115; (5) violation of California's Ralph Act, codified as section 51.7 of the Civil Code, *id.* ¶¶ 116–20; (6) false arrest and imprisonment, *id.* ¶¶ 121–25; (7) negligence, *id.* ¶¶ 126–29; (8) a claim for injunctive relief based on the violations alleged above, *id.* ¶¶ 130–36; and (9) a claim for declaratory relief that Defendants' practices are unconstitutional, *id.* ¶¶ 137–38.

## III.    LEGAL STANDARD

A complaint may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure "based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (citation and internal quotation marks omitted). A complaint generally must include a "short and

plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

A court reviewing a 12(b)(6) motion must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007). "Threadbare recitals of the elements of a cause of action . . . do not suffice," however, and a court need not credit "legal conclusions" or "mere conclusory statements". *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). The allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must demonstrate "facial plausibility" by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A court's review is generally limited to the contents of a complaint, with the exception of materials incorporated by reference in a complaint or materials subject to judicial notice. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

A court generally should not dismiss a complaint with prejudice under Rule 12(b)(6) unless it is clear the complaint cannot be saved by any amendment. *See United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011). "[L]eave to amend should be freely granted 'when justice so requires.'" *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting Fed. R. Civ. P. 15(a)). Generally, leave to amend may be denied only if allowing the amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

## IV. REQUEST FOR JUDICIAL NOTICE

Defendants request judicial notice of: (A) a press statement issued by SFPD containing its description of the events of the Dolores Hill Bomb, including purported property destruction, vandalism of public transit and other misconduct, and the subsequent mass arrest; and (B) SFPD General Order 8.03, setting policies for crowd control at "demonstrations and other First Amendment activities". ECF No. 43 (Request for Judicial Notice); ECF No. 42-1 (Ikels Decl., attaching those two documents as Exhibits A and B). Defendants argue that those documents are subject to judicial notice as public records and as incorporated by reference by Plaintiffs'

United States District Court
Northern District of California

7

1    Amended Complaint.  Plaintiffs oppose judicial notice of the press release, and do not address

2    Defendants' request for judicial notice of the general order.  *See generally* ECF No. 49.

3        "[A] court may take judicial notice of public records 'not to credit the truth of the

4    allegations or facts set forth therein,' but only for the existence of such documents."  *Zaragoza-*

5    *Rios v. City of Concord*, No. 18-cv-06803-JCS, 2019 WL 2247856, at *3 (N.D. Cal. May 24,

6    2019) (quoting *Acasio v. San Mateo County*, No. 14-cv-04689-JSC, 2015 WL 5568345, at *1 n.1

7    (N.D. Cal. Sept. 22, 2015)).  For example, "when a court takes judicial notice of another court's

8    opinion, it may do so 'not for the truth of the facts recited therein, but for the existence of the

9    opinion, which is not subject to reasonable dispute over its authenticity.'"  *Lee v. City of Los*

10   *Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (quoting *S. Cross Overseas Agencies, Inc. v. Wah*

11   *Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426–27 (3rd Cir. 1999)).

12       Defendants cite a decision from the Central District of California as taking judicial notice

13   of the facts stated in a police press release.  ECF No. 43 at 3.  In that case, however, the court did

14   not rely on those facts as evidence of what actually occurred for the purpose of a motion to

15   dismiss, but instead as demonstrating that a municipality had defended the actions of police

16   officers who shot a decedent plaintiff, thus supporting an inference that criminal prosecution of

17   those officers was unlikely and denying the city's motion to stay the civil action against it.  *Est. of*

18   *Adams v. City of San Bernardino*, No. EDCV 22-2206 JGB (SPx), 2023 WL 4843074, at *5 (C.D.

19   Cal. June 1, 2023).  Here, accepting the Defendants' own press release to prove facts not alleged

20   in Plaintiffs' Amended Complaint would effectively and improperly allow Defendants to establish

21   their version of events through an unsworn, unattributed statement of fact.  Defendants plainly rely

22   on the press release to describe facts that are not alleged in Plaintiffs' Amended Complaint and to

23   argue that there was no unlawful mass arrest because SFPD was responding to the equivalent of a

24   car sideshow or drag race.  *See* ECF No. 42 at 15, 21.  In this case the facts have yet to be

25   collected through formal discovery.  At this stage Defendants are not allowed to offer even a

26   declaration or deposition testimony to supplement or contradict Plaintiffs' allegations.  Taking

27   judicial notice of a police press release for the same purpose is impermissible.

28       To support their request for judicial notice, Defendants cite the doctrine of incorporation

United States District Court
Northern District of California

8

by reference. This judicially created doctrine allows courts to consider documents on which a complaint relies, to "prevent[] plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). Unlike other forms of judicial notice, the incorporation-by-reference doctrine sometimes allows courts to "assume an incorporated document's contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Id.* at 1003 (cleaned up). That said, the question of "what inferences a court may draw from an incorporated document should . . . be approached with caution," and "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.*

Here, Plaintiffs' Amended Complaint appears to reference the press statement to allege that Defendant Scott ratified the conduct at issue by "publicly thanking the involved officers, and publicly disseminating a false narrative purporting to justify the arrests". Corrected Am. Compl., ¶ 69; *cf.* ECF No. 42-2 at 3 (thanking "officers for taking action to hold those accountable who brazenly engaged in reckless and dangerous behavior and violated the law"). As noted above, Defendants cite the press statement for an entirely different purpose, relying on the purported disorderly conduct described at length therein to challenge the existence of cognizable claims. ECF No. 42 at 21; ECF No. 52 (Consolidated Reply) at 12, 19.

This is not a case where incorporating factual statements from the press release would be appropriate. Plaintiffs have not sought to use any facts stated in the release selectively, but instead refer only to Scott's apparent endorsement of officers' conduct on the night in question, while specifically alleging that SFPD's description of the event accompanying that endorsement was "false". Corrected Am. Compl., ¶ 69. To accept the full scope of SFPD's description in the press release as true would improperly contradict Plaintiffs' allegations.

Turning to Defendants' request for judicial notice of SFPD General Order 8.03, Plaintiffs allege that Defendants violated the order by failing to provide sufficient notice and routes for attendees to disperse. Corrected Am. Compl., ¶ 33. Defendants argue that General Order 8.03

does not apply, because it concerns "Crowd Control" rather than efforts to quell a purported riot,[2] and because a provision on which Plaintiffs rely relates to orders to "move" crowds rather than to disperse them.  ECF No. 42 at 22–23.  Plaintiffs do not oppose Defendants' request for judicial notice of General Order 8.03, and the Court finds such notice appropriate both as a matter of public record and under the doctrine of incorporation by reference.  *See Steinle v. City & County of San Francisco*, 919 F.3d 1154, 1163 (9th Cir. 2019) (taking judicial notice of an official memorandum stating city policy).

The Court therefore GRANTS Defendants' request for judicial notice of General Order 8.03.  The Court DENIES Defendants' request for judicial notice of the press release, except to acknowledge that SFPD issued it.  For the purpose of the present Motion to Dismiss, the Court does not accept as true the press release's factual statements describing events that occurred on the night of July 8, 2023.

## V.    ANALYSIS

### A.    Federal Constitutional Claims

#### 1.    Fourth Amendment Claim

The Fourth Amendment to the U.S. Constitution prohibits "unreasonable . . . seizures".  U.S. Const. amend. IV.  Although the Fourth Amendment often requires a police officer to have individualized probable cause to arrest a suspect, whether such cause is *individualized* is not an "irreducible requirement," and the ultimate question is whether the officer's belief that the suspect committed a crime "was reasonable in light of the circumstances."  *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1194 (9th Cir. 2015).  "If a group or crowd of people is behaving as a unit and it is not possible . . . for the police to tell who is armed and dangerous or engaging in criminal acts and who is not, the police can have [probable cause[3]] as to the members of the group."  *Id.*  "Police

---

[2] As explained above, on a motion to dismiss Defendants not permitted to reach beyond Plaintiffs' allegations to cite a press release that paints a different picture of what purportedly occurred.

