UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.T., et al., <br><br>   Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, et al., <br><br>   Defendants. | Case No.  23-cv-06524-LJC <br><br> **ORDER RESOLVING DISCOVERY LETTER BRIEFS REGARDING SUBPOENAS** <br><br> Re: Dkt. Nos. 75, 77 |

## I. INTRODUCTION

This putative class action concerns the arrest of over one hundred people in July of 2023 at the Dolores Hill Bomb, an unsanctioned skateboarding event that Defendants—the City and County of San Francisco and several of its police officials—contend devolved into a riot. Plaintiffs, like many of the detainees they seek to represent as a class, were minors at the time of the events at issue. The parties have filed two joint discovery letter briefs (ECF Nos. 75, 77) concerning subpoenas served by Defendants, which the Court resolves as follows.[1] This Order assumes the parties' familiarity with the facts and history of the case.

## II. LEGAL STANDARD

"A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). A court must quash a subpoena that "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(i), (iv). "Although irrelevance is not among the litany of enumerated reasons for quashing a subpoena found in Rule 45, courts have incorporated relevance as a factor

---

[1] The parties have consented the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

[related to undue burden] when determining motions to quash a subpoena." *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005).

"Unless otherwise limited by court order," Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "The scope of [subpoena] discovery under Rule 45 is the same as under Rule 26(b)." *Waymo LLC v. Uber Techs., Inc.*, No. 17-cv-00939-WHA (JSC), 2017 WL 2929439, at \*2 (N.D. Cal. July 7, 2017).

That said, the "Ninth Circuit has long held that nonparties subject to discovery requests deserve extra protection from the courts." *Maplebear Inc. v. Uber Techs., Inc.*, No. 21-mc-80007-SK, 2021 WL 1845535, at \*1 (N.D. Cal. Mar. 23, 2021) (citation omitted); *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 161 F.R.D. 86, 88 (N.D. Cal. 1995) (citing *United States v. C.B.S.*, 666 F.2d 364, 371–72 (9th Cir. 1982)).

> "In general, there is a preference for parties to obtain discovery from one another before burdening non-parties with discovery requests." *Soto v. Castlerock Farming & Transp., Inc.*, 282 F.R.D. 492, 505 (E.D. Cal. 2012) (collecting cases). When the requesting party has "not shown [that it] attempted to obtain documents from the [opposing party] in an action prior to seeking the documents from a non-party, a subpoena duces tecum places an undue burden on a non-party." *Id.* Further, "when an opposing party and a non-party both possess documents, the documents should be sought from the party to the case." *Soto*, 282 F.R.D. at 505.

*Genus Lifesciences Inc. v. Lannett Co., Inc.*, No. 18-cv-07603-WHO, 2019 WL 7313047, at \*4 (N.D. Cal. Dec. 30, 2019) (quashing a subpoena where the requesting party had not first sought the same materials from the opposing party, who would have been expected to have them).

A party to a case may challenge a subpoena served on a non-party that implicate the party's cognizable interests, including privacy interests. *See, e.g., Cabell v. Zorro Prods., Inc.*, 294 F.R.D. 604, 607 (W.D. Wash. 2013).

2

## III. SUBPOENAS FOR ACADEMIC RECORDS

Defendants have served subpoenas on Plaintiffs' schools for "[a]ny and all academic records, including, but not limited to transcripts, attendance, absences, tardiness, discipline, and participation in extracurricular activities" for each of the named Plaintiffs. ECF No. 75-1 at 2.[2] As written, Defendants' subpoenas had no restriction as to time. Defendants have agreed to limit subpoenas to the San Francisco Unified School District (but not specific schools) to a period from two years before the arrest through the present. ECF No. 75 at 3. Defendants contend that such records are relevant to Plaintiffs' claims for equitable relief and damages. *Id.* at 2. Plaintiffs argue that academic records are not relevant to any issue in the case because they have not put their academic performance at issue or sought damages for loss of future academic or career prospects. *Id.* at 4.

