1
2
3
4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    J.T., et al.,                         Case No.  23-cv-06524-LJC

8              Plaintiffs,
                                           **ORDER REGARDING MOTION FOR**
9         v.                               **CLASS CERTIFICATION**

10   CITY AND COUNTY OF SAN                Re: Dkt. No. 164
     FRANCISCO, et al.,
11
               Defendants.
12

13   **I.      INTRODUCTION**

14          This case concerns a mass arrest of more than one hundred people, many of them minors,

15   in the aftermath of the July 2023 "Dolores Hill Bomb," an unsanctioned skateboarding event.

16   Plaintiffs bring claims under state and federal law based on theories of arrest without probable

17   cause and constitutionally impermissible conditions of confinement.  Plaintiffs now move under

18   Rule 23 of the Federal Rules of Civil Procedure to certify a class consisting of "all persons who

19   were arrested in the 3500 block of 17th Street, San Francisco, on July 8, 2023, in the mass arrest

20   that occurred at approximately 8:40pm."  ECF No. 164 at 2.  Defendants do not oppose class

21   certification for determining liability on Plaintiffs' false arrest claims, but argue that conditions-of-

22   confinement claims require subclasses of adults, minor girls, and minor boys, [1] and that damages

23   must be determined individually.  Defendants also oppose class certification of claims seeking

24   injunctive relief in the form of exoneration.

25          The Court held a hearing on July 15, 2025, and has considered the parties' arguments,

26

27   ───────────────
     [1] When addressing subclasses and describing how Defendants conducted the mass arrest, this
     Order uses gendered terms like "girls," "boys," "male," and "female" to refer to how detainees
28   were categorized by Defendants during their detention, even if a given detainee's gender identity
     might differ from such categorization.

evidence, and briefing.  Since then, by stipulation, Plaintiffs have filed a Second Amended Complaint adding two additional named Plaintiffs.  The Court now GRANTS Plaintiffs' Motion for Class Certification in large part, subject to the limitations and modifications discussed below.[2]

## II.    BACKGROUND

The original named Plaintiffs in this case are three minor girls, all of whom were detained during the events at issue.  Each submits a declaration in support of class certification.  Plaintiffs also provide declarations by S.H., a minor boy who was detained, and Jack Brundage, a young adult who was detained, and have since filed a Second Amended Complaint adding S.H. and Brundage as Plaintiffs.  The following summaries of those declarations and a police incident report are not intended as a complete recitation of the declarations or other relevant evidence in the record (which also includes audiovisual recordings, among other exhibits) but provide context for the Court's analysis below.  These summaries should not be construed as resolving any disputed issues of fact.

### A.    J.T.'s Declaration

Plaintiff J.T., who was thirteen at the time, went to the vicinity of Dolores Park with friends and a cousin to watch people skateboard.  ECF No. 116, ¶ 2–3.  J.T. states in a declaration that she and her friends did not engage in graffiti or property damage and did not disobey police orders.  *Id.* ¶ 4.  After watching skateboarding on Dolores Street, J.T. heard an announcement by police officers.  *Id.* ¶ 6.  She "could not make out the exact words," but understood it as an instruction to leave the area.  *Id.*  She and her group walked through Dolores Park and then north with the intent of finding something to eat, but they learned that J.T.'s friend's father was on his way to pick them up at the intersection of 17th Street and Valencia Street, so they turned in that direction to meet him.  *Id.*

On 17th Street, they found a line of police officers with helmets and shields approaching them.  *Id.*  Officers refused J.T.'s request to pass through to meet her friend's father.  *Id.* ¶ 7.  J.T.'s group moved in the direction the police directed them and were eventually surrounded by

---

[2] The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

United States District Court
Northern District of California

officers approaching from other directions, at which point they were not allowed to leave.  *Id.*
¶¶ 8–9.  J.T. never heard any orders to disperse or instructions for how to leave the area after she
left Dolores Park earlier in the evening.  *Id.* ¶ 8.

According to J.T., the detainees were ordered to sit down on the street and stayed there for
at least two hours, including after the sun set and the temperature dropped.  *Id.* ¶ 10.  J.T. "was
able to get in touch with [her] family," and her friend's father came to the area where the group
was detained, but officers did not allow them to leave with him.  *Id.* ¶ 11.

After a period of hours, officers divided the detainees into minors and adults, and divided
the minors by gender.  *Id.* ¶ 12.  Officers handcuffed the adults with zip ties and placed them in
vans, and told the minors they would have to wait for buses.  *Id.*  Officers later searched and zip
tied the girls, took their property, and placed them on a Muni bus, which drove one block to the
Mission police station.  *Id.* ¶ 13.  The girls waited on the bus "for an hour or more."  *Id.* ¶ 14.
J.T.'s father came to the bus, where she was allowed to speak to him, but not to leave with him.
Around midnight, J.T. was taken into the police station, fingerprinted, and given her belongings,
and she was released around 12:45 AM to her father with a citation "for failure to disperse,
inciting a riot and conspiracy."  *Id.* ¶ 17.  Her wrists were red and irritated from the zip ties.