[3] Although *Lyall* primarily concerned reasonable suspicion for the purpose of a *Terry* stop rather than probable cause for arrest, that opinion cites with approval *Carr v. District of Columbia*, 587 F.3d 401 (D.C. Cir. 2009), which applied a substantially similar standard for individualization in the context of probable cause for arrest.  This Court therefore understands *Lyall* as expressing the Ninth Circuit's view of individualized versus group suspicion in both the reasonable suspicion context and the probable cause context.

United States District Court<br>Northern District of California

witnesses must only be able to form a reasonable belief that the entire crowd is acting as a unit and therefore all members of the crowd violated the law." *Carr v. District of Columbia*, 587 F.3d 401, 408 (D.C. Cir. 2009) (reversing summary judgment granted in favor of plaintiffs bringing Fourth Amendment claims after being arrested for participating in a riot). On the other hand, "if a person is simply present in the vicinity of potential criminal activity, without doing anything else to indicate that he is engaging in criminal activity or that he is armed and dangerous, the police do not have probable cause to search him or reasonable suspicion sufficient to detain him and frisk him for weapons." *Lyall*, 807 F.3d at 1194.

In *Lyall*, police responded to a report that "six male Hispanic juveniles wearing 'rocker type' clothing" stole beer from a convenience store, driving a truck with an identified license plate. *Id.* at 1182 (internal quotation marks omitted). Officers found the truck parked around the corner from a warehouse with a party in progress, and "observed people wearing what they deemed to be 'rocker type' clothing going inside." *Id.* They found a person at the door who met the general description of the suspects, who backed away from them when they asked to speak to the person in charge of the event, and ran inside when they ordered him to stop. *Id.* The officers followed him inside and subdued him, while the crowd yelled at the officers and approached them in a manner they characterized as aggressive. *Id.* A thin wooden partition fell on the officers' heads, startling but not injuring them. *Id.* After those officers called for backup, additional officers ordered all of the partygoers out of the warehouse, lined them up against a fence, patted them down for weapons, and allowed a witness from the convenience store to try to identify suspects for the theft. *Id.* at 1183.

The trial court declined to instruct the jury that individualized suspicion was required, instead instructing that "plaintiffs must prove by a preponderance of the evidence that the officer or officers lacked reasonable suspicion to detain him or her or that the length and scope of the detention was excessive," and that the "touchstone of the Fourth Amendment is reasonableness," with "no irreducible requirement of individualized suspicion." *Id.* at 1194. The jury found for the defense, and the Ninth Circuit found no error in the jury instruction, holding that although some circumstances (like the fact that many plaintiffs did not meet the description of the theft suspects)

United States District Court
Northern District of California

1    "bore on the question whether the searches and seizures were reasonable," such questions of

2    individualized suspicion did not render the detentions and searches unconstitutional per se, but

3    instead were factors for the jury to consider.  *Id.*

4         Here, Defendants are correct that Plaintiffs' position that they engaged in no illegal

5    behavior—and that police had no *individualized* reason to suspect that they did so—does not

6    necessarily show that police lacked probable cause to arrest.  If a factual record were to show that

7    police reasonably believed that the crowd in which Plaintiffs found themselves, acting as a unit,

8    had broken some law, then Defendants might have had probable cause to arrest the group.

9    Drawing reasonable inferences in Plaintiffs' favor, however, no basis for such a belief is apparent

10   from the face of their Amended Complaint.  Unlike in *Lyall*, where police found the truck used in

11   the beer theft and at least some partygoers matched a general description of the suspects, Plaintiffs

12   have not alleged any connection between the group of people arrested here and the "unknown

13   other individuals who had damaged property earlier that evening at a different location."  *See*

14   Corrected Am. Compl., ¶ 76.[4]

15        Nor is it apparent that there was any reason to believe, based on the Amended Complaint,

16   that the group broke any other law.  Although officers ordered at least some members of the crowd

17   to vacate both Dolores Street and Dolores Park, the group was not arrested in either of those

18   locations, and C.L.—the only plaintiff alleged to have heard those orders—alleges that she and her

19   friends complied with them to the best of their ability before being arrested on 17th Street.  *Id.*

20   ¶ 26.[5]  J.T.'s location is unclear except that she was arrested on 17th Street, *id.* ¶¶ 23–24, and

21

22   ─────────────────
     [4] Defendants assert that Plaintiffs' allegation that such damage occurred elsewhere and earlier in
23   the night "of course, means they were there."  ECF No. 52 at 12.  That assertion lacks foundation.
     There are any number of means by which Plaintiffs might have learned of the location and timing
24   of property damage without having been present when it occurred, including through press
     coverage, police statements, or word of mouth.
25   [5] Defendants' Motion mischaracterizes Plaintiffs' allegations, asserting that paragraph 26 of the
     Amended Complaint "confirms that the individuals heard dispursement [sic] orders given between
26   7:15 p.m. and 7:30 p.m. to leave Dolores Park and an hour later still had not done so and were
     detained as a result."  ECF No. 42 at 29.  That paragraph in fact states that C.L. and her friends
27   (but not necessarily any other Plaintiffs) "heard an SFPD announcement to leave Dolores *Street*"
     at that time, complied with that order by entering Dolores Park, *later* heard an announcement to
28   leave the park *and did so*, but were unable to leave the vicinity because police blocked their route
     home, and were later arrested on 17th Street, a block away from the park.  Corrected Am. Compl.,
     ¶ 26 (emphasis added).

Plaintiffs allege that L.R. and her friends only went towards Dolores Street at SFPD officers' specific instruction, and after the officers blocked their efforts to go anywhere else, *id.* ¶ 27.  There is no allegation that any other member of the group had disobeyed orders to disperse or otherwise committed a crime.  In this respect, the present case is distinguishable from *Bidwell v. County of San Diego*, 607 F. Supp. 3d 1084, 1099 (S.D. Cal. 2022), a case argued at length in Defendants' reply brief.  In *Bidwell*, a case decided on summary judgment, there was no genuine dispute that the arrested plaintiffs had refused to comply with the dispersal order.

Defendants argue that they are entitled to qualified immunity because Courts have so held in cases where police used significantly greater force than Plaintiffs have alleged here to suppress riots.  ECF No. 42 at 24 (citing *Haber v. City of Portland*, No. 3:17-cv-01827-JR, 2020 WL 7129596, at *16–17 (D. Or. Dec. 4, 2020), *recommendation adopted*, 2021 WL 1341853 (D. Or. Apr. 9, 2021)).  Qualified immunity shields "government officials performing discretionary functions. . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

*Haber* was decided on summary judgment, where the defendants introduced evidence that a demonstration where some participants were armed descended into violence against police officers before the officers responded with force and detained the group for around an hour.  2020 WL 7129596, at *2–6.  This case, however, is before the Court on a Motion to Dismiss, and Plaintiffs do not allege that a riot, any form of violence, or any illegal activity occurred here, other than property damage at a separate location by other unknown individuals.  The law is clearly established that merely being present at the scene of suspected illegal activity does not establish probable cause to search or arrest bystanders, unless officers reasonably believe that an entire group of people acted as unit to break the law.  *Lyall*, 807 F.3d at 1195 (citing *Ybarra v. Illinois*, 444 U.S. 85 (1979)).  It is even clearer that such an arrest violates the Fourth Amendment when there is no probable cause to believe that *anyone* the group committed a crime.  Since neither probable cause to arrest, nor any basis for a reasonable officer to *believe* they had probable cause to arrest, is apparent from the allegations of Plaintiffs' Amended Complaint, Defendants are not

United States District Court
Northern District of California

1    entitled to qualified immunity at this stage of the case.