The parties dispute the significance of the Family Education Rights and Privacy Act (FERPA), which includes safeguards against (and penalties for) unwarranted disclosure of educational records by schools. Although FERPA allows for disclosure in response to a subpoena after providing notice to students and parents, *see* 20 U.S.C. § 1232g(b)(2)(B), and does not create a discovery privilege, it demonstrates Congress's recognition that students have a significant privacy interest in educational records. "Courts have [therefore] required a party seeking disclosure of education records to meet a 'significantly heavier burden' to show that the party's need for the information outweighs the students' privacy interests." *Doe v. Manhattan Beach Unified Sch. Dist.*, No. CV19-06962-DDP (RAOx), 2020 WL 11271845, at *4 (C.D. Cal. Oct. 20, 2020) (quoting *Jun Yu v. Idaho State Univ.*, No. 4:15-cv-00430-REB, 2017 WL 1158813, at *2 (D. Idaho Mar. 27, 2017)). Although the courts in *Doe* and *Jun Yu* found production of redacted academic records warranted under the circumstances before them, such records were more relevant to the claims in those cases than they are here. *See Doe*, 2020 WL 11271845, at *4 ("Defendants' handling of other allegations of sexual misconduct is relevant to Plaintiff's allegation that there was a culture of hostility towards female complainants and there is no other

---

[2] The parties attached one exemplar subpoena to their Joint Letter, and appear to agree that all of the subpoenas to schools are substantially identical. *See* ECF No. 75 at 1.

source for Plaintiff to obtain this information."); *Jun Yu*, 2017 WL 1158813, at *2–3 (ordering production so that a student alleging discrimination could compare his treatment by a university to that of non-minority students).

Plaintiffs emphasize in their portion of this Joint Letter that they "are *not* claiming that the arrest or detention had any impact on their school performance," and "are *not* claiming a future wage loss or damages for harm to their future careers." ECF No. 75 at 4. Defendants counter that two paragraphs of Plaintiffs' Complaint—which Defendants characterize as "the sole foundation for the equitable claim and one basis for damages"—contradict that position. *Id.* at 2. Those paragraphs read as follows:

> 44. L.R. and other high school students were very worried about how the arrests might affect their future. An officer told them that this would be on their record, and L.R. heard an officer say that they would have to "prove your innocence" in court. A star athlete, L.R. was scared that the arrest could ruin her chances for a college athletic scholarship.

Corrected Am. Compl. (ECF No. 24) ¶ 44.

> 133. Plaintiffs fear that without intervention by this Court, the record of this wrongful arrest will negatively affect the plaintiffs' futures, including but not limited to their job, career, and college prospects.

*Id.* ¶ 133. One other paragraph also includes a passing reference to Plaintiffs' fears as to "how this arrest might affect their futures." *Id.* ¶ 60.

Plaintiffs' prayer for damages (other than punitive and statutory damages) reads as follows:

> 2. For past, present, and future general damages for the named plaintiffs and class members, including but not limited to, pain, suffering, anxiety, and/or emotional distress, deprivation of liberty, and loss of constitutional rights, to be determined according to proof;

*Id.* at 21 (Prayer for Relief).

Construed broadly, that request for relief could perhaps encompass damages for loss of future education and employment opportunities. But to the extent there was any ambiguity on the face of the Amended Complaint, Plaintiffs have now clarified that their use of the word "general" to describe the damages they seek was deliberate and limiting, and that their "complaint does not ask for special damages at all." ECF No. 75 at 4. As the Supreme Court has explained, albeit in

4

the context of defamation claims, "'[s]pecial damages' are limited to actual pecuniary loss, which must be specially pleaded and proved,' while "'[g]eneral damages,' on the other hand, cover 'loss of reputation, shame, mortification, injury to the feelings and the like and need not be alleged in detail and require no proof.'" *F.A.A. v. Cooper*, 566 U.S. 284, 295–96 (2012) (quoting a treatise). Setting aside any question of what proof Plaintiffs must offer to recover emotional distress damages and other forms of "general" damages on the claims they assert, they have now made clear that they do not intend to pursue damages for harm to their potential future careers. ECF No. 75 at 4.