J.T. "heard other kids asking to use a bathroom" while detained on the street and on the
bus, but they were not allowed to use bathrooms "until near the end of the detention on the bus."
*Id.* ¶ 15.

### B.    C.L.'s Declaration

C.L., who was fifteen years old during the events at issue, walked with friends from her
nearby home to watch the skateboarding.  ECF No. 177, ¶ 3.  According to C.L., she and her
friends did not themselves skateboard, engage in any graffiti or property damage, or disobey
police orders.  *Id.* ¶ 4.

C.L. heard an announcement by police between 7:15 and 7:30 PM.  *Id.* ¶ 5.  Like J.T., she
could not make out every word that was said, but she understood it as an instruction to leave
Dolores Street and enter Dolores Park.  *Id.* ¶ 5.  Police then announced that the park was closed as
well.  *Id.*

Police had blocked the most direct route to C.L.'s house, so C.L. and her friends walked to Church Street and 18th Street, which appeared to be the available exit. *Id.* ¶ 6. They "stopp[ed] to watch what was happening," and then "walked down 18th to Dolores, hoping to be able to circle back to [C.L.'s] home." *Id.* But Dolores Street remained closed to the south towards C.L.'s house, so the group paused to try to determine an alternate route, and then unsuccessfully tried to get to Guerrero Street. *Id.* ¶¶ 6–7. Eventually they went north on Dolores hoping to find another way to Guerrero, but police officers walking behind them directed them onto 17th Street, and then other officers corralled them on 17th between Dolores and Guerrero. *Id.* ¶¶ 8–9.

According to C.L., the group was required to sit on the street for around two hours in cold and windy weather. *Id.* ¶ 11. Officers did not let her leave with family members who came to get her. *Id.* ¶ 12. Around 11:00 PM, an officer search C.L., took her property, and zip-tied her hands behind her back in a manner that was tight and painful. *Id.* ¶ 13. C.L. was then placed on a bus and remained there for more than an hour. *Id.* ¶ 15. Officers did not allow the girls on the bus to use the bathroom, including a girl who was "crying and begging" to do so. *Id.* ¶ 15. C.L. was hungry and thirsty, but the police did not provide any food or water. *Id.*

Around midnight, C.L. was allowed to use a bathroom in the police station while an officer watched. *Id.* ¶ 16. She was fingerprinted and given a citation, and released around 1:15 AM. *Id.*

### C.    L.R.'s Declaration

Plaintiff L.R. was fifteen during the events at issue. ECF No. 180, ¶ 2. She had dinner at a friend's house in Potrero Hill, and then rented electric scooters with friends to go to another friend's house near Kezar Stadium. *Id.* ¶ 3. When they were passing through the Mission District on 17th Street, they saw a large number of young people approaching them from the west, followed by police officers. *Id.* ¶ 4. L.R. and her friends tried to turn around, but "officers came charging towards [them] from Guerrero, blocking [their] way" and directing them to head west towards the other police officers. *Id.* ¶ 5. The officers in the other direction then directed them back towards Guerrero, and would not let them leave despite their efforts to explain that they "weren't involved in whatever was happening." *Id.* ¶ 6. At 8:45 PM, unable to leave, L.R. and her friends parked their scooters "and sat in the street with everyone else." *Id.* ¶ 7. An officer

4

1    announced that the crowd was under arrest. *Id.*

2         L.R. states that she and her friends "never heard any orders to disperse," "did not

3    participate in bombing [i.e., skateboarding] the hill," "did not throw anything or engage in any

4    graffiti or property damage," and "did not at any point disobey any police orders that [they]

5    heard." *Id.* ¶ 8.

6         As in the other Plaintiffs' declarations above, L.R. states that she was held on the street in

7    the cold for more than two hours, without access to bathrooms, food, or water. *Id.* ¶ 9.  When the

8    officers divided the detainees by age and gender, L.R. was separated from her friends, who are

9    boys. *Id.* ¶ 10.  L.R.'s description of subsequent events—being searched around 11:00 PM,

10   handcuffed tightly with zip ties, held on a bus for over an hour without access to a bathroom, and

11   eventually released after midnight with a citation—is substantially similar to J.T.'s and C.L.'s. *Id.*

12   ¶¶ 11–16.

13        **D.    S.H.'s Declaration**

14        S.H., who was not a named plaintiff at the time he submitted a declaration but is now, was

15   fifteen years old during the events at issue.  ECF No. 170, ¶ 2.  He brought his skateboard with

16   him to watch the Dolores Hill Bomb but "did not participate in bombing the hill," and states that

17   he did not engage in other illegal activity like graffiti or disobeying any police orders that he

18   heard. *Id.* ¶¶ 3–4.