2         Defendants assert in their reply that "Plaintiffs admit they were partygoers to an

3    unpermitted street sideshow, that there was fair notice that their actions violated clearly

4    established law, and they were given plenty of time and opportunity to leave the streets."  ECF

5    No. 52 at 17.[6]  No such admissions (except perhaps that Plaintiffs were "partygoers") actually

6    appear in the Amended Complaint.  Defendants rely on an allegation in Plaintiffs' original

7    Complaint that former plaintiff E.J.[7] "left" after he finished skateboarding as apparently showing

8    that all Plaintiffs could have left the scene, but the original Complaint only indicates that E.J. was

9    able to leave Dolores Park (apparently before any announcement that the park was closed), and he

10   was still later arrested on 17th Street, suggesting that he was not able to leave the area completely.

11   ECF No. 1 (under seal) ¶ 26.  Defendants also cite allegations in a related case, *R.P. v. City and*

12   *County of San Francisco*, No. 24-cv-0522, but those allegations are not before the Court in this

13   action.  The parties' sensible agreement to treat these cases as related because they pertain to the

14   same mass arrest does not serve as an admission by Plaintiffs here that all of R.P.'s allegations are

15   accurate, or vice versa, and Defendants cite no authority suggesting that the Court can conflate

16   different parties' complaints in two separate cases to resolve a challenge to the pleadings.

17        Moreover, Defendants' Motion does not address the separate prong of Plaintiffs' Fourth

18   Amendment claim asserting "unreasonable conditions of confinement".  Corrected Am. Compl.,

19   ¶ 100.  "[T]he Fourth Amendment sets the applicable constitutional limitations on the treatment of

20

21   _____

22   [6] After initially claiming in their Motion to Dismiss that the events of the Dolores Hill Bomb were
     "no different than sideshow or drag races with cars," ECF No. 42 at 21, Defendants go on in their
23   Reply to refer repeatedly to the events at issue as a "sideshow," "sideshow party," or "sideshow
     race."  ECF No. 52 at 9, 14–20.  In local parlance, "sideshows" are unsanctioned "events where
24   streets are blocked off for drivers to perform unlawful maneuvers like burnouts and donuts" in
     their cars, sometimes resulting in injury or even death.  *See Villanueva v. California*, 986 F.3d
25   1158, 1162 (9th Cir. 2021).  Whatever might ultimately be shown in this case about the danger or
     legal status of the Dolores Hill Bomb, the Amended Complaint must be construed in Plaintiffs'
26   favor on a motion to dismiss, and it leaves no room for Defendants' contention that the event was
     akin to a "sideshow" under that usual meaning of the term, at the very least because the allegations
27   do not involve motor vehicles.  While *comparing* this event to an automotive sideshow might or
     might not prove useful on a factual record, outright conflation of the two is not, and the Court
28   declines to adopt that nomenclature at this stage of the proceeding.
     [7] E.J. voluntarily dismissed his claims on January 3, 2024, shortly before Plaintiffs filed their
     operative Amended Complaint.  ECF No. 13.

United States District Court
Northern District of California

an arrestee detained without a warrant up until the time such arrestee is released or found to be legally in custody based upon probable cause for arrest." *Pierce v. Multnomah County*, 76 F.3d 1032, 1043 (9th Cir. 1996). Although Defendants briefly argue in their Reply that they complied with the Fourth Amendment by eventually releasing all arrestees with citations, ECF No. 52 at 18, they waived any such argument by failing to address it in their Motion, *see United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006). Even in their Reply, Defendants do not address whether the alleged deprivation of water, food, shelter, warm clothing, and access to restrooms for several hours after arrest meets "Fourth Amendment objective reasonableness standards." *See Pierce*, 76 F.3d at 1043 (9th Cir. 1996).

Defendants' Motion to Dismiss is therefore DENIED as to Plaintiffs' Fourth Amendment claim under § 1983 against Captain Harvey and Lieutenant Sullivan, who allegedly ordered the mass arrest. Corrected Am. Compl., ¶¶ 11–12. This Order addresses Plaintiffs' theory of supervisor liability against Chief Scott and *Monell* liability against the City separately below.

### 2. First Amendment Claim

As Plaintiffs acknowledge, ECF No. 50 at 18, their First Amendment retaliation claim requires them "to show that they were engaged in a constitutionally protected activity, the . . . Defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and the protected activity was a substantial or motivating factor in the . . . Defendants' conduct." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020).

#### a. Plaintiffs Have Not Sufficiently Alleged Protected Expression

Beginning with the question of protected activity, "[t]he First Amendment protects not only the expression of ideas through printed or spoken words, but also symbolic speech— nonverbal activity . . . sufficiently imbued with elements of communication." *Hightower v. City & County of San Francisco*, 77 F. Supp. 3d 867, 876–77 (N.D. Cal. 2014) (quoting *Roulette v. City of Seattle*, 97 F.3d 300, 302-03 (9th Cir. 1996)). "In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," courts look to "whether an intent to convey a particularized message was present, and whether the likelihood

United States District Court
Northern District of California

was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (cleaned up); *see also Edge v. City of Everett*, 929 F.3d 657, 668 (9th Cir. 2019).  The Supreme Court "has rejected the concept that 'an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea'" and "eschewed a rule that "all conduct is presumptively expressive," instead placing the burden on those "claiming the protection of the First Amendment" to "demonstrat[e] that their nonverbal conduct meets the applicable standard." *Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018) (holding that collecting early ballots is not expressive conduct) (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)).

Plaintiffs allege that the Dolores Hill Bomb is an expression of San Francisco's antiauthoritarian skateboarding culture.  ECF No 24, ¶¶ 18–19.  Their allegations to that effect are limited to two short paragraphs of their Amended Complaint, and their Opposition relies heavily on extraneous media reports and scholarly work, with no explanation for why the Court should consider such materials in assessing the sufficiency of Plaintiffs' Amended Complaint.  ECF No. 50 at 19–20 & n.1.  As one of the articles Plaintiffs cite acknowledges, courts have generally rejected claims that athletic activities trigger First Amendment protection.  Genevieve Lakier, *Sport As Speech*, 16 U. Pa. J. Const. L. 1109, 1114 (2014) ("[S]ports—even spectator sports— usually receives no First Amendment protection whatsoever.");  *see, e.g.*, *Fighting Finest, Inc. v. Bratton*, 898 F. Supp. 192, 195 (S.D.N.Y. 1995) ("[W]e are not convinced that a boxing match, in which police officers participate, inexorably conveys any message other than that police officers can be pugilists."), *aff'd*, 95 F.3d 224 (2d Cir. 1996).  Plaintiffs cite no authority treating similar athletic conduct as expressive activity subject to First Amendment protection.

Though Plaintiffs' Amended Complaint alleges that the Dolores Hill Bomb is an expression of skateboarding culture and its values of freedom and resistance to regulation in an urban landscape, that alone is not sufficient to bring the gathering within the First Amendment's ambit.  As noted above, conduct must be both intended to convey a message and reasonably understood as doing so in order to qualify as protected speech.  *See Johnson*, 491 U.S. at 404.  The Amended Complaint is thin when it comes to allegations that participants intended to convey such

United States District Court
Northern District of California

16

a message or that the event was organized for that purpose, but perhaps sufficient to survive a motion to dismiss as to that element. Even if the non-party skateboarders intended to express such a message through their high-speed descent,[8] however, Plaintiffs have not plausibly alleged any "likelihood . . . that the message would be understood by those who viewed it", or even that any of the Plaintiffs in this case understood it as such. *See Johnson*, 491 U.S. at 404.