The Court also considers whether the subpoena is relevant to Plaintiffs' claim for injunctive relief. Although Plaintiffs seek injunctive relief (including an order exonerating them and destruction of their detention records) based on potential harm to their academic and career prospects, *see* Corrected Am. Compl. ¶¶ 133, 136, such relief does not require quantifying the degree of any such potential harm with specificity. *Cf. Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (acknowledging that irreparable harm may be "difficult to valuate," in holding that this element of a claim for injunctive relief may be established by such difficulty of valuation). The extent to which Plaintiffs' juvenile records could be subject to future disclosure is not clear, but assuming for the moment that such disclosure is a possibility and might influence future employers, institutions for vocational or higher education, scholarship providers, or the military, it is not self-evident that such harm would be limited to particularly strong or weak students, or to alleged "star athletes" like L.R. An arrest record might affect the prospects of a straight-A student with no record of academic discipline or attendance problems. At the same time, an arrest record also might affect the prospects of a student who struggles academically, has attendance challenges, or has been involved in a disciplinary incident, as that student enters adulthood and pursues their path after high school. Defendants' subpoena appears to be premised on a belief that a "poor" student does not have prospects that could be harmed by an arrest record, and by delving into school records to determine whether a student is promising or not, Defendants may defend themselves against Plaintiffs' request for injunctive relief. The premise is wrong, and the precise degree of any such effect is unlikely to be the

5

deciding factor in whether Plaintiffs can obtain injunctive relief, particularly on behalf of a class.

Plaintiffs' claims do not place their academic records materially at issue, and Defendants have not met their "significantly heavier burden" to warrant disclosure of such records. *See Doe*, 2020 WL 11271845, at *4. To the extent that Plaintiffs' future plans and prospects could bear on their request for injunctive relief, and academic performance might have some tangential relevance to that inquiry, those issues are better addressed at least in the first instance through Plaintiffs' deposition testimony.

All subpoenas for academic records are therefore QUASHED.

## IV. SUBPOENAS TO E.J. AND SOPHIA CHUMLEY

### A. Background

E.J. is a minor who was detained at the Dolores Hill Bomb, and he was a named plaintiff in this case before voluntarily dismissing his claims without prejudice on January 3, 2024. *See* ECF No. 13.[3] E.J.'s mother, Sophia Chumley (spelled "Sofia" in Defendants' subpoenas, apparently erroneously), applied to serve as his guardian ad litem during his brief participation in this litigation. Defendants served subpoenas on both E.J. and Chumley seeking production of fifteen categories of documents and information from E.J., and sixteen categories from Chumley:

(1) All documents reflecting any statements related to the Dolores Hill Bomb;

(2) All of the E.J.'s and Chumley's "social media" (defined as including any electronic messaging, such as iMessage text messages, as well as related metadata) for a three-month period from June 1, 2023 through August 31, 2023;

(3) Records of all usage of any electronic device during the same three-month period, including geolocation, search history, messages, drafts, and any other electronic data[4];

---

[3] E.J.'s notice of voluntary dismissal was filed on January 3, 2024 but is dated December 19, 2023, which is the same day that this case was filed. The December date appears to be an error, but the discrepancy is not relevant to the present dispute.

[4] This request seeks all "activity" recorded on any electronic device from that three-month period, with the term "activity" defined in the subpoenas as:

> physical, electronic and virtual state or conduct, including but not limited to any record thereof, geotracking, geolocation, date/time stamp, diaries, calendars, log, index, stamp, "fingerprint," tracker, template, images, and/or *any other type of record on any type of electronic device*, e.g. laptop, mobile, cloud-based, backup system or

(4) All documents related to any communications about the Dolores Hill Bomb;

(5) All documents authored or maintained by E.J. or Chumley related to the Dolores Hill Bomb;

(6) All communications regarding E.J.'s whereabouts from July 1, 2023 through July 15, 2023;

(7) All documents reflecting either E.J. or Chumley's location from July 7, 2023 through July 9, 2023, including any recorded geolocation data;

(8) All communications regarding E.J.'s activity on July 8 and 9, 2023;

(9) All communications sent, received, or posted by E.J. regarding the Dolores Hill Bomb;

(10) All records of any deletion of data of any kind that was created "on or about July 1, 2023 through and including August 31, 2023" on any device or platform used by E.J.;

(11) All documents reflecting any electronic activity by E.J. from July 7, 2023 through July 10, 2023;

(12) "All photographs, videos, or images created, saved, modified, forwarded, received, related to, and/or deleted at any time between July 7 through 10, 2023" (in the subpoena served on Chumley, this is limited to media related to E.J.);

(13) All geolocation data reflecting E.J.'s location or movement on July 8 and 9, 2023;

(14) All documents reflecting any purchases or funds received from noon on July 7, 2023 through noon on July 9, 2023 (in the subpoena served on Chumley, this is limited to