19        S.H. heard an announcement by police "at some point," but could not understand it

20   "because there was a lot of noise." *Id.* ¶ 5.  He and his friends decided to leave the area and go to

21   a skatepark. *Id.* ¶ 6.  They walked on 17th Street to Church Street, where they sat on some steps to

22   try to determine the right bus route. *Id.*  When a group of people came running towards them, they

23   "walked away, east on 17th." *Id.*

24        Like Plaintiffs' experience described above, S.H. states that he was surrounded by officers

25   and required to sit on the street in the cold, without access to bathrooms, food, or water. *Id.* ¶¶ 7–

26   9.  S.H. and other boys were kept on the street after officers "loaded the girls onto a Muni bus and

27   people over 18 into other vehicles." *Id.* ¶ 10.  S.H. "and some of the other boys" were searched,

28   handcuffed with tight zip ties, and placed on a bus around 11:30 PM, where they remained "for

United States District Court
Northern District of California

1  what seemed like an hour." *Id.*  The boys were later held in "an open air garage-like area." *Id.*

2  S.H. was released with a citation around 2:00 AM. *Id.* ¶ 11.

3      **E.**    **Jack Brundage's Declaration**

4      Like S.H., Jack Brundage was not a named plaintiff at the time Plaintiffs filed their

5  Motion, but he has since been added as a plaintiff in the Second Amended Complaint.  On the

6  night in question, Brundage (then nineteen years old) was walking with friends at the intersection

7  of 17th Street and Guerrero Street to find a restaurant.  ECF No. 178, ¶¶ 2–3.  They did not engage

8  in graffiti or property damage. *Id.* ¶ 5.  They "encountered a wall of San Francisco Police Officers

9  with batons out," who directed them "to walk west on 17th Street to exit the area." *Id.* ¶ 4.

10  Brundage and his friends complied with that instruction, which was the only police instruction that

11  Brundage heard that night. *Id.* ¶¶ 5–6.  They then encountered another line of officers who

12  blocked them from proceeding. *Id.* ¶ 6.  Police required Brundage and his friends to sit on the

13  ground with a large group of people on 17th Street, where they received conflicting instructions as

14  to whether they would be released soon with "tickets" or arrested. *Id.* ¶¶ 7–8.

15      Police separated adults from minors, zip-tied the adults' hands behind their backs, and

16  loaded them into police wagons. *Id.* ¶¶ 9–10.  Brundage was held in a hot and crowded wagon

17  with seven other people "for somewhere around 1.5 to 2 hours." *Id.* ¶¶ 11–12.  Officers refused

18  Brundage's request to open the doors to provide fresh air, denied other detainees' requests for

19  water, and would not let the detainees use the bathroom. *Id.* ¶¶ 12–13.  Officers also denied

20  Brundage's request to loosen his zip tie handcuffs, which were causing him pain. *Id.* ¶ 14.

21      Officers brought Brundage into the Mission police station for around ten minutes to book

22  him, but still did not let him use a bathroom. *Id.* ¶ 15.  They then put him back in the wagon and

23  drove to the county jail, but held the detainees in the wagon for several more hours while waiting

24  for the Sheriff's Office to open the jail. *Id.* ¶¶ 16–17.  Around 3:30 AM, the detainees were

25  moved to holding cell in the jail, and Brundage was allowed to use the bathroom for the first time.

26  *Id.* ¶¶ 18–19.  Brundage was released around 11:00 AM that morning with a citation. *Id.* ¶ 20.

27      **F.**    **Police Incident Report**

28      Defendants do not offer declarations from officers involved in the arrest.  Instead, they

have provided "an excerpt from the San Francisco Police Department Incident Report" for the events at issue.  ECF No. 186-1, ¶ 2.[3]  The incident report states that officers attempted to prevent the Dolores Hill Bomb from taking place, but participants defied orders; skateboarded recklessly; set off fireworks; removed barricades; took over intersections; threw bottles, fireworks, and other objects at officers; and vandalized Muni vehicles.  *See generally* ECF No. 186-3.  Such activities continued despite multiple orders to disperse.  *Id.*  One officer was stabbed with an unknown object and treated for a head injury.  *Id.* at 3.

Defendants Captain Thomas Harvey and Lieutenant Matt Sullivan "formulated a plan to effect an arrest" of "a large crowd of approximately 200-250 rioters" that had gathered at 18th Street and Dolores Street.  *Id.* at 4.  The crowd was ultimately encircled and arrested on 17th Street.  *Id.* at 4.  "A mass arrest was done on order and approval by Captain Harvey."  *Id.*  "All detainees were ordered to sit on the ground during the encirclement because, 1) some people in the crowd deployed ignited fireworks, 2) the crowd was unsearched, 3) the crowd has shown destructive and violent behavior and 4) based on the size of the crowd."  *Id.*  "All juveniles were separated from the adults that were involved in the encirclement," and "[a]ll female juveniles were transported separated from the male suspects to Mission Station."  *Id.*  Adults were booked at the county jail based on Captain Harvey's approval.  *Id.*  Officers recovered a loaded handgun from a bag found on the street after the arrest.  *Id.*

### G.    The Parties' Claims and Arguments

Plaintiffs assert claims for violation of the Fourth Amendment under 42 U.S.C. § 1983, violation of section 52.1 of the California Civil Code (the Bane Act), common law false arrest and imprisonment, negligence, and declaratory and injunctive relief (including expungement of records).  Corr. 2d Am. Compl. (ECF No. 209) ¶¶ 113–37 (filed after the present Motion); *see generally* ECF No. 66[4] (order dismissing in part Plaintiffs' First Amended Complaint, leaving claims substantially similar to those presented in the Second Amended Complaint operative at the

---

[3] Defendants also submit a copy of the San Francisco Police Department General Order governing detention, arrest, and custody of minors.  ECF No. 186-2.
[4] *J.T. v. City & Cnty. of San Francisco*, No. 23-cv-06524-LJC, 2024 WL 3012791 (N.D. Cal. June 13, 2024).