As illustrated by Judge Chen's consideration of a San Francisco anti-nudity law, context can be critical to these inquiries. "Being 'in a state of nudity' is not an inherently expressive condition" but can be expressive under some circumstances, such as some types of nude dancing. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (plurality op.) (citation omitted). Judge Chen carefully considered several instances of plaintiffs having engaged in nude protests, and held that an expressive purpose could reasonably be understood where the plaintiffs appeared nude at City Hall at two organized protests close in time to the enactment of the anti-nudity law, but no such message would likely have been discerned from other instances where plaintiffs disrobed many months after the law was passed, or in different locations. *Hightower*, 77 F. Supp. 3d at 877–80 (citing *Spence v. Washington*, 418 U.S. 405, 410–11 (1974); *Roulette*, 97 F.3d at 303), *aff'd sub nom. Taub v. City & County of San Francisco*, 696 F. App'x 181 (9th Cir. 2017).[9]

Here, Plaintiffs do not allege any relevant context upon which to infer an observer's likely understanding of the message allegedly conveyed by the Dolores Hill Bomb, comparable to the nude protests in *Hightower* that occurred in sufficient proximity to the City's efforts to regulate nudity. If, say, City officials had recently announced plans to restrict skateboarding in the vicinity of Dolores Park, or if the City attempted to replace spontaneous events like the Dolores Hill Bomb with a City-sponsored skateboarding competition, then perhaps observers might reasonably understand an informal exhibition of hillbombing as conveying a message of "resisting attempts to regulate [skateboarding] and to mold it into a mainstream sport." *Cf.* Corrected Am. Compl., ¶ 18.

---

[8] There is no allegation that J.T., C.L., or L.R. themselves engaged in expressive activity of any kind.

[9] Even with respect to the incidents that Judge Chen found sufficiently expressive to fall within the First Amendment's protection, Judge Chen held that the City had a sufficient content-neutral interest in regulating nudity to enact and enforce its law. *Hightower*, 77 F. Supp. 3d. at 880–81.

United States District Court
Northern District of California

But in the absence of any such context, Plaintiffs have not plausibly alleged that the public would understand any message—much less that specific message—from skateboarders speeding downhill at the Dolores Hill Bomb. *Cf. Hightower*, 77 F. Supp. 3d at 879 ("It is not evident that one in the nude would be perceived as trying to convey a political message. Even if it were, it is not clear what that particular message would have been."). The Court therefore concludes that Plaintiffs have not sufficiently alleged protected speech to support their First Amendment claim.

### b.    Plaintiffs Have Not Sufficiently Alleged Protected Association

The First Amendment also protects a right to association. Courts "have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).[10] In *Roberts*, the Supreme Court considered whether the Jaycees, a nonprofit organization intended to provide networking and educational opportunities for young men, had a protected interest in association. The Court noted that "a not insubstantial part of the Jaycees' activities constitutes protected expression on political, economic, cultural, and social affairs", because "the national and local levels of the organization have taken public positions on a number of diverse issues, and members of the Jaycees regularly engage in a variety of civic, charitable, lobbying, fundraising, and other activities worthy of constitutional protection under the First Amendment." *Id.* at 626–27. The First Amendment right of association was therefore "plainly implicated" in a case challenging a state law that required the Jaycees to admit female members, although the Court ultimately held that the state had a sufficiently compelling interest to overcome the Jaycees' rights to association and enforce that requirement. *Id.* at 622, 628–29.

Although the First Amendment also protects a right to association under some circumstances, such association generally must be tethered to speech or other First Amendment rights to be protected. *City of Dallas v. Stanglin*, 490 U.S. 19, 23–24 (1989). The Supreme Court

---

[10] Courts have also recognized certain "highly personal relationships" as subject to fundamental constitutional protection, such as marriage and other close familial connections. *Roberts*, 468 U.S. at 618–20. Plaintiffs do not assert such an interest in this case.

United States District Court
Northern District of California

held, for example, that "hundreds of teenagers who congregate each night at [a] particular dance hall" were not engaged in the sort of association protected by the Constitution. In *Conti v. City of Fremont*, the Ninth Circuit relied on *Stanglin* to hold that a nightclub owner did not have a First Amendment right to associate with underage patrons, even if he engaged in "some expressive activities such as . . . showing videos at" his club. *Conti*, 919 F.2d 1385, 1389 (9th Cir. 1990).

As discussed above, Plaintiffs have not sufficiently alleged that the Dolores Hill Bomb met the *Johnson* test of both intent to convey a message and significant likelihood that the message would be understood. *See Hightower*, 77 F. Supp. 3d at 879. In the absence of such allegations, Plaintiffs have not sufficiently alleged a protected right to association. Accordingly, at least based on the allegations presently before the Court, the Plaintiffs here, who either gathered to watch an extreme sporting event or (in the case of L.R.) merely happened to be in the vicinity, are more analogous to the dance hall patrons in *Stanglin* than to the civic association members in *Roberts*, or to other protected gatherings such as demonstrators joining in a protest march. *See* Corrected Am. Compl. ¶ 64 ("Each of the plaintiffs continues to desire to peacefully and lawfully assemble and *associate with other youth*, and/or to skateboard and to express San Francisco skateboarding and youth culture." (emphasis added)). It is notable, although likely not dispositive, that Plaintiffs have not alleged that they personally considered themselves part of the skateboard culture they allege the Dolores Hill Bomb allegedly embodied, or that their attendance was related to any such cultural expression rather than motivated merely by spectacle.

* * *

Because Plaintiffs have not plausibly alleged that they engaged in expressive activity or association protected by the First Amendment, the Court GRANTS Defendants' Motion to dismiss Plaintiffs' First Amendment claim, with leave to amend.

### 3. Fourteenth Amendment Claim

#### a. Equal Protection

Plaintiffs assert that Defendants discriminated against them based on race in violation of the Fourteenth Amendment's Equal Protection Clause. "To prevail on an equal protection claim under the Fourteenth Amendment, a plaintiff must demonstrate that enforcement had a

discriminatory effect and the police were motivated by a discriminatory purpose." *Lacey v. Maricopa County*, 693 F.3d 896, 920 (9th Cir. 2012).

Plaintiffs cite *Lacey* for that legal standard, but ignore that decision's further explanation that "to prove a discriminatory effect, 'the claimant must show that similarly situated individuals were not prosecuted.'"[11] *Id.* (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). Proving discriminatory effect at trial implicates a demanding standard, but "to state a claim" at the pleading stage, a plaintiff "need only allege some facts, either anecdotal or statistical, demonstrating 'that similarly situated defendants . . . could have been prosecuted, but were not.'" *Id.* (quoting *Armstrong*, 517 U.S. at 469). Although Plaintiffs allege that most of the arrestees were people of color, they do not allege that arrestees of different races were treated differently from one another, or that any similarly situated person or group of people—either on the night in question or at any other time—was not arrested. *See Rosenbaum v. City & County of San Francisco*, 484 F.3d 1142, 1153–54 (9th Cir. 2007) (discussing potential comparator groups). And while Plaintiffs' counsel suggested at the hearing that a group of predominantly white teenagers *would* have been treated differently, ECF No. 65 at 22:13–20, there is nothing in the Amended Complaint that alleges such a disparity. If *Lacey* governs this case, as Plaintiffs' opposition brief suggests, then the absence of allegations identifying a similarly situated class alone is grounds for dismissal of Plaintiffs' Fourteenth Amendment selective enforcement claim.