---

drive, as well as cloud-based and/or internet-based applications or "apps", including SOCIAL MEDIA, NEWS apps, and/or music and/or video streaming applications (such as Spotify, Apple Music, Podcasts). For the avoidance of doubt, activity, also includes but is not limited to, reading, searching, reviewing, saving, viewing, deleting, altering, modifying, creating, storing, sending, forwarding, drafting and/or any other on-line/internet-based conduct and used, accessed, subscribed to, viewed, copied, or in any way accessed. Activity, electronically, can also mean the metadata of the device, such as all records of the history, viewing, geolocation, access, interaction, account information, and/or activity logs, as well as deletions, drafts, creation, *posts, comments, messages*, emojis, "likes", views, downloading, saving, forwarding, editing, modifying, creating and/or saving.

ECF No. 77-1 at 5 (emphasis added).

1      transactions related "in any way" to E.J.);

2      (15) All documents reflecting communications with the media regarding the Dolores Hill

3      Bomb and subsequent mass detention; and

4      (16)[5] "All [of Chumley's] monthly invoices, mobile data history, activity, location, usage,

5      and/or monitoring logs related to telecommunication carriers, mobile communication

6      apps, videogame consoles or games, and/or any other devices for [E.J.] and/or

7      [Chumley] from June 1, 2023 through September 30, 2023."

ECF No. 77-1 at 5–8; ECF No. 88[6] at 5–8 (paraphrased except as indicated by quotation marks).

Some of those requests include examples of more specific topics or types of documents, but those are offered specifically "without limitation" and do not narrow the scope of the requests. *E.g.*, ECF No. 77-1 at 7 (Request No. 6, seeking all communications regarding E.J.'s whereabouts for a two-week period, "including but not limited to the Dolores Hill Bomb, skateboarding, sideshows, parties, and/or Dolores Park").

Defendants also demanded that E.J. and Chumley produce for inspection any electronic device that contained data from July 1 through 31, 2023, including but not limited to smartphones and laptops. ECF No. 77-1 at 9 (listing a narrower date range of July 7 through 10, 2023 in the subpoena to E.J.); ECF No. 88 at 9 (listing the full month of July in the subpoena to Chumley, and seeking both Chumley's and E.J.'s devices). Defendants assert in the joint letter that they "never asked for unfettered access to E.J.'s devices," instead proposing extraction and production of

---

[5] This request appears only in the subpoena served on Chumley, where it is one of two requests bearing the number "15." ECF No. 88 at 8.

[6] The Court sealed sua sponte the version of the subpoena to Chumley that was filed with the parties' joint letter because it included E.J.'s full name in violation of Rule 5.2(a) of the Federal Rules of Civil Procedure. *See* ECF Nos. 77-2 (sealed), 86 (text-only Order). Plaintiffs refiled a redacted version of that subpoena as ECF No. 88. The Court notes that E.J. was seventeen years old when this case was filed and will reach the age of majority soon. This use of E.J.'s name foreshadows potential issues regarding references to other non-parties or putative class members who were minors during the events at issue but might reach majority while this litigation is pending. Taking into account background rules regarding privacy of juvenile detention records, the Court now clarifies that **the parties must continue to identify any non-party or putative class member who was a minor when detained only by their initials absent further order of the Court, even if such a detainee has since turned eighteen, unless the detainee affirmatively consents to public disclosure of their name in connection with this litigation after reaching the age of eighteen**. *See* ECF No. 79 at 14 n.10 (previous Order addressing the use of initials to identify Plaintiffs).

1  certain information like geotracking data by a vendor, ECF No. 77 at 5, but no such limitation

2  appears on the face of the subpoenas.

3        E.J. and Chumley contend that these requests are overly broad, especially when E.J. is no

4  longer a named plaintiff in the case and Chumley was not involved in the events at issue except to

5  pick up her son when he was released from detention.  ECF No. 77 at 1–2.  E.J. has agreed to

6  produce documents as follows:

> He will produce his text messages with Ms. Chumley and others from that day related to the Hill Bomb, police response or arrests; his photos and videos of the event; and all social media posts, notes, and statements related to the Hill Bomb, police response or arrests; as well as any available location data for July 8, 2023, 4pm – 8:40pm (he and Ms. Chumley do not use any geolocation tracking.)