United States District Court
Northern District of California

1    time the present Motion was filed).  Those claims present two general theories of liability: that

2    Defendants wrongfully arrested Plaintiffs without probable cause, and that Defendants held

3    Plaintiffs in impermissible conditions of confinement.

4         Plaintiffs move to certify a class "defined as the 113 people arrested in the 3500 block of

5    17th Street at approximately 8:40pm," as listed in Defendants' police report.  ECF No. 164 (Mot.)

6    at 20.

7         Defendants "do not oppose certification of the mass arrest claim," but argue that

8    "conditions of confinement were not uniform" and thus do not warrant class treatment, at least for

9    the class as a whole.  ECF No. 186 (Opp'n) at 2–4.  Defendants state in their opposition brief that

10    they would "not to oppose certification on conditions of confinement upon the creation of

11    subclasses that satisfy the requirements of Rule 23(a) based on the following categories of

12    detainees: adults, minor boys, and minor girls."  *Id.* at 4.  Defendants also contends that damages

13    cannot and should not be calculated on a class-wide basis.  *Id.*  Defendants do not specifically tie

14    their arguments regarding conditions of confinement and damages to any subpart of Rule 23, but

15    they argue that the conditions-of-confinement claims "cannot be resolved by common evidence,"

16    perhaps suggesting an argument based on Rule 23(a)(2)'s commonality requirement.  *Id.* at 3.

17    Finally, Defendants argue that certification of a class seeking injunctive relief of exoneration is

18    inappropriate both because a lack of probable cause to arrest would not necessarily establish actual

19    innocence, and because class members were never charged with a crime after their arrest.  *Id.* at

20    4–5.

21         In their reply brief, Plaintiffs argued that conditions of confinement could be resolved for

22    the class as a whole, because all class members were detained for hours in cold weather and

23    without access to food, water, or bathrooms.  ECF No. 188 at 2–4.  But Plaintiffs did "not

24    necessarily object to subclassing," *id.* at 2.  At the hearing, Plaintiffs agreed to modify the class

25    definition for the purpose of injunctive relief to exclude the apparently small number of people

26    who had individualized charges filed against them separately from and after the mass arrest.  ECF

27    No. 195 at 14:8–11, 19:16–20.

28         Defendants confirmed at the hearing that they do not oppose class certification for

United States District Court
Northern District of California

declarary relief.  ECF No. 195 at 19:11–15.

### III.    LEGAL STANDARD

Rule 23(a) of the Federal Rules of Civil Procedure requires a party seeking class certification to show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).[5]

The class must also satisfy at least one of the requirements of Rule 23(b).  As is relevant here, Rule 23(b) may be satisfied where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," Fed. R. Civ. P. 23(b)(2), or where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3).

> Although . . . a court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (citations and internal quotation marks omitted).

"When appropriate, an action may be brought or maintained as a class action with respect to particular issues," Fed R. Civ. P. 23(c)(4), or "may be divided into subclasses that are each treated as a class under" Rule 23, Fed. R. Civ. P. 23(c)(5).  A court may later amend a class

---

[5] Some courts have also imposed an implied fifth requirement of "ascertainability," which might or might not be consistent with Ninth Circuit precedent.  *See True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 929 (9th Cir. 2018).  The Court need not address that issue in this case, where there is no dispute over whether the putative class of arrestees is ascertainable.  The parties agree that Defendants have records of all putative class members.

United States District Court
Northern District of California

1    certification order before final judgment is entered.  Fed. R. Civ. P. 23(d)(1)(C).

2    **IV.    ANALYSIS**

3         **A.    Rule 23(a) Requirements**

4              **1.    Numerosity**

5         "Although the [numerosity] requirement is not tied to any fixed numerical threshold, courts

6    have routinely found [it] satisfied when the class comprises 40 or more members."  *See Kazi v.*

7    *PNC Bank, N.A.*, No. 18-cv-04810-JCS, 2020 WL 607065, at *3 (N.D. Cal. Feb. 7, 2020) (citing

8    *EEOC v. Kovacevich "5" Farms*, No. CV-F-06-165 OWW/TAG, 2007 WL 1174444, at *21 (E.D.

9    Cal. Apr. 19, 2007)); *see also Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010) (citing

10   *Kovacevich* with approval for the principle that classes of at least forty are generally sufficient,

11   and affirming certification of a class of twenty members).  No party disputes numerosity in this

12   case, and the more than one hundred putative class members exceed that informal threshold.  The

13   Court finds this factor to be satisfied.

14              **2.    Commonality**

15        To satisfy Rule 23(a)(2)'s commonality requirement, "even a single common question will

16   do."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (cleaned up).  But not any question

17   necessarily will suffice.  "Commonality requires the plaintiff to demonstrate that the class

18   members have suffered the same injury . . . . Their claims must depend upon a common contention

19   . . . of such a nature that it is capable of classwide resolution—which means that determination of

20   its truth or falsity will resolve an issue that is central to the validity of each one of the claims in

21   one stroke."  *Id.* at 349–50 (cleaned up).