The Ninth Circuit has since relaxed that requirement under at least some circumstances. In *United States v. Sellers*, a case cited by neither party here, the Ninth Circuit "join[ed] the Third and Seventh Circuits and h[e]ld that *Armstrong*'s rigorous discovery standard for selective

---

[11] Although much of the caselaw addressing equal protection claims in the criminal enforcement context discusses "prosecution," *Lacey* applied the same standards to a case where the plaintiffs were arrested but apparently not prosecuted in court, and indicated that it encompasses "[e]nforcement . . . through a variety of actual or threatened arrests, searches and temporary seizures, citations, and other coercive conduct by the police." *See* 693 F.3d at 910, 920. Some justices of the Supreme Court have acknowledged uncertainty as to whether *Armstrong*'s requirement for a comparator applies in the context of selective enforcement rather than selective prosecution. *Nieves v. Bartlett*, 587 U.S. 391, 418–19 (2019) (Gorsuch, J., concurring); *id.* at 432–33 (Sotomayor, J., dissenting). Between *Lacey* and *Sellers* (discussed below), however, the Ninth Circuit has adopted at least something resembling that requirement in selective enforcement cases, and this Court is bound by those decisions.

United States District Court
Northern District of California

prosecution cases does not apply strictly to discovery requests to advance selective enforcement claims, or at least to "selective enforcement claims like Sellers's." *Sellers*, 906 F.3d 848, 855 (9th Cir. 2018). Sellers's claim involved a stash house reverse-sting operation. *Sellers*, 906 F.3d 848, 855 (9th Cir. 2018). A subsequent unpublished Ninth Circuit decision noted uncertainty as to whether *Sellers* applies beyond the reverse-sting context. *United States v. Ford*, 821 F. App'x 742, 746 n.2 (9th Cir. 2020). It is also not entirely clear whether *Sellers*, a criminal discovery decision, affects the civil pleading standard described by *Lacey*, although courts have generally used the same standard for selective prosecution in both civil and criminal contexts. *Armstrong*, on which *Lacey* relied for its standard, was itself a criminal discovery case. Assuming that *Sellers* applies here, it acknowledged that discriminatory effect remains an essential element of a claim for selective enforcement, *see* 906 F.3d at 856, and Plaintiffs must still show "*something* more than mere speculation" to proceed on such a theory, *id.* at 855. The Amended Complaint likely lacks sufficient factual allegations to plausibly infer discriminatory effect even under *Sellers*, although this Order does not conclusively resolve that question when both parties failed to address that case in briefing. If Plaintiffs amend this claim and Defendants again move to dismiss, the parties should be prepared to address *Sellers*'s significance in this civil context.

Even if Plaintiffs had sufficiently alleged discriminatory effect, their allegations also do not support a plausible inference to satisfy the second prong of the test, that the arrest was motivated by their race. A plaintiff not only must "show that the law is applied in a discriminatory manner or imposes different burdens on different classes of people" as discussed above, but also must demonstrate "that the prosecution is based on an impermissible motive." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995) (emphasis added; internal quotation marks omitted); *see also Lacey*, 693 F.3d at 920, 922 (reciting and applying this test at the pleading stage). That requires showing "that the decision-maker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Rosenbaum*, 484 F.3d at 1153 (cleaned up); *see also Holy Ghost Revival Ministries v. City of Marysville*, 98 F. Supp. 3d 1153, 1175 (W.D. Wash. 2015) (granting a motion to dismiss for failure to include allegations meeting this standard).

Plaintiffs note that people of color were disproportionately represented among the arrestees as compared to the population of San Francisco as a whole, but racial discrepancies between arrestees and the population of the city where they are arrested do not in themselves show discriminatory motive or effect. *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948 & n.8 (9th Cir. 2003) (acknowledging that "Manhattan Beach is predominantly white," but rejecting the plaintiff's "essential[]" argument that "because he is African-American, the officer is white, and they disagree about the reasonableness of the traffic stop, these circumstances . . . raise an inference of racial discrimination"). Plaintiffs also cite "multiple SFPD shootings of Black, Indigenous, and People of Color (BIPOC) and the exposure of racist text messages involving multiple SFPD officers" that prompted the City to enter a reform agreement with the Department of Justice in 2016 (around seven years before the events in question), Corrected Am. Compl., ¶ 73,[12] but cite no authority suggesting that a police force's history of racial disparities renders *any* arrest of racial minorities subject to an equal protection claim, and do not claim that any officers involved in the arrest here sent or received racist text messages. To the extent that the City's alleged failure to complete reforms mandated by its agreements with the Department of Justice might bear on this inquiry, Plaintiffs have failed to explain what those agreements required, and have not addressed how compliance with those requirements would have affected the City's response to the Dolores Hill Bomb.

Plaintiffs' Fourteenth Amendment equal protection claim is therefore DISMISSED for failure to allege a discriminatory effect or a discriminatory motive, with leave to amend.

### b. Substantive Due Process

Plaintiffs also assert a violation of liberty and free-movement interests protected by the Fourth Amendment's guarantee of substantive due process. Corrected Am. Compl., ¶ 109. Their

---

[12] In footnotes in their Motion and Reply, Defendants ask to strike this allegation under Rule 12(f) as unduly inflammatory. ECF No. 42 at 22 n.3; *see also* ECF No. 52 at 9 n.2 (inaccurately citing "MTD., fn. 4"). Motions to strike are disfavored in federal court, and footnotes are not the place to raise substantive requests for relief. *See Ely Holdings Ltd. v. O'Keeffe's, Inc.*, No. 18-cv-06721-JCS, 2021 WL 1164783, at *5 n.7 (N.D. Cal. Mar. 26, 2021) ("A footnote does not suffice to raise a substantive argument . . . ." (citing *United States v. Strong*, 489 F.3d 1055, 1060 n.4 (9th Cir. 2007))). Defendants' request to strike the allegation is DENIED.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Opposition makes clear that the deprivation of liberty at issue for this claim is their arrest.  ECF

2    No. 50 at 29 ("The arbitrary arrests here, stopping the plaintiffs' freedom of movement, served no

3    legitimate state interest and were not narrowly tailored.").  Plaintiffs cite no case analyzing a

4    purportedly wrongful arrest through the lens of Fourteenth Amendment substantive due process.

5    The handful of cases they cite in addressing this claim concern restrictions on movement that do

6    not relate to arrests.  *Papachristou v. City of Jacksonville*, 405 U.S. 156, 161 (1972) (addressing

7    vagrancy laws); *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999) (addressing a gang loitering

8    ordinance); *Nunez ex rel. Nunez v. City of San Diego*, 114 F.3d 935, 945 (9th Cir. 1997)

9    (addressing juvenile curfew laws); *United States v. Wheeler*, 254 U.S. 281, 292 (1920) (holding

10   that the United States had the constitutional power to punish the forcible expulsion of a group of

11   people from one state to another, but the statute under which it sought to do so did not reach that

12   conduct), *disapproved of by United States v. Guest*, 383 U.S. 745, 759 n.16 (1966).

13        Ninth Circuit precedent holds that the legal justification for arrest, duration of pre-

14   arraignment custody, and conditions of such custody are all governed by the Fourth Amendment.

15   *Pierce*, 76 F.3d at 104.  Where a plaintiff challenges the reasonableness of an arrest or ensuing

16   detention, the "claim fits the Fourth Amendment, and the Fourth Amendment fits [the] claim, as

17   hand in glove."  *Manuel v. City of Joliet*, 580 U.S. 357, 364 (2017).  "Where a particular

18   Amendment provides an explicit textual source of constitutional protection against a particular sort

19   of government behavior, that Amendment, not the more generalized notion of 'substantive due

20   process,' must be the guide for analyzing these claims."  *Albright v. Oliver,* 510 U.S. 266, 273

21   (1994) (cleaned up) (rejecting a substantive due process challenge to alleged prosecution without

22   probable cause, and suggesting that a Fourth Amendment challenge to arrest would have been

23   more appropriate).  As far as this Court is aware, the few courts to consider Fourteenth

24   Amendment substantive due process challenges to arrests have rejected them "because all claims

25   for unreasonable search and seizure must be analyzed under the Fourth Amendment."  *E.g.*, *Davis

26   v. Novy*, No. 03 C 572, 2003 WL 1964200, at *2 (N.D. Ill. Apr. 25, 2003).