11  ECF No. 77 at 1.  Chumley has not agreed to produce any documents.  *See id.*

12      **B.**    **Analysis**

13        The breadth of these subpoenas strains belief, particularly Request Nos. 2 and 3.  At least

14  based on the subpoenas as originally served, Defendants sought literally all electronic records and

15  messages created or retained by a non-party minor and his mother over a three-month period.  The

16  subpoenas would include location data, search history, and communications that either E.J. or

17  Chumley had about any topic with any other person—friends, family, intimate partners,

18  professional colleagues, financial institutions, or anyone else with whom they might have

19  exchanged messages.  There is no reason to think that the vast majority of information falling

20  within that scope would have any relevance to this case.

21        As should go without saying to experienced counsel, this is not how discovery typically

22  works.  In a normal case, a request for production of documents (whether in a subpoena to a non-

23  party or a request to a party under Rule 34) identifies specific categories of potentially relevant

24  documents.  Documents might be identified by type, like financial statements covering a time

25  period where an entity's assets are at issue, or by topic, such as communications regarding certain

26  events or issues giving rise to a claim, or by search terms reasonably calculated to appear in

27  relevant documents.  But they are almost always identified in some way that ties the request to

28  issues relevant to the case; parties are rarely if ever entitled to all records of any kind that someone

9

might have from the months surrounding an event.

"As the Supreme Court has recognized, '[m]odern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans the privacies of life.'" *Henson v. Turn, Inc.*, No. 15-CV-01497-JSW (LB), 2018 WL 5281629, at *6 (N.D. Cal. Oct. 22, 2018) (quoting *Riley v. California*, 134 S. Ct. 2473, 2494–95 (2014)). "An Internet search and browsing history, for example, . . . could reveal an individual's private interests or concerns—perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD." *Riley*, 573 U.S. 373, 395–96 (2014). Smartphone applications might include data related to intimate topics like a person's political views, drug or alcohol use, religious practices, finances, romantic relationships, or reproductive information. *Id.* at 396. In *Henson*, Judge Beeler therefore denied requests by a defendant to inspect the plaintiffs' smartphones (or complete forensic images thereof) and for the plaintiffs to produce their complete browsing history, even where the case turned the defendant's alleged use of browser cookies that were stored on the plaintiffs' phones. *Henson*, 2018 WL 5281629, at *5, *8. Defendants contend that "*Henson* is a red herring" because Defendants here have "never asked for direct access to the devices," but that position contradicts the inspection requests stated on the face of the subpoenas Defendants served, and ignores that their requests for production of documents would sweep so broadly as to approximate a complete forensic review, at least with respect to a discrete but relatively long period of time.

The subpoenas that Defendants have served here seeking all of a person's electronic records of any kind over a period of several months, as well as inspection of all of their electronic devices, would be inappropriate even for party discovery in most cases. Such a request is beyond the pale when it comes to non-parties.

Defendants assert that, during the meet-and-confer process, they offered a proposal that "contemplates the device is turned over to a third-party vendor, search terms and a time-stamp algorithm is applied, and produced after counsel reviews for privilege." ECF No. 77 at 3. They do not detail that proposal in the Joint Discovery Letter or explain what search terms they intended to use. They also do not clearly indicate that they narrowed their substantive requests in any way,

10

although they characterize those requests as somewhat narrower than what appears on the face of the subpoenas, and Plaintiffs assert that Defendants were "willing to 'limit' their subpoenas to complete mirror imaging of E.J.'s phone; plus his mother's phone bills and other 'records related to E.J.'s activity.'" ECF No. 77 at 1. According to Defendants, the subpoenas seek "two types of ESI:"

> (1) non-privileged data related to "activity" (defined in the subpoenas) during the 48 hour period of time around July 8, 2023, including all activity on apps and geotracking data (***Category One***), (2) a two-month period of time as to E.J.'s social media activity and visual images, and (3) data that relates to hill bombing, skateboarding, graffiti, and the Dolores Hill Bomb Event (collectively, the "Subject Matter") (***Category Two***).

ECF No. 77 at 4.

It appears that either Defendants have backed off from the full scope of their subpoenas and particularly Request No. 3, which seeks all electronic "activity" (i.e., data *of any kind*) from both E.J. and Chumley over a *three*-month period, or Defendants accidentally drafted and served much broader subpoenas than they intended. Regardless, even as characterized or potentially narrowed by Defendants, these subpoenas are not proportional to the needs of the case. The request for all "social media" (defined to include any electronic messages) over a period of months remains particularly egregious.