22        This case meets that test, because the question of whether Defendants—and particularly

23   Captain Harvey, who ordered the arrest—had probable cause to effect a mass arrest of all putative

24   class members is central to all of their claims.  Defendants do not contest commonality for the

25   purpose of Plaintiffs' claims based on a theory of false arrest.  At the hearing, defense counsel

26   conceded that those claims rise or fall together:

27              THE COURT: So are you conceding that . . . the Plaintiffs' claim, as
              far as the arrest class, . . . rises and falls on the question of whether or
28            not there was probable cause to arrest the group?

United States District Court
Northern District of California

1

2 . . . .

        MS. SCHROEDER: That is correct.

3 ECF No. 195 at 4:2–9.  In defense counsel's words, "this was an arrest that was a mass arrest,

4 conducted pursuant to a single decision by Captain Tom Harvey."  *Id.* at 20:10–12.  The Court

5 therefore finds that commonality is satisfied with respect to Plaintiffs' false arrest claims.

6        It is not entirely clear whether Defendants challenged commonality with respect to

7 Plaintiffs' conditions-of-confinement claims.  Their argument that such claims "cannot be resolved

8 by common evidence," ECF No. 186 at 3, does not address the standard of whether class members

9 suffered the same injury and whether at least one significant common question can be resolved on

10 a class-wide basis.  *See Dukes*, 564 U.S. 338, 349–50, 359.  There is at least some common

11 question, and common injury, with respect to the reasonableness of the initial period when all

12 detainees were held together on the street for around two hours.  *See, e.g.*, ECF No. 180, ¶¶ 9–10.

13        The Court need not resolve whether that is sufficient to establish commonality as to the

14 class as a whole, however, because at least the typicality factor (as discussed below) requires

15 dividing the class into three subclasses: adults, minor girls, and minor boys.[6]  Plaintiffs have made

16 clear both in their briefing, ECF No. 188 at 2, at the hearing, and through their Second Amended

17 Complaint that though they did not believe such subclasses were necessary, they are amenable to

18 proceeding in that manner.  At least based on the current record, it appears that each subclass was

19 treated in a substantially uniform manner[7] such that they suffered common injuries, and such that

20 their claims present common questions of the reasonableness of their detention that are amenable

21 to class-wide resolution.  The Court therefore concludes that the commonality requirement is

22 satisfied for Plaintiffs' conditions-of-confinement claims to proceed based on subclasses.

23       **3.**      **Typicality**

24        The typicality requirement looks to "whether other members have the same or similar

25

26 ───────────────

[6] All references herein to minors refer to class members who were under the age of eighteen at the
27 time of their detention.
[7] Minor boys were transported to the police station in different groups, but at least based on the
28 current record and the parties' previous representations to the Court, it appears that all were held
in the same "open air garage-like area" upon arrival.  *See* ECF No. 170, ¶ 10.

United States District Court
Northern District of California

1    injury, whether the action is based on conduct which is not unique to the named plaintiffs, and

2    whether other class members have been injured by the same course of conduct." *Hanon v.*

3    *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted); *see also Dukes*, 564

4    U.S. at 348–49 (noting that "a class representative must be part of the class and possess the same

5    interest and suffer the same injury as the class members" (citation omitted)).  "The purpose of the

6    typicality requirement is to assure that the interest of the named representative aligns with the

7    interests of the class."  *Hanon*, 976 F.2d at 508.  "The commonality and typicality requirements of

8    Rule 23(a) tend to merge" with each other and with the adequacy requirement because all "serve

9    as guideposts for determining whether under the particular circumstances . . . the named plaintiff's

10   claim and the class claims are so interrelated that the interests of the class members will be fairly

11   and adequately protected in their absence."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13

12   (1982); *see also Dukes*, 564 U.S. at 350 n.5.

13        There is no dispute in this case that each named plaintiff is typical of the class for the

14   purpose of determining liability on Plaintiffs' theories that Defendants lacked sufficient cause for

15   the mass arrest.  When it comes to the conditions of their confinement, however, Defendants

16   divided the detainees into groups of adults, minor girls, and minor boys, and treated those groups

17   somewhat differently.  Defendants' incident report and Plaintiffs' declarations are consistent with

18   respect to Defendants' separation of the detainees by age and gender.  *See, e.g.*, ECF No. 186-3 at

19   4 ("All juveniles were separated from the adults that were involved in the encirclement. . . . All

20   female juveniles were transported separately from the male suspects to Mission Station.").

21   Defendants loaded the girls on a bus shortly after that division, held them on the bus, took their

22   fingerprints and issued them citations at the police station, and then released them.  ECF No. 166,

23   ¶¶ 12–16; ECF No. 177, ¶¶ 14–16; ECF No. 180, ¶¶ 12–14.  Defendants transported the boys to an

24   "open air garage-like area" at the police station before fingerprinting, citing, and releasing them.