27        Accordingly, although neither party addresses this claim in any useful detail, the Court

28   DISMISSES Plaintiffs' Fourteenth Amendment liberty claim as redundant to their Fourth

1  Amendment claim and not supported by law.  In an abundance of caution, the Court grants

2  Plaintiffs leave to amend if they believe that this claim is viable and serves any purpose as a

3  separate theory of liability.

### 4.   Supervisor and Entity Liability for Constitutional Claims

5  To bring § 1983 claims for constitutional violations against Chief Scott in his capacity as a

6  supervisor or against the City, Plaintiffs must meet additional standards that courts have

7  established for such claims.  Since the Court dismisses Plaintiffs' First and Fourteenth

8  Amendment claims for the reasons discussed above, the analysis below addresses Plaintiffs' claim

9  under the Fourth Amendment.

### a.   Supervisor Liability

11  Beginning with Plaintiffs' claim against Chief Scott, a supervisor can be held liable under

12  § 1983 based on "(1) his or her personal involvement in the constitutional deprivation, or (2) a

13  sufficient causal connection between the supervisor's wrongful conduct and the constitutional

14  violation," including "for his own culpable action or inaction in the training, supervision, or

15  control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct

16  that showed a reckless or callous indifference to the rights of others."  *Starr v. Baca*, 652 F.3d

17  1202, 1208 (9th Cir. 2011).  Plaintiffs allege that Scott "monitored the response as it was

18  occurring, and on information and belief, approved HARVEY and SULLIVAN's decision to

19  arrest and detain the plaintiffs and class members en masse".  Corrected Am. Compl., ¶ 68.

20  Although relatively thin, those allegations are plausible given the alleged scale and duration of the

21  mass arrest—with over a hundred young people held for several hours, requiring multiple city

22  buses to transfer them, while parents unsuccessfully sought to give them supplies or take them

23  home—and the Court therefore takes them as true in resolving Defendants' Motion to Dismiss.

24  "[W]hen the department is executing an organized, department-wide response, one can presume

25  that the police chief was in control of his department, either directing that response himself or—at

26  the very least—ratifying the actions of his subordinates."  *Martinez v. City of Santa Rosa*, 499 F.

27  Supp. 3d 748, 750 (N.D. Cal. 2020).  Because Scott allegedly acquiesced in and approved of the

28  arrest, the Motion is DENIED as to Plaintiffs' Fourth Amendment claim against Scott.

United States District Court
Northern District of California

### b.   *Monell* **Liability**

With respect to the City, Plaintiffs must establish liability under the framework of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), which allows § 1983 claims to proceed against municipalities only under limited circumstances, including: "(1) an unconstitutional custom or policy behind the violation of rights; (2) a deliberately indifferent omission, such as a failure to train or failure to have a needed policy; or (3) a final policy-maker's involvement in, or ratification of, the conduct underlying the violation of rights." *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249–50 (9th Cir. 2010), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). Here, Plaintiffs have asserted at least two those grounds for liability, but plausibly alleged only one of them.

Plaintiffs' most straightforward allegations for *Monell* liability relate to involvement and ratification by a final policy-maker. Specifically, Plaintiffs allege that Chief Scott (whom Defendants do not dispute has final authority) was personally involved in the arrest, in that he monitored and approved of it as discussed above, and also that he ratified it by thanking the arresting officers and publicly approving their conduct. Corrected Am. Compl., ¶¶ 68–69. Defendants' Motion is DENIED to the extent that Plaintiffs' Fourth Amendment claim against the City rests on that theory.

Plaintiffs also allege that the violations resulted from inadequate policies, although it is not clear if they intend to pursue a theory of unconstitutional policies as distinct from deliberate indifference. *See id.* ¶¶ 71–74; ECF No. 50 at 26–27. In certain circumstances, "the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

Some of Plaintiffs' more specific allegations as to this issue are not sufficiently connected to the alleged violation of Plaintiffs' Fourth Amendment rights. Plaintiffs allege that the City committed to reforms when it entered a Memorandum of Agreement with the U.S. Department of Justice in 2016 and adopted a Racial Equity Action Plan in 2020 in response to multiple shooting and racially charged incidents involving SFPD offices. Corrected Am. Compl. ¶ 73. Plaintiffs

allege that the City's failure to implement the reforms was a function of its deliberate indifference, led to inadequate policies, training and oversight, which in turn resulted in racially discriminatory arrests and other constitutional violations on the night of the Dolores Hill Bomb. *Id.* As discussed above, however, Plaintiffs have not plausibly alleged that the arrests were racially discriminatory in violation of the Fourteenth Amendment. With respect to the Fourth Amendment claim, which has been sufficiently pled, Plaintiffs have not offered allegations explaining what reforms, including enhanced policies and training programs, the Department of Justice or Racial Equity Action Plan called for, or how implementing those reforms would have avoided or altered the manner of Plaintiffs' arrest.

Plaintiffs' allegations that the City had insufficient policies are conclusory, failing to identify any particular defect in any enumerated policy or training program. The Amended Complaint references two SFPD General Orders, 8.03 pertaining to crowd control and 7.01 pertaining to juveniles, and alleges that Defendants failed to follow those policies in this instance. The allegations, however, do not illustrate or explain how those policies themselves contributed to a violation of Plaintiffs' rights. Consolidated Am. Compl., ¶¶ 33, 58. For liability to attach, an "identified deficiency in a city's [policy] or training program must be closely related to the ultimate injury." *Canton*, 489 U.S. at 391. In response to Defendants' Motion, a footnote of Plaintiffs' Opposition advances a new argument that Defendants have "reinterpreted" General Order 8.03 to allow mass arrests under improper circumstances, ECF No. 50 at 26 n.4, but no allegations to support that theory appear in the Amended Complaint. The press release that Defendants offer for judicial notice asserts that SFPD's "policies in dealing with juveniles were followed," ECF No. 42-2 at 3, which might lend some support to a theory that inadequate juvenile policies led to a deprivation of rights. But Plaintiffs' Amended Complaint asserts inadequate policies only "with respect to crowd control, First Amendment rights, and the requirement of probable cause for arrest in crowd contexts"—not policies related to juveniles—without specifying any deficiency in any such policy, or even alleging that Defendants followed such policies during Plaintiffs' arrest. Consolidated Am. Compl., ¶ 74. Accordingly, the Court GRANTS Defendants' Motion as to Plaintiffs' *Monell* claim against the City to the extent that it is

predicated on a theory of an unconstitutional policy.

The Court also GRANTS Defendants' Motion to dismiss claims against the City grounded on *Monell* liability based on an alleged failure to train and supervise adequately SFPD officers to prevent foreseeable constitutional violations.  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. . . . To satisfy [§ 1983], a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Canton*, 489 U.S. at 388).  Plaintiffs have not pled sufficient facts to support a plausible claim that City policymakers were on "actual or constructive notice that a particular omission in their training program or supervision structure causes city employees to violate citizens' constitutional rights."  *Id.*  Nor do they allege any specific omission in Defendants' training procedures.  *Cf. Martinez*, 499 F. Supp. 3d at 750 (noting allegations "that Santa Rosa lacks *any* written policy on tear gas and has failed to train its officers in the use of chemical agents and less-lethal projectiles" (emphasis added)).  As discussed above, Plaintiffs generally allege that SFPD failed to implement certain reforms, but there are no factual allegations concerning the DOJ reforms from which the Court can infer that such reforms would have prevented violations of the Fourth Amendment, nor that such reforms would have included relevant training that would have prevented such violations.