Defendants assert that Plaintiffs' original Complaint includes "admissions" that E.J. "(a) knew the street party and Dolores Hill Bomb was dangerous and illegal, (b) heard the notices to disperse by police for two hours around the vicinity, and (c) he easily 'complied' and 'left through Church Street,'" before later "rejoin[ing] the crowd." ECF No. 77 at 4. These assertions exaggerate and in some ways misstate Plaintiffs' allegations.[7] Even so, E.J.'s personal knowledge of any danger or illegality has no apparent relevance to whether Defendants had probable cause to

---

[7] The Court previously sealed Plaintiffs' original Complaint sua sponte because it included the full names of minors in violation of Rule 5.2(a) of the Federal Rules of Civil Procedure. Plaintiffs did not file a redacted version of the original Complaint, presumably because it had been amended and superseded. A redacted version of the original Complaint remains necessary to complete the public record, particularly now that its allegations have been referenced in arguments. **Plaintiffs are ORDERED to file a redacted version of the original Complaint** no later than October 8, 2024, with a cover page explaining that it has been superseded and is filed only to complete the record.

11

arrest the crowd, and police orders to disperse are presumably captured on their body-worn camera recordings. The extent to which E.J. was able to leave the area in response to those orders may be relevant, but that does not justify the full forensic audit of his and his mother's electronic records and communications that Defendants seek, particularly when few if any such records are likely to shed light on that question.

Defendants also suggest that evidence will show E.J. engaged in vandalism and graffiti,[8] ECF No. 77 at 4, but if they already have evidence to that effect, it is not clear why a burdensome and wide-ranging subpoena is needed to show that a single person engaged in such conduct, particularly when there does not seem to be any dispute that at least some individuals in the community did so either during or following the Hill Bomb. If police had probable cause to arrest the crowd based on vandalism by some members of the crowd, evidence from participants as to what occurred may have some relevance at the margins, but probable cause will likely be proven in large part by police video recordings and testimony to show what the officers involved knew and perceived at the time of the arrest. It is therefore reasonable to ask E.J. to produce some documents relevant to the events at the Dolores Hill Bomb (as he concedes), but Defendants have not shown cause to impose a significant burden on him in doing so, or to require production of largely irrelevant records from the days, weeks, or months surrounding the event based on the possibility that E.J. might overlook the potential relevance of some of them.

Defendants assert that all of E.J.'s (and apparently also Chumley's) digital "activity" from the days surrounding the Dolores Hill Bomb is relevant because Plaintiffs "argue[] these are 'children'[9] and, therefore, adult supervision and involvement is relevant," and anything tending to suggest that E.J. "hid his participation in the Hill Bomb or his graffiti activity from his guardian" would "disprove[] blaming the City [for] a guardian not being contacted." ECF No. 77 at 4. Defendants' theory appears to be that if E.J. wasn't forthright with his mother about his plans

---

[8] There is no evidence currently in the record that E.J. engaged in graffiti or vandalism, and the Court expresses no opinion on the truth or falsity of this assertion.
[9] That Plaintiffs and E.J. were children at the time of their detention does not appear to be subject to argument, although the significance of that fact might well be disputed. *See* CHILD, Black's Law Dictionary (12th ed. 2024) ("1. An unemancipated person under the age of majority.").

to attend the Dolores Hill Bomb, he has somehow waived his rights to relief for an allegedly illegal detention, or perhaps that any such concealment by E.J. would support an inference that he did not provide his mother's contact information to police when he was detained. E.J. is no longer a plaintiff in this case. Whether he provided sufficient information to allow police officers to contact his mother has no apparent relevance to the remaining Plaintiffs' claims, and given that Plaintiffs allege that some but not all of the minor detainees' parents or guardians were contacted, any failure to contact parents seems unlikely to be an issue suitable for class treatment. *See* Corrected Am. Compl. (ECF No. 24) ¶ 53. In any event, whatever information E.J. did or did not provide to police about his guardian(s) would be better captured by police records and deposition testimony than by electronic messages that E.J. sent to his mother or anyone else, and any contemporaneous messages that E.J. sent about his involvement in the Dolores Hill Bomb would be included within the narrower scope of documents the Court now orders him to produce, as detailed below.