25   ECF No. 170, ¶¶ 10–11.  Defendants transported adults to the police station in other vehicles,

26   booked them, and then held them at the county jail overnight before releasing them, with long

27   periods of detention in vehicles over the course of that process.  ECF No. 178, ¶¶ 7–20; *see also*

28   ECF No. 170, ¶ 10 (noting that police "loaded . . . people over 18 into other vehicles").

United States District Court
Northern District of California

United States District Court
Northern District of California

1     As Plaintiffs argue in their reply, there are some common threads to all of their

2 experiences: "All were detained outdoors and then in vehicles for hours, all were confused, scared,

3 anxious, cold, thirsty, had to urinate, the plastic handcuffs were painful, and they are all worried

4 about how the arrest record may impact their futures."  ECF No. 188 at 5.  But a finder of fact

5 could reasonably perceive relevant distinctions between the length of time and the locations of

6 each of the three groups' detention.  As Defendants note, for example, courts have sometimes

7 rejected conditions-of-confinement claims based on relatively short deprivations of amenities.

8 ECF No. 186 at 3 (citing, *e.g.*, *Reviere v. Phillips*, No. 1:11-cv-00483-AWI, 2014 WL 711002, at

9 *9 (E.D. Cal. Feb. 21, 2014)).  The Court or jury also might reasonably discern meaningful

10 differences in whether the same treatment or similar treatment was constitutionally reasonable as

11 applied to minors as compared to adults.  *See, e.g.*, ECF No. 186-2 (Defendants' policies for

12 detention of minors,[8] recognizing that special considerations are appropriate).

13     As noted above, Plaintiffs are at least amenable to proceeding based on subclasses.  To the

14 extent that Plaintiffs still pursue adjudication of their conditions-of-confinement claims as a single

15 class, the Court holds that each named plaintiff's experience is not sufficiently typical of those of

16 other groups (adults, minor girls, and minor boys) to proceed without subclasses.  Divided in that

17 manner, however, the Court holds that each named plaintiff is sufficiently typical of others in their

18 respective group to proceed with those subclasses.

19     Defendants have suggested that the original Plaintiffs' disclosure of their identities—both

20 through filing their since-sealed original Complaint with their full names in violation of Rule

21 5.2(a) of the Federal Rules of Civil Procedure, and through other purported public disclosures not

22 documented in the record—renders them atypical of other class members who wish to avoid

23 disclosure of their detention, at least for the purpose of seeking injunctive relief to expunge

24 records of such detention.  *See* ECF No. 195 at 11:15–12:9.  Now that Plaintiffs have amended

25 their Complaint to add S.H. as a named plaintiff and class representative, the Court need not

26 resolve that issue.  There is no indication that S.H. has disclosed his identity, so S.H. at least is

---

[8] Defendants' policy uses the term "juvenile" in the manner that this Order uses "minor," to refer to a person under the age of eighteen.  *See* ECF No. 186-2 at 2.

typical of class members who wish to avoid such disclosure, while the original named plaintiffs are similarly situated to any other class members who may have already disclosed their detention. The Court does not resolve whether such disclosure would have served as a barrier to class certification in the absence of S.H. as a class representative.

### 4. Adequacy

"Rule 23(a)(4), which requires that the class representatives 'fairly and adequately protect the interests of the class,' is satisfied if the proposed representative plaintiffs do not have conflicts of interest with the proposed class and are represented by qualified and competent counsel." *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 184 (N.D. Cal. 2015) (citing *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 535 (N.D. Cal. 2012)).

As previously noted, this inquiry merges to some degree with the typicality requirement discussed above. *See Falcon*, 457 U.S. at 158 n.13. The reasons identified in connection with the typicality analysis, namely the interrelatedness of class members' claims and the named plaintiffs' claims, also support a determination that the named plaintiffs will provide adequate representation to the absent class members. The Court finds no other significant deficiency or conflict of interest with respect to Plaintiffs or their counsel. The Court therefore finds the adequacy element of Rule 23(a) satisfied.

### B. Rule 23(b) Requirements

In addition to satisfying all four elements of Rule 23(a), a class must meet at least one of the requirements of Rule 23(b). Here, Plaintiffs invoke Rule 23(b)(2), for injunctive and declaratory relief to remedy Defendants' "act[ion] or refus[al] to act on grounds that apply generally to the class," and Rule 23(b)(3), because common questions predominate such that a class action is superior to individual adjudication of claims. ECF No. 164 at 26–33.

### 1. Rule 23(b)(2)

Rule 23(b)(2) allows for certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P.

United States District Court
Northern District of California

1    23(b)(2).