The Court DENIES Defendants' Motion to dismiss Plaintiffs' Fourth Amendment claim against the City based on a *Monell* theory of Chief Scott's involvement in, ratification of, and/or delegation of authority related to Plaintiffs' arrest.  The Court GRANTS Defendants' motion as to other asserted grounds for *Monell* liability, with leave to amend.

## B.     State Law Claims

### 1.     Bane Act Claim

California's Bane Act, section 52.1 of the Civil Code, "provides a cause of action for violations of a plaintiff's state or federal civil rights committed by threats, intimidation, or coercion."  *Reese v. County of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (citation and internal quotation marks omitted).  Defendants' Motion addresses this claim solely with the

arguments that: (1) the "'statute requires a showing of coercion independent from the coercion inherent in the wrongful detention itself'"; and (2) the statute does not provide for supervisor liability.  ECF No. 42 at 27–28 (quoting *Shoyoye v. County of Los Angeles*, 203 Cal. App. 4th 947, 959 (2012)).

The case on which Defendants rely for their first argument is no longer good law, at least in federal court.  In 2017, another California appellate court specifically rejected *Shoyoye*'s requirement of "independent" force or coercion.  *Cornell v. City & County of San Francisco*, 17 Cal. App. 5th 766, 799–02 (2017).  Defendants argue in their Reply that this Court is nevertheless bound by *Shoyoye*'s rule because the Ninth Circuit adopted it in *Lyall*, 807 F.3d at 1196.  ECF No. 52 at 23.  But *Cornell* specifically criticized *Lyall*'s embrace of that rule, 17 Cal. App. 5th at 799 & n.28, and Ninth Circuit interpretations of state law are "only binding in the absence of any subsequent indication from the California courts that [its] interpretation was incorrect," *Owen ex rel. Owen v. United States*, 713 F.2d 1461, 1464 (9th Cir. 1983).  After *Cornell*, district courts were free to determine which approach better predicted how the California Supreme Court would decide the issue.  *See Watkins v. City of Oakland*, No. 17-cv-06002-JCS, 2018 WL 574906, at *12–13 (N.D. Cal. Jan. 26, 2018) (following *Cornell* as more persuasive than *Shoyoye* and *Lyall*).  More importantly—and strangely not addressed by Defendants' Reply, despite Plaintiffs citing it in their Opposition—the Ninth Circuit has since adopted *Cornell*'s interpretation and acknowledged a change of course from *Lyall*.  *Reese*, 888 F.3d at 1043–44 & n.5.  This Court is aware of no subsequent indication from the California courts that *Reese* erred in doing so, and is therefore bound by *that* interpretation of the Bane Act.  *See Owen*, 713 F.2d at 1464.

In their Reply, Defendants argue for the first time that Plaintiffs have not satisfied a separate requirement articulated by *Cornell*, that the Bane Act requires "specific intent" to violate a plaintiff's rights.  ECF No. 52 at 24.  For the purpose of the present Motion, Defendants waived that argument by failing to raise it before their Reply.  In any event, *Reese* held that a showing of "reckless disregard for a person's constitutional rights" can meet that standard, 888 F.3d at 1045, and at least one decision from this district has held that a lack of probable cause to arrest is enough to show reckless disregard, at least to avoid dismissal under Rule 12(b)(6).  *Mehta v. City of*

1    *Sunnyvale*, No. 23-cv-03193-PCP, 2024 WL 950165, at *5 (N.D. Cal. Mar. 5, 2024).  The Court is

2    satisfied that Plaintiffs' allegations of an indiscriminate mass arrest without probable cause

3    support a sufficient inference that the Defendants who ordered that arrest acted with reckless

4    disregard for arrestees' right to be free from unreasonable seizures.

5           Defendants are correct that some district court decisions have held that the Bane Act does

6    not support supervisor liability, based on a perceived absence of prior decisions imposing such

7    liability.  *Redmond v. San Jose Police Dep't*, No. 14-cv-02345-BLF, 2017 WL 5495977, at *30

8    (N.D. Cal. Nov. 16, 2017); *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1119 n.19 (E.D. Cal.

9    2012).  But other decisions have held that supervisor liability applies under this statute to the same

10   extent as under § 1983, with the most carefully reasoned of those cases noting that a California

11   Supreme Court decision implicitly blessed such a theory, albeit without meaningful analysis.

12   *Johnson v. Baca*, No. CV 13-04496 MMM (AJWx), 2014 WL 12588641, at *16 (C.D. Cal. Mar.

13   3, 2014) (citing *Venegas v. County of Los Angeles*, 32 Cal. 4th 820, 841 (2004)); *see also Black*

14   *Lives Matter-Stockton Chapter v. San Joaquin Cty. Sheriff's Off.*, 398 F. Supp. 3d 660, 679 (E.D.

15   Cal. 2019); *Shirazi v. Oweis*, No. 5:21-cv-00136-EJD, 2022 WL 445763, at *7 (N.D. Cal. Feb. 14,

16   2022).

17          The Court finds the latter view more persuasive, particularly when nothing in the text of

18   the statute precludes supervisor liability.  *See* Cal. Civ. Code § 52.1(c) ("Any individual whose

19   [rights have] been interfered with, or attempted to be interfered with . . . may institute and

20   prosecute in their own name and on their own behalf a civil action for damages . . . .").  The Court

21   also notes that the Ninth Circuit has repeatedly indicated that the elements of a Bane Act claim are

22   generally identical to a § 1983 claim, albeit in cases where that issue does not appear to have been

23   disputed.  *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014); *Cameron v.*

24   *Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013); *but see Reese*, 888 F.3d at 1044 (acknowledging

25   *Cornell*'s intent requirement as a distinction from § 1983).  Accordingly, for the same reasons

26   discussed above with respect to Plaintiffs' Fourth Amendment claim under § 1983, the Court

27   holds that Plaintiffs have sufficiently alleged a Bane Act claim against each of the individual

28

United States District Court
Northern District of California

defendants.[13]

Defendants' Motion to dismiss Plaintiffs' Bane Act claim is therefore DENIED.

### 2.    Ralph Act Claim

California's Ralph Act guarantees a right to be free from violence or intimidation on account of certain protected characteristics, including race.  Cal. Civ. Code § 51.7(b)(1); *see id.* § 51(b) (listing protected characteristics).  Plaintiffs address their Ralph Act claim only in conjunction with their Fourteenth Amendment equal protection claim, implicitly conceding that the two rise or fall together.  ECF No. 50 at 28.  For the same reasons discussed above in the context of the Fourteenth Amendment claim, Plaintiffs have not plausibly alleged discrimination on account of race.  Defendants' Motion to dismiss the Ralph Act claim is therefore GRANTED, and that claim is DISMISSED with leave to amend.

### 3.    False Arrest and Imprisonment Claim

Defendants move to dismiss Plaintiffs' false arrest and imprisonment claim on the grounds that: (1) Plaintiffs' own allegations reveal probable cause to arrest; and (2) Defendants are immunized by California Penal Code section 847(b), which Defendants contend is effectively identical to the federal qualified immunity standard.  ECF No. 42 at 18–19.

A plaintiff can pursue a false arrest claim against a peace officer if the officer lacked probable cause to arrest.  *See Cornell*, 17 Cal. App. 5th at 779–90.  As discussed above in the context of Plaintiffs' Fourth Amendment claim, nothing in the Amended Complaint indicates that Defendants had probable cause to arrest Plaintiffs.