Defendants further argue that Plaintiffs failed to preserve evidence, including electronically stored information. ECF No. 77 at 5. Whether or not that is true provides little if any support for demanding forensic examination of the records of a former plaintiff who decided not to continue in that role within a few weeks after filing the case.

Defendants cite a decision from this district authorizing forensic inspection of plaintiffs' devices. ECF No. 77 at 5 (citing *In re Apple Inc. Device Performance Litig.*, No. 5:18-md-02827-EJD, 2019 WL 3973752 (N.D. Cal. Aug. 22, 2019)). The claims in that case were based specifically on the performance of the devices at issue, and the defendant proposed that forensic images of the devices would be reviewed only by its experts, who would provide counsel with opinions on the issues in dispute while revealing as little information as possible about the plaintiffs' data stored on the devices. 2019 WL 3973752, at *2. Judge Davila found such review warranted under a heightened "compelling need" standard, which applied to the "serious" invasion of the plaintiff's privacy implicated by forensic imaging. *See generally id.* Given the limited potential relevance of E.J.'s records, as well has his current status as a non-party, this case does not resemble *Apple* in any way.

The Court finds E.J.'s proposed production more reasonable than Defendants' requests, but overly constrained. For example, E.J. has only agreed to produce messages (and only text messages) "from that day," as opposed to potential subsequent descriptions of the event. The Court therefore ORDERS as follows: E.J. shall produce all non-privileged documents (including but not limited to photographs, videos, and messages of any kind) describing or depicting the events of the July 2023 Dolores Hill Bomb and subsequent mass detention, including but not limited to documents that reflect E.J.'s whereabouts, activities, or state of mind during those events, regardless of when such documents were created.

E.J. agreed to produce "any available location data for July 8, 2023 4pm – 8:40pm," but asserts that "he and Ms. Chumley do not use geolocation tracking." ECF No. 77 at 1. Defendants assert "that is impossible" because "geotracking is embedded in devices and apps," and that only a vendor could extract that information. *Id.* at 5. Because E.J. has agreed to produce location data to the extent that it exists, and because E.J.'s previous allegation that he was able to comply with a dispersal order at least for a time suggests that his locations during the police response to the Dolores Hill Bomb might have some relevance to the case, the Court is open to exploring the production of that data if it exists. On the other hand, because E.J. is no longer a party to the case and the location of any single person is likely to have only limited relevance to the reasonableness of a mass arrest, any forensic review for such data must be narrowly targeted, any production of geolocation data must be limited to the period from 4:00 PM on July 8, 2023 (when Plaintiffs allege skateboarders began to arrive) to 2:00 AM on July 9, 2023 (when E.J. previously alleged he was released), and Defendants must bear the cost of any forensic review and extraction. If Defendants wish to pursue E.J.'s geolocation data under those conditions, the parties are ORDERED to meet and confer to determine whether the data likely exists and whether reasonable means are available to access it. E.J. need not produce a complete list of applications on his smartphone, but must cooperate in good faith to identify potential sources of geolocation data. The parties shall file either a stipulation setting forth a process for review and extraction or a joint letter addressing any disputes as to this issue no later than October 15, 2024.

There is no indication that Chumley was personally involved in the events at issue in any

14

1  way other than picking E.J. up from the police station, or that she is likely to have relevant
2  evidence beyond what is also in E.J.'s possession or control.  The request for Chumley's invoices
3  and other information regarding "telecommunications carriers, mobile communication apps,
4  videogame consoles," and other services or devices that E.J. might have used, *see* ECF No. 88 at
5  8, is an intrusive distraction not proportional to the needs of the case.  The subpoena served on
6  Chumley is therefore QUASHED in its entirety.

7  **V.     CONCLUSION**

8        For the reasons discussed above, all subpoenas for academic records are QUASHED.
9  Defendants shall provide a copy of this Order to all of the educational institutions on which they
10 served subpoenas.

11       The subpoena served on E.J. is QUASHED in part, and E.J. is ORDERED to produce
12 documents consistent with this Order no later than October 15, 2024.  If Defendants intend to
13 pursue location data under the conditions set forth above, the parties shall meet and confer and file
14 either a stipulation or a joint letter no later than October 15, 2024.  The subpoena served on Sophia
15 Chumley is QUASHED in its entirety.

16       **IT IS SO ORDERED.**

17 Dated: October 1, 2024

LISA J. CISNEROS
United States Magistrate Judge

15