2    　　　Defendants do not oppose certification under Rule 23(b)(2) to the extent Plaintiffs seek

3    declaratory relief that Defendants' conduct violated Plaintiffs' constitutional and legal rights.  *See*

4    ECF No. 195 at 19:11–15.

5    　　　With respect to injunctive relief, Plaintiffs proposed at the hearing that the class should

6    exclude individuals who were charged with crimes in connection with the Dolores Hill Bomb

7    later, subsequent to the mass arrest and detention.  ECF No. 195 at 19:16–20.  Defendants argue

8    that class certification should be denied as to Plaintiffs' request for injunctive relief for an order of

9    exoneration, for two reasons: (1) "the Court would have to individually determine each detainee's

10   factual innocence with respect to the charges for which they were arrested"; (2) "the independent

11   flaw that exoneration is inapplicable because none of the detainees was ever charged with any

12   crimes arising from the mass arrest itself."  ECF No. 186 at 4–5.  In their reply brief and at the

13   hearing, Plaintiffs backed off somewhat from seeking "exoneration" per se, as opposed to

14   expungement of arrest records.  But in any event, Defendants' second argument somewhat

15   undermines the former: it is at least possible for this request for injunctive relief to be resolved on

16   a class-wide basis if Defendants prevail in showing that exoneration is per se improper for

17   plaintiffs who were never charged with a crime.  And if Plaintiffs prevail in showing that the mass

18   arrest lacked probable cause, it *might* be appropriate for the Court to order some sort of class-wide

19   injunctive relief to remedy that wrong, such as expungement of the arrest record, even if an order

20   of "exoneration" might not be appropriate.  At this stage of the case, the Court need not resolve

21   what form of relief, if any, might be appropriate for such a violation.  *See Amgen*, 568 U.S. 455 at

22   466 (cautioning against "free-ranging merits inquiries at the [class] certification stage").

23   　　　Turning back to the standard of Rule 23(b)(2), Defendants have "refused to act on grounds

24   that apply generally to the class," Fed. R. Civ. P. 23(b)(2), by declining to expunge the arrest

25   records or issue any sort of exoneration.  Whether Plaintiffs are *entitled* to such relief is a merits

26   question that need not be resolved at class certification.

27   　　　**2.　　Rule 23(b)(3)**

28   　　　Turning to Plaintiffs' damages claims, at least for issues of *liability*, no party disputes that

United States District Court
Northern District of California

15

1   resolution of Plaintiffs' claims on a class– and subclass-wide basis is superior to individual

2   adjudication and that common issues predominate.  The Court agrees.  As discussed above,

3   Plaintiffs' false arrest theories rise and fall together based on whether Defendants had sufficient

4   cause for Captain Harvey's decision to order the mass arrest.  Plaintiffs' conditions-of-

5   confinement theories turn on conditions that, within each of the three subclasses, were

6   substantially similar, at least as reflected by the current record.  Defendants' only remaining

7   objection, which appears to be a matter of predominance and superiority though not specifically

8   framed as such, relates to damages.

9        Precedent regarding when issues of damages can preclude class certification is complex.

10  *See Kazi*, 2020 WL 607065, at \*5, \*7.  "[T]o satisfy the Rule 23(b)(3) predominance requirement,

11  damages must be 'capable of measurement on a classwide basis.'"  *Doyle v. Chrysler Grp., LLC*,

12  663 F. App'x 576, 579 (9th Cir. 2016) (quoting to *Comcast Corp. v. Behrend*, 569 U.S. 27, 35

13  (2013)).[9]  But at least in the Ninth Circuit, "the need for individualized findings as to the amount

14  of damages does not defeat class certification."  *Vaquero v. Ashley Furniture Indus., Inc.*, 824

15  F.3d 1150, 1155 (9th Cir. 2016); *see also Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th

16  Cir. 2014), *cert. denied*, 576 U.S. 1028 (2015).  One decision from this district has synthesized

17  those holdings as essentially requiring that a plaintiff need not "present a specific model that

18  calculates all class members' damages" at the class certification stage, but must show at least show

19  "a common source of evidence" from which damages can be determined, even if the amount of

20  damages will vary among class members.  *Kazi*, 2020 WL 607065, at \*7.

21       In this case, there is a common source of evidence in Defendants' records to show that all

22  class members were detained at the same time, that class members were divided and subjected to

23  distinct conditions of confinement based on age (adults) and gender (minor boys and minor girls),

24  and when each class member was released.  According to Plaintiffs, such evidence—in

25  conjunction with testimony and other evidence regarding the nature of each subclass's

26  confinement—could be used to assess damages for any violation that might be found of Plaintiffs'

27

28  [9] As an unpublished disposition, *Doyle* is not itself precedent, but its characterization of *Comcast* is substantially accurate.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    rights under the Fourth Amendment and related authority.  *See* ECF No. 195 at 33:3–34:6.

2          At the hearing, Defendants appeared to drop their objection after Plaintiffs clarified that the

3    only relevant distinctions for damages would be the three subclasses and the length of time that

4    each class member was detained.  After a discussion of Plaintiffs' view that those would be the

5    relevant considerations for damages, the Court asked if Defendants disagreed.  ECF No. 195 at

6    34:12–25.  Defense counsel responded, "No. We just weren't -- it wasn't entirely clear to us that

7    the length, the duration, was the only multiplier for each."  *Id.* at 35:1–3.