Defendants assert that "[i]t is a crime to obstruct the free movement of any persona on any street sidewalk, or public place," but identify no allegations of the Amended Complaint showing that Plaintiffs obstructed any person, or that Defendants had probable cause to believe that they did.  ECF No. 42 at 29 (citing Cal. Penal Code §§ 664, 647c.)  They also note that it is a crime to "participate in an unlawful assembly."  *Id.* (citing Cal. Penal Code §§ 407, 408).  The Penal Code defines an "unlawful assembly" as "two or more persons assemble together to do an unlawful act,

---

[13] Defendants do not argue that the City cannot be held vicariously liable for its employees' violation of the Bane Act.  See ECF No. 52 at 23

United States District Court
Northern District of California

or do a lawful act in a violent, boisterous, or tumultuous manner". Cal. Penal Code § 407. To accord with the First Amendment, the California Supreme Court has limited that definition to "assemblies which are violent or which pose a clear and present danger of imminent violence." *In re Brown*, 9 Cal. 3d 612, 623 (1973). Setting aside Defendants' version of events in their press release, which the Court declines to consider here as discussed above in the context of their Request for Judicial Notice, nothing in the Amended Complaint indicates that the crowd was violent, presented any danger of violence, or collectively engaged in any unlawful act. Plaintiffs' allegations therefore do not show probable cause to arrest them for participating in an unlawful assembly.

Section 847(b) protects peace officers from liability for false arrest if the "arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful." Cal. Penal Code § 847(b)(1). The California appellate court in *Cornell* persuasively held that section 847(b) neither protects an arrest made without probable cause nor imports the federal qualified immunity standard into state law. *Cornell*, 17 Cal. App. 5th at 786–90. Even if Defendants were correct that section 847(b) is equivalent to qualified immunity, Plaintiffs' allegations are sufficient to overcome that immunity, as discussed above in the context of their Fourth Amendment claim.

Defendants' Motion to dismiss Plaintiffs' false arrest and imprisonment claim is therefore DENIED.

### 4. Negligence Claim

"The elements of a cause of action for negligence are (1) a legal duty to use reasonable care, (2) breach of that duty, and (3) proximate cause between the breach and (4) the plaintiff's injury." *Mendoza v. City of Los Angeles*, 66 Cal. App. 4th 1333, 1339 (1998). Defendants do not dispute that arrest without probable cause can support a negligence claim, but move to dismiss this claim based on Government Code section 820.8, based on Plaintiffs' failure to allege vicarious liability against the City, and because Defendants' conduct was reasonable "to stop a riot causing violence and mayhem". ECF No. 42 at 30–31.

Section 820.8 of the California Government Code reads as follows:

> Except as otherwise provided by statute, a public employee is not
> liable for an injury caused by the act or omission of another person.
> Nothing in this section exonerates a public employee from liability
> for injury proximately caused by his own negligent or wrongful act or
> omission.

Cal. Gov't Code § 820.8. As discussed above in the context of Plaintiffs' Fourth Amendment claim, Plaintiffs have alleged that each of the individual defendants either ordered or approved and acquiesced to the mass arrest at issue, with no indication in the Amended Complaint that such an arrest was supported by probable cause. The Court finds those allegations sufficient to support a claim that the arrest was caused by each individual Defendant's "own negligent or wrongful act or omission," such that immunity under section 820.8 does not apply.

Defendants acknowledge that the City can be held vicariously liable for the acts of its employees, but argue that "Plaintiffs do not allege vicarious liability." ECF No. 42 at 30–31. Under California law, a "public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would . . . have given rise to a cause of action against that employee". Cal. Gov't Code § 815.2(a). Although Plaintiffs do not specifically cite that statute or use the term "vicarious liability," it is not difficult to infer from their Amended Complaint that they seek to hold the City liability for the mass arrest carried out by its police officers, as Plaintiffs make clear in their Opposition. ECF No. 50 at 32. The Federal Rules of Civil Procedure "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam) (summarily reversing dismissal of a constitutional claim for failure to cite § 1983). The Court therefore declines to dismiss Plaintiffs' negligence claim against the City for failure to invoke vicarious liability under section 815.2 explicitly.

As for whether Defendants' conduct was reasonable, nothing in the Amended Complaint—to which the Court's present review is confined—supports Defendants' characterization of a "riot causing violence and mayhem". *See* ECF No. 42 at 31.

Defendants' Reply addresses Plaintiffs' negligence claim only in an argument for immunity under Penal Code section 847(b). ECF No. 52 at 25. As discussed above in the context

United States District Court
Northern District of California

of Plaintiffs' false arrest claim, section 847(b) does not protect an arrest made without probable cause, which Plaintiffs have sufficiently alleged.

Defendants' Motion to dismiss Plaintiffs' negligence claim is therefore DENIED.

### 5.    Declaratory and Injunctive Relief

Defendants' move to dismiss Plaintiffs' claims for injunctive and declaratory relief, but raise arguments related only to the requested injunctive relief. ECF No. 42 at 31. To the extent Defendants' Motion encompasses Plaintiffs' claim for declaratory relief, it is DENIED for failure to offer any discernable argument as to that claim.

Plaintiffs seek injunctive relief requiring Defendants to destroy the records of their arrests[14]—among other purportedly injunctive relief not addressed in either party's briefs, such as "an order exonerating each of them and finding them factually innocent." Corrected Am. Compl., ¶ 136. Defendants contend that California automatically seals juvenile police records, citing Welfare and Institutions Code section 827.9, and that "Plaintiffs do not explain how the record keeping associated with a local, juvenile arrest warrant could conceivably be addressed in federal court," citing no authority whatsoever. ECF No. 42 at 31.

As Plaintiffs correctly note in their Opposition, the statute that Defendants cite "only appl[ies] to Los Angeles County," and thus has no bearing on this case. Cal. Welf. & Inst. Code § 827.9(p). The parties disagree on the extent to which other statutes protect Plaintiffs' records. *See* ECF No. 50 at 33–34; ECF No. 52 at 10–11.

In their Reply, Defendants cite *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), for the proposition that federal courts should exercise restraint in issuing injunctions affecting state law enforcement authorities. ECF No. 52 at 11. Defendants do not address the holding of *Lyons*, which was that the plaintiff lacked standing to seek an injunction against the use of chokeholds by Los Angeles police when he could not show more than a speculative chance that he would be subject to a chokehold in the future. *See generally Lyons*, 461 U.S. 95. That holding has little if

---

[14] Defendants have elsewhere objected to the term "arrest," arguing that the State of California does not use that term for detention of juveniles. This Order uses the term "arrest" in its colloquial sense and for consistency with Plaintiffs' Complaint, without deciding whether the documents at issue strictly constitute "arrest records" under California law.

United States District Court
Northern District of California

1  any bearing on whether this Court can order Defendants to destroy Plaintiffs' arrest records, the

2  existence of which is in no way speculative.

3        The perfunctory arguments in Defendants' Motion regarding Plaintiffs' claim for

4  injunctive relief are insufficient to resolve the potentially complex issues raised by that claim, and

5  have led to the parties' unhelpfully talking past each other in their subsequent briefs.  These issues

6  would be better addressed on more thorough briefing and on a factual record.  The Court therefore

7  DENIES Defendants' Motion to dismiss Plaintiffs' claim for injunctive relief, without prejudice to

8  any argument that Defendants might raise on summary judgment or at a later stage of the case.

9  **VI.    CONCLUSION**

10        For the reasons discussed above, Defendants' Motion is GRANTED as to Plaintiffs' claims

11  for violation of the First Amendment, the Fourteenth Amendment, and California's Ralph Act, and

12  as to all theories of *Monell* liability other than involvement, ratification, or delegation by a final

13  policy-maker (Chief Scott) in a violation of Plaintiffs' Fourth Amendment rights.  The Motion

14  DENIED as to all other claims.  If Plaintiffs intend to pursue any claim dismissed by this Order,

15  they may file a second amended complaint no later than July 5, 2024, or they may bring a motion

16  for leave to amend at a later date if they believe discovery supports such an amendment.

17        **IT IS SO ORDERED.**

18  Dated: June 13, 2024

19

20

21  LISA J. CISNEROS
    United States Magistrate Judge

United States District Court
Northern District of California