8          As Plaintiffs note in their reply brief, ECF No. 188 at 5–6, some courts have allowed class-

9    wide determination of damages based on the length of detention, presenting juries with options to

10   assess different values of damages for different lengths of detention.  The D.C. Circuit noted the

11   use of such a process in a footnote of *Dellums v. Powell*, 566 F.2d 167, 174 (D.C. Cir. 1977).  In

12   *Barnes v. District of Columbia*, the U.S. District Court for the District of Columbia adopted that

13   "*Dellums* method" for determining "general damages"—as relevant there, "the injury to human

14   dignity that is presumed when a person is strip searched or overdetained."  278 F.R.D. 14, 20

15   (D.D.C. 2011).  The *Barnes* court declined to use that sort of aggregate method to assess "special"

16   damages "such as damages for emotional distress, lost wages, or other types of compensatory

17   damages other than general damages as defined above," which "must proceed on an individual

18   basis."  *Id.* at 22.

19         Plaintiffs do not seek special damages here.[10]  *See* ECF No. 164 at 30 ("The plaintiffs and

20   class members are not seeking special damages for out-of-pocket losses.").  Based on the current

21   record, the Court agrees with Plaintiffs that—if they prevail on any claim—general damages could

22   feasibly and fairly be assessed based on the length of detention and the subclass in which a given

23   class member falls.  The Court reserves the authority to revisit that determination if evidence later

---

[10] This action is therefore limited to general damages, and the Court is not inclined to allow for
subsequent adjudication of individual special damages that Plaintiffs have not sought in any
iteration of their Complaint.  The class notice should make clear that if a given class member
wishes to pursue damages for lost wages; physical injury; individualized emotional distress
beyond the inherent injury to their dignity and ordinary pain, suffering, anxiety, and distress
associated with a wrongful detention or unreasonable conditions of confinement; or other
"special" damages, that person must opt out of this class action to do so.

1    shows that class members' treatment or experiences varied meaningfully beyond those parameters.

2    *See* Fed. R. Civ. P. 23(c)(5) (granting a court authority to modify a class certification order).  At

3    this time, however, the Court does not find damages to be an impediment to class certification, and

4    concludes that Rules 23(b)(3)'s requirements of predominance and superiority are satisfied.

5    **V.    CONCLUSION**

6        For the reasons discussed above, the Court hereby certifies a class of plaintiffs under Rules

7    23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, defined as all persons who were

8    arrested in the 3500 block of 17th Street, San Francisco, on July 8, 2023, in the mass arrest that

9    occurred at approximately 8:40 PM.  Whether Defendants had sufficient cause to conduct the mass

10   arrest will be addressed for the class as a whole.  For the limited purposes of considering claims

11   based on conditions of confinement and assessing damages, the Court certifies the following

12   subclasses: (1) individuals categorized by Defendants as girls under the age of eighteen at the time

13   of their detention; (2) individuals categorized by Defendants as boys under the age of eighteen at

14   the time of their detention; and (3) individuals categorized by Defendants as adults of the age

15   eighteen or older at the time of their detention.[11]

16       For the limited purpose of considering injunctive relief, the class excludes any person who

17   was charged with a crime connected to the events of the Dolores Hill Bomb after their release

18   from the mass detention at issue.  If Plaintiffs prevail on the merits of any claim, any such person

19   may pursue injunctive relief individually following the conclusion of this class action.

20       The Court appoints Plaintiffs J.T., C.L., L.R., S.H., and Jack Brundage as class

21   representatives.  The Court appoints Plaintiffs J.T., C.L., and L.R. as representatives of the

22   subclass of minor girls; S.H. as representative of the subclass of minor boys; and Jack Brundage as

23   representative of the subclass of adults.  The Court appoints the Partnership for Civil Justice Fund,

24

---

25   [11] The relevant distinction for the purpose of this case is how Defendants treated detainees after
     dividing them into gender-based groups, even if a given detainee's gender identity might differ

26   from such categorization.  Though there is no allegation or evidence in the present record of any
     detainee having been categorized incorrectly, the Court addresses that possibility in an abundance

27   of caution, and to make clear how this Order and subsequent proceedings based on subclasses will
     apply in the event that some class members' gender identities differ from how they were

28   categorized during the detention at issue.  The parties' proposed class notice should reflect this
     approach.

United States District Court
Northern District of California

the Community Law Office, and Bobbie Stein as counsel for the class and all subclasses.

Defendants are ORDERED to produce the unredacted police incident report showing all putative class members' names no later than one week from the date of this Order if they have not done so already.

The parties shall meet and confer and, if possible, file no later than two weeks from this Order a joint motion to approve class notice, attaching the proposed form of notice and addressing (among any other relevant issues) how the notice accounts for any special considerations relevant to class members who are still minors. If the parties are unable to agree to a form of notice, they may file separate motions addressing their competing proposals by the same deadline. A party's motion to approve a proposed notice consistent with this Order shall not be construed as waiving any objection to the merits of this Order.

**IT IS SO ORDERED.**

Dated: October 30, 2025

_____
LISA J. CISNEROS
United States Magistrate Judge