**Pages 1 - 67**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Lisa J. Cisneros, Magistrate Judge

L. R., *through her mother and Guardian ad litem* Gwen Lee, et al.,

Plaintiffs,

VS.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

Defendants.

**NO. C 3:23-cv-06524-LJC**

San Francisco, California
Tuesday, June 16, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

PARTNERSHIP FOR CIVIL JUSTICE FUND
1720 Broadway - Suite 430
Oakland, California 94612
**BY: RACHEL LEDERMAN, ATTORNEY AT LAW**

THE COMMUNITY LAW OFFICE
P.O. Box 31194
Oakland, California 94604
**BY: GABRIELA M. LOPEZ, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
Official Reporter, CSR No. 12219

**APPEARANCES**: **(CONTINUED)**

For Plaintiffs:

LAW OFFICE OF BOBBIE FAY STEIN
503 Dolores Street - #201
San Francisco, California 94110
**BY: BOBBIE F. STEIN, ATTORNEY AT LAW**

For Defendants:

SAN FRANCISCO CITY ATTORNEY'S OFFICE
Fox Plaza
1390 Market Street - Sixth Floor
San Francisco, California 94102
**BY: REILLY T. STOLER, ATTORNEY AT LAW**

**Tuesday - June 16, 2026** **10:12 a.m.**

**P R O C E E D I N G S**

---o0o---

**THE COURTROOM DEPUTY:** All rise and come to order, U.S. District Court in now session. The Honorable Magistrate Judge Lisa J. Cisneros presiding.

You all may be seated.

Counsel, please approach the podiums for appearances.

Good morning, everybody. We are calling Civil matter 23-cv-06524-LJC. Case name J.T. et al., v. City and County of San Francisco.

Counsel will state their appearances for the record, beginning with plaintiff.

**MS. LEDERMAN:** Rachel Lederman for the plaintiffs. Good morning.

**THE COURT:** Good morning.

**MS. STEIN:** Bobbie Stein also appearing for the plaintiffs.

**MS. LOPEZ:** Gabriela Lopez appearing for the plaintiffs.

**THE COURT:** Okay. Thank you.

**MR. STOLER:** Reilly Stoler on behalf of defendants.

**THE COURT:** Good morning.

All right. So we have this on -- we've got pending motions for summary judgment as well as Daubert motions. I

principally want to focus on the motions for summary judgment.

I also understand that there were some videos that you all wanted to show me. I don't know if you wanted to just work that into your argument as you're addressing my questions or if you wanted to present them in some other fashion.

**MS. LEDERMAN:** I was just going to present it as part of my argument.

**THE COURT:** Okay.

**MR. STOLER:** Yes, Your Honor, I can do it either way.

**THE COURT:** Okay. All right. Well, why don't we just jump in to start with my questions.

So what I understand the defendants' argument to be is that there's probable cause based on what transpired at 18th and Church Street, and then -- and where these Muni buses -- or the Muni train was defaced and destroyed, and then that carried over to 8:41 p.m.

And so the probable cause for that mass arrest at 17th and Dolores -- between Dolores and Guerrero Street was transferred from what happened at 18th and Church Street?

**MR. STOLER:** Your Honor, I'd be happy to answer that question, but I think the -- our position needs some clarification from how you recited it.

Would you like me to start?

**THE COURT:** Sure. I mean, that's what I understood the City's -- or the defendants' position to be.

**MR. STOLER:** Understood. So probable cause, I think we could -- I think we should start with a map.

**THE COURT:** Okay.

**MR. STOLER:** So -- and could everybody see this? Your Honor?

**THE COURT:** I can see it.

**MR. STOLER:** Okay. So, Your Honor, I'd like to focus the Court's attention on one critical moment in time as to probable cause, and that's 8:15 p.m. on the night of the Hill Bomb.

At that moment, the group, the assembly -- the unlawful assembly had moved from here where it had been declared an unlawful assembly, which is at -- between 19th and Cumberland and Dolores. Then it had moved to 18th and Church, as Your Honor pointed out. Then it had moved up to 16th, come down 16th, then taken a right, and was moving south down Dolores.

At 8:15, that is when Captain Harvey received the report that the group was moving, now, south, back down Dolores, back toward the park. That's the moment in which a reasonable officer would believe that the group was not complying with the dispersal orders, the nine dispersal orders that were issued to the group, in violation of California Penal Code Section 409.

That's also the moment in which a reasonable officer would believe that the group was -- that had stayed together at this

point, was also not dispersing and continued to be an unlawful assembly in violation of California Penal Code Section 408.

Now, the facts that underlie the probable cause are undisputed. At 7:10, Captain Harvey declared the unlawful assembly for the first time, declares the assembly here unlawful. That's at 7:10. That's based on the violent conduct that he observed and his officers observed. That includes being peppered with glass bottles, having lit fireworks thrown at them, and includes an officer who was stabbed in the head, includes a variety of violent conduct.

He declares the unlawful assembly. And, Your Honor, this is -- this is undisputed. I don't think plaintiffs dispute that the assembly here was unlawful.

He then issues his first dispersal order at 7:10 instructing them [as read]:

> "Immediately disperse, which means to break up this assembly. If you do not do so, you may be arrested or subject to other police action. You have to leave the area immediately. Disperse now."

He then gives that same dispersal order to the group, to encourage them to disperse, for about a half-hour in this area. They then move up to 18th and Church.

I'll -- well, we can save the video.

The -- complying with the dispersal order required a member of the assembly to do two things: First, they needed to

leave the area; and second, they needed to break up, which meant to disassociate themselves, stop being a group. That was stated right there in the order.

At 8:15 -- some -- some people do disperse. The officers observe that some people from the group at various points disperse.

At 8:15, Your Honor, the group that remained together had now moved up to 16th. And Captain Harvey testified that he strongly preferred a peaceful dispersal to a mass arrest. He was hoping that the group would disperse in this direction, this direction, anywhere here. They didn't. Instead they started coming back south again on Dolores.

At that point, Your Honor, that's the critical moment, 8:15, he hears the report that they're coming back and they're still together, in violation of the dispersal order. And at 8:16, he orders their encirclement and arrest.

**THE COURT:** Yeah. What about the group specifically on 17th Street between Dolores and Guerrero led the officers to believe that as a whole -- that people on that block as a whole, as a unit, were involved in the unrest that you identified earlier?

**MR. STOLER:** Absolutely, Your Honor.

**THE COURT:** What's the best evidence in the record that's specific to those people who are on that block?

**MR. STOLER:** Yes, Your Honor.

So in summary, the -- there's a video I'd like to play for the Court on this issue.

The -- in summary, after they start moving south, they come down Dolores. They're being monitored by the police the entire time. They then -- there's an attempted encirclement here at 18th and Oakwood. That encirclement fails. They're still being monitored by police here, here, all up and down the street, at each intersection. They then turn around and come back. This is at 8:30. So only 11 minutes before the encirclement, Your Honor.

They then come back this way, and take this corner. They're being observed while they do it. They run up north Dolores. They're being observed by officers here, who are blocking this intersection, and here.

They're also being pursued by officers here who are monitoring the same group that they've seen come south, now move here, evade encirclement, and then move north again.

**THE COURT:** Okay. What -- other than the geographic location of these people in the minutes leading up to the mass arrest, other than that, what, if anything, was -- did the officers see that was specific to how this group of people was conducting themselves that indicated that they were acting as a group to violate the law?

Other than the geographic proximity, the flow of some of these individuals, like was there anything else specific that

the officers considered?

**MR. STOLER:** Yes, Your Honor. So I think --

**THE COURT:** Were they chanting anything? Were they -- did they look a certain way? Were they carrying skateboards? Were they skateboarding? You know, like --

**MR. STOLER:** Yes, Your Honor.

**THE COURT:** -- there's a lot of different facts that officers can consider in evaluating whether or not a group of people is acting as a unit. There's the -- several cases that have been cited and briefed.

So what did officer -- Captain Harvey, Lieutenant Sullivan, the other officers identify that was specific to the group other than this history of movement of people across the blocks --

**MR. STOLER:** Yes.

**THE COURT:** -- while these dispersal orders were issued?

**MR. STOLER:** Yes, Your Honor. So there -- there were a few characteristics. The reason I bring the history of movement was that they were observing the group, so they weren't guessing who was in the group at each stage. They were observing them and monitoring them. They have a specialized unit, the Hondas unit, which scouted the group continuously and reported back their whereabouts.

But I'd like to play some video to help -- help

understand --

**THE COURT:** Is this video of people on 17th Street?

**MR. STOLER:** This is taking the corner of 18th and onto Dolores, about 9 minutes before they turn onto 17th.

**THE COURT:** What -- you're not answering my question, though, which I keep asking is about the people on 17th Street who were ultimately contained.

And so *Lyall* -- I mean, this goes back to the order that I issued denying the motion to dismiss that lays out the *Lyall* test; and that's if a group or crowd of people is behaving as a unit and it's not possible for the officers, the people to tell, you know, who is armed or involved in dangerous activity but there's something about the group that indicates that they're acting as a unit, then you don't need individualized probable cause for the arrest of that group.

So I'm really focused on who -- you know, the conduct of the group at 17th. And clearly there was some movement of people across these blocks in the way that you've described. But tell me -- if it's body-cam video of people on 17th Street, if it's testimony from the officers about what they saw on 17th Street, I'm interested in that.

**MR. STOLER:** Yes, Your Honor. All right.

So the first -- the first thing I'd like to show the Court is the record at Docket Number 256-2. This is from the Kuchac declaration, Exhibit 11.

**THE COURT:** I'm sorry. I'm having trouble hearing you. You're not speaking into the microphone.

**MR. STOLER:** This is -- this is at Docket Number 256-2. It's from the Kuchac declaration, Exhibit 11.

Your Honor, this is a still from the body-worn camera of 17th. You can see the time stamp here. This is 8:41. They have a convention of being five hours behind.

This is from the Guerrero side, Your Honor. So what you see here is -- in the red circle, this is the group as it's coming -- as it's coming -- as it's coming around the corner onto 17th, the group that's now, you know, being encircled. The group you see at the end of the block. You don't see any pedestrians here. You don't see anybody walking along the sidewalks.

What you see is really what's open and obvious is the group, they're in the middle of the street. It wasn't hard to tell who was involved.

I'd like to play just a clip of video, if I could, Your Honor, very close in time to this moment. And that is...

And, Your Honor -- sorry, Your Honor. Can you see this?

Here, Your Honor, as I said, this is the corner of 18th and Dolores. This is after the group has evaded the first encirclement and is now coming back up 18th and taking a right on Dolores.

(Video played but not reported.)

**MR. STOLER:** All right. And if I may, Your Honor, I'd like to play one more that will help this.

And I'll just, for the record, say that that last video we watched was attached to the Solomon declaration as Exhibit 12, and that's Docket Number 258-3.

All right. Now, what you'll see here, Your Honor, is the same -- it's the same sequence of events, but this was submitted by our event reconstruction expert where he did an analysis of the number of people who are now taking this turn.

(Video played but not reported.)

**MR. STOLER:** So, Your Honor, the reason I -- this is a -- a lot of our budget of video is here. And the reason for that is the total count does arrive at 122. 122 people, you know, take this right coming back.

It's undisputed that this is 122. It's undisputed that there was 118 who were then encircled at 17th eventually.

Again, the police officers are following them from behind. After their failed encirclement they are now still seeking to arrest this group. Still seeking to arrest this group for the hour -- the over an hour they spent conducting unlawful assembly, and for the over an hour they spent refusing dispersal orders.

I'll note also that during that hour, in addition to the violence, there's a great deal of property damage, that

Your Honor alluded to, at 18th and Church.

So, now, here, as I said, Your Honor, this is about 10 minutes before the encirclement, one block up on Dolores and 17th.

So we don't have to guess, Your Honor. The group comes around here. It's 122 strong. We don't have to guess. They turn onto 17th and this is what officers see. They see an empty street with a group arriving here, turning on there.

That's the group they encircled and that's the group they arrested --

**THE COURT:** Okay. So when I spent time thinking about this intersection at Dolores and 18th Street, it made me think about that park in the *Barham* case. And it's not -- this intersection is not a park. Dolores Park is right there, adjacent. That was cleared. There was dispersal orders; everyone cleared out in the lead-up to the conflagration at 18th and Church. Then fast-forward, we've got this other intersection at 18th and Dolores.

Now, there was never any containment there, control around egress, ingress, you know, people coming in and out of the intersection. So you're counting this 122 as a group of people who kind of persisted in an unlawful assembly for some stretch of time, and I was just wondering what's the factual basis for accusing them at that intersection of that when there were clearly passersby, bystanders, all sorts of people?

So, like, what's --

**MR. STOLER:** Yes, Your Honor. Yes, Your Honor. So at 18th --

**THE COURT:** Why is it not like -- like *Barham*? Even though *Barham* is different because there were dispersal orders. There wasn't -- there was no dispersal orders -- excuse me -- and there wasn't a dispersal order at this particular intersection. I think there was one earlier, closer to 7:00, at Cumberland and 20th.

So anyways, why is this not like *Barham*?

**MR. STOLER:** Yeah. Yes, Your Honor. So --

**THE COURT:** In terms of the fluidity of people coming in and out.

**MR. STOLER:** So, there's a key distinction between -- a few key distinctions between what we have here and *Barham*. In *Barham*, the officer ordered the indiscriminate arrest of everybody within the park.

Here Captain Harvey ordered the encirclement of the group that they were monitoring as it moved across the location. It was not a situation where no matter who was in the intersection, no matter who was around, they would arrest them. Rather he ordered -- they -- I'll note they attempted an encirclement at 18th and Oakwood, and that failed. Captain Harvey wasn't ordering them: Just arrest anybody on the block of 17th and Dolores.

He was ordering them: Arrest the group that we've been tracking and monitoring.

**THE COURT:** The group that came down Dolores from 16th?

**MR. STOLER:** That's right, Your Honor.

**THE COURT:** And in the meantime, you had people coming up from Guerrero on 18th and people coming down 18th from The Castro across Dolores? I mean, if -- the body camera shows people coming in all sorts of directions into that intersection, even as -- even as officers spotted some people coming down Dolores.

So then you've got this mix of people.

**MR. STOLER:** Well, Your Honor, I would direct you back to the video clip we just watched of the 122. They're moving together there.

**THE COURT:** Well, yeah.

**MR. STOLER:** So they're -- they're running; right? They're running up the block. Their conduct is pretty clear that they -- these are the same folks that then had just moved down 18th. After the failed encirclement there, they're coming back.

So if I hear Your Honor correctly, you know, the concern would be a pedestrian, potential pedestrian who's passing through could have gotten caught up in it at 18th and Dolores. That pedestrian would have had to then join the group in

running up the block and evading the police to be caught in the encirclement.

And, Your Honor, we would submit that if you physically join an unlawful assembly as it's moving, it's reasonable, subjectively reasonable for officers to believe that you were a member of the unlawful assembly.

And that's -- the *Kampas* case cited in our papers. That's from 2025 out of the Eighth Circuit. That's broadly supported in the law, that officers, it's subjectively reasonable, they can't sort -- it's also the *Lyall* case, Your Honor.

The -- that in a fluid dynamic situation, officers can't sort. And it's objectively reasonable if they have group probable cause to arrest those that are directly associated with the group.

**THE COURT:** Go ahead.

**MR. STOLER:** If I may, it's -- the last point I'd make on this is that as they're running north, again, they -- they turn onto 17th. That group, that directed conduct by the group, they are stopped from -- from evading the police further down other intersections.

So there then, they turn onto 17th, and I just want to emphasize one more time, Your Honor, what we see now is not a situation on 17th where the police conducted a huge dragnet arrest and indiscriminately -- again, unlike *Barham*, indiscriminately arrested everyone.

Your Honor raised the point that in *Barham*, unlike *Barham* here, there were dispersal orders, and I think that's critical. The teaching of *Barham* is that you -- is really that you have to give a group fair warning. You have to give them the dispersal order and then you need to give them time to comply. And here the record shows that Harvey gave them -- the group nine -- gave them nine dispersal orders, and then gave them over an hour to comply.

**THE COURT:** Okay. Well, I mean, I had questions about the dispersal orders too, but I want to give Counsel Lederman an opportunity to respond to the arguments that you were making earlier about the movement of people at -- you know, running away from Oak Street and kind of coming around the curb, and then they were joining this unlawful assembly, and therefore the defendants' position is that there's probable cause to round up everyone.

**MS. LEDERMAN:** Yes, Your Honor. Pretty much every single one of the purported facts that's just been recounted by counsel is disputed.

This case involves disputed facts. First of all, was there a cohesive group to begin with that would justify a determination of group probable cause rather than individualized probable cause -- which the defendants have admitted they did not have? There's simply no indicia of a cohesive group at any time in this evening.

In terms of what you just saw, which was a brief, out-of-context clip that shows a bunch of kids running, that group movement is -- was caused by the police officers. Captain Harvey gave an order to attempt to make an arrest on 18th Street. That order wasn't supported by any kind of probable cause that the -- that there was anything illegal going on at 18th and Dolores. The last dispersal order was given at 7:59 p.m., at 18th and Church, a completely different location, and it instructed people to vacate 18th and Church and to go north on Church. And that's actually what happened.

So once you give a dispersal order and tell everybody to go a certain direction, like the Ninth Circuit stated in *Collins v. Jordan*, a dispersing crowd can't simply atomize. You're going to have large numbers of people on the streets. Nobody gave any kind of announcement at 18th and Dolores that it was prohibited to be there. There was a cafe, an open ice cream parlor, restaurants down the street, the park nearby.

So it's a busy Saturday evening, well before dark. And there were a lot of youth in the area. Some of them originally there for the Hill Bomb, and others of them there for other business. A number of declarants that we filed stated that they were going -- they were going to go to the park, but then they were told the park was closed, and then they end up at 18th and Dolores.

A number -- so the running was caused because

Captain Harvey and Lieutenant Sullivan decided that they were going to attempt to make this arrest on 18th Street between Dolores and Oakwood. And so Captain Harvey gave one of the sergeants an order to move the crowd toward Oakwood Street from Dolores. And so that's what we see where the officers start waving their batons in the eastern direction, pointing their less-lethal launchers at the crowd, and yelling at the kids and the -- many of the kids start running east towards Oakwood Street.

But there was no -- counsel repeatedly says people were evading. This is really mystifying to me because at no point was anyone told, "Stop, you're under arrest" -- never in the entire evening until they were encircled on 17th Street.

So there could be no evading. All the officers ever said to them was to leave, to disperse.

And so when the officers gestured and pointed weapons -- I'm not sure if a weapon was fired there -- but that caused this group movement toward Oakwood Street. And then, when the kids approached Oakwood Street, the other squad of officers suddenly jumps out and they start yelling, waving their weapons. And so that's what you see where this crowd of youth then turns around and runs back the other way.

And when they approach Dolores Street, I guess the plan was for the other squad to then stop them and arrest them, but that message somehow didn't get across; and instead the other

officers who were at 18th and Dolores direct all of the youth to go north from 18th towards 17th. And -- and then the commanders then have officers go into place to encircle them on 17th Street.

Every single person in the 18th and Dolores intersection was directed to go north towards 17th Street at 8:30 and a little bit after 8:30, and that's why you see a large crowd moving that direction. And I can show more video of this as well.

**THE COURT:** Let me ask the defense counsel, you know, what -- what was a passerby on 18th Street supposed to do once the encirclement coming out of Oakwood happened and -- you know, what were they supposed to do?

**MR. STOLER:** Yes, Your Honor. Not run away. If they had just kept walking their dog, which I think is on the video --

**THE COURT:** In what direction?

**MR. STOLER:** In either direction, because as long as they don't run then back up 18th and back up Dolores --

**THE COURT:** Was an order -- was there an order not to run?

**MR. STOLER:** There was no order to do anything. The group acted spontaneously in response to what -- I think they observed the police on 18th coming up Oakwood to execute the encirclement.

And I just want to correct the record on one -- many things, but there's one quick one I'd like to also correct the record on.

Ms. Lederman mentioned that at no point was the group ever told that they would be arrested if they didn't comply with the dispersal orders, and that's just factually untrue.

The dispersal order itself, the script, and you can hear it in the BWC, continuously says "Immediately disperse, which means to break up this assembly. If you do not do so, you may be arrested or subject to other police action."

**THE COURT:** Where in the record is that specific order? I mean, the -- in the briefs it's not like -- in one of the expert reports, there's a chart that shows, you know, Dispersal Order Number 1 at such and such a time, at such and such a location. It doesn't say specifically what was spoken in that dispersal order.

**MR. STOLER:** So the --

**THE COURT:** So what's this particular one that you described?

**MR. STOLER:** The one I just quoted is from the Sullivan declaration, Exhibit 12. And that is BWC recording of it. And it's at the 3 minute mark to the 4 minute and 10 second mark.

**THE COURT:** At what time?

**MR. STOLER:** Starts at the 3 minute mark and ends at

the 4 minute 10 second mark.

**THE COURT:** What does that mean in terms of --

**MR. STOLER:** So if you're looking.

**THE COURT:** -- time? Like 8:00?

**MR. STOLER:** Oh, I'm sorry, Your Honor. That's just in the video itself.

**THE COURT:** Yeah.

**MR. STOLER:** So I'm giving you the time stamps to scroll to. But in terms of when that dispersal order was given, that exact dispersal order was given at 7:10.

The --

**THE COURT:** Was there ever a dispersal order that said to leave the Mission District?

**MR. STOLER:** No, Your Honor.

**THE COURT:** Was there ever a dispersal order that spelled out clearly what was meant by "leave the area"?

**MR. STOLER:** Beyond -- beyond immediately disperse and leave this area, no, Your Honor.

**THE COURT:** Okay.

**MS. LEDERMAN:** Well, they specifically said the area. The 7:59 dispersal order, which was the last order given over the LRAD said to leave 18th and Church. And the previous orders that were given between approximately 7:15 and 7:30 said to leave Dolores Street between Cumberland and 18th.

**MR. STOLER:** Yes, Your Honor. So --

**MS. LEDERMAN:** And then at 7:40, there was an order that was somehow left out of the defense exhibit, but that order told people to go through Dolores Park and go north and west to 18th and Church.

And then that was followed by the 7:59 order to leave 18th and Church, and that told people to go north on Church.

**MR. STOLER:** Your Honor, I'd like to just note that the dispersal orders that were in the defense compilation exhibit, they are all the amplified dispersal orders and they're given -- they're given with a script, so they're uniform.

**THE COURT:** The script -- I looked at the script and there is a -- like a parenthetical that says specific location.

**MR. STOLER:** Yes. And it's -- it's meant to be dynamic.

**THE COURT:** So "leave the area," is that specific enough for a group of people to understand exactly where they're supposed to go?

**MR. STOLER:** Well, I think they -- they -- it's meant to be dynamic so they provide instructions as to the route in which compliance, you know, can be managed.

And again, Your Honor, they instruct them -- it's helpful who to look at a map. The -- they instruct them -- for example, Your Honor here at 18th and Church, they instruct them to go north. And, again, as I mentioned before, the hope is

that they would disperse anywhere here, here, here.

But they were told that they could not come back to the park. They could not come this way. And they were blocked from coming this way. They were asked to disperse in any of these directions.

And that's the critical conduct here and where we know that the group -- the unlawful assembly which is now moved -- they've been given instructions to leave this area, they've then have been given instructions to leave this area. And each time they spent a significant amount of time in each place.

Now, they've come up, they're not dispersing, they're, in fact, coming back to the same place that Captain Harvey first ordered them to leave. So I don't think there's any ambiguity --

**THE COURT:** Yeah.

**MR. STOLER:** -- as to whether or not they were violating --

**THE COURT:** I think, following that train of thought, you're -- defendants are indicating that there was probable cause to arrest this particular group because they were moving together across these blocks. But then they come to this other busy intersection where there is a lot of traffic, pedestrian traffic from all sorts of directions, and then there's this encirclement attempt out of Oakwood. People start to run together.

And then defendants' position seems to be: If you're running with that group, then you're part of the unlawful assembly and you should have kept walking in some other -- past a line of officers with batons.

I mean, that's -- because there was a line of officers moving across. That seems to be what you're arguing and that's -- in that way one would distinguish themselves from -- from the group.

**MS. LEDERMAN:** Well, not everybody was running by the time that they get to 17th Street. You see that running up to Dolores. Then the police block off all other directions besides north on Dolores Street, so the crowd has to turn that way, and then everybody else in the intersection was -- was forced to walk north on Dolores Street towards 17th Street whether they were walking, running, or just simply hanging out on the corner. And I can show video of this.

We also submitted declarations from several people who are --

**THE COURT:** Is this one of the videos that you have teed up to show me?

**MS. LEDERMAN:** Yes.

**THE COURT:** Why don't you go ahead and show that video then.

**MS. LEDERMAN:** Let's show the -- let's show 8:25, 8:31 -- yeah, let's show this one.

So here we have our declarant, Asset, with her two 18 year-old friends arriving at 8:25 p.m. at 18th and Dolores. They're obviously not part of a group.

You can go ahead and play it.

(Video played but not reported.)

**MS. LEDERMAN:** And then we're going to skip to 8:31, which is immediately after the clip that defense counsel just played.

Go ahead.

(Video played but not reported.)

**MS. LEDERMAN:** So here you see that Asset and one of her friends had started walking north as the police were directing. One of their friends, Khiara Lawrence, is just standing on the corner.

So we could see that Asset and her friend Marina, as well as other youth, have already started walking north on Dolores Street as the police indicated. Then their other friend, Khiara, was still standing on the corner there. Not the corner where the police were concerned about the five rude boys, et cetera, but the opposite corner.

And the police go and they force the youth that are just hanging out on that corner to leave and walk north towards 17th Street.

And then we can show --

**THE COURT:** Well, why don't we pause because I want to

hear defense counsel's response to that particular clip. You've got, you know, a set of young teenage girls and they're not actually running with that group that was- -- that you identified in the earlier clip. They're following the officer's directions to go north on Dolores.

**MR. STOLER:** Yes, Your Honor.

**THE COURT:** Sure enough, they're rounded up.

So you think that they were -- they were appropriately considered as acting with that -- as a unit with that unlawful assembly?

**MR. STOLER:** So, Your Honor, I think it's important to take a step back. The way Ms. Lederman has been framing her argument is based on the reasonable belief of the individuals that are members of the group. The salient inquiry here under the law is the reasonable belief of the officer, what the officer -- what the officer observed and what they were confronted with.

There at that intersection, the officers had been there for quite a long time --

**THE COURT:** Well, they're observing people, young and old, walking in and out of this intersection, including these particular teenagers. And they're observing that they've issued orders to walk in this direction. They walked in that direction. And then the defendants' position is that there was probable cause to treat this group as a unit.

What about that conduct demonstrates that they're acting as a unit, they're acting with the group as a whole to engage in an unlawful assembly or otherwise disregard the dispersal order?

**MR. STOLER:** Yes, Your Honor. They're at the intersection, the officers were observing a number of people who -- who were a part of the group, they had observed them arrive with the group. So there were a number of teenagers, a number of skateboarders, a number of people who were associated and socializing with the group. They were integrated within the group and --

**THE COURT:** Because the officer directed them in that direction. They were actually walking east.

**MR. STOLER:** Your Honor, actually, I was referring to prior -- prior to this clip. The officers -- and this is critical because the officers have to use their judgment. The order that they were given --

**THE COURT:** Yeah, but I think -- I mean --

**MS. LEDERMAN:** That's the --

**THE COURT:** I mean, there's a case in Lopez that says -- Lopez -- I mean, the totality of the circumstances has to be considered and that includes the facts that support the probable cause determination; and the facts that don't, can't be entirely ignored, so --

**MR. STOLER:** Absolutely, Your Honor. But at this

stage, I want to -- I want to emphasize that the probable cause determination was made at 8:15, which supported the 8:16 encirclement order. Nothing disturbed that probable cause determination. And at this stage, only nine minutes before the encirclement and after the first failed encirclement, the officers were simply executing on the arrest order.

They were seeking to safely and effectively conduct a mass arrest in an urban environment, which presents a lot of challenges. So the first one failed as they were executing Captain Harvey's first encirclement arrest order. And that was about 8:30 or so.

They're now continuing to follow the group, they're pursuing the group from all sides. It's -- they're seeking to arrest this group at this point, the group that they have observed come down, the group they have been observing throughout the day engaged in this conduct, that's the group that they're seeking to arrest.

So what you see there in that video is officers who have been charged with "Arrest this group," "Arrest this group that we have been observing, that you have been watching throughout."

And now you see them all move at once, and there's a reason for that. The reason is that they were told not to move until the group could then be encircled safely away from the intersection. So they then begin moving in.

That is all based on the probable cause determination from 8:15 --

**THE COURT:** So when did Harvey say "Arrest this group"?

**MR. STOLER:** That was at 8:16.

**THE COURT:** 8 --

**MR. STOLER:** 8:16, Your Honor.

**MS. LEDERMAN:** But if probable cause dissipates, he can't proceed with the arrest. All of the facts that counsel is recounting are contested facts. You saw on the video these girls, not part of a group, they come from the east. They had been planning to go Dolores Park, but Dolores Park was closed, so they kept walking in the direction of Mission Street. Then they were forced to all proceed north on Dolores and arrested.

I can show additional video of obvious bystanders walking in close to 8:30 to 18th and Dolores, being forced to 17th, and then being pushed into 17th Street when they ask: How can we leave the area?

That is what happened to most of the people that were arrested. We saw the declaration from 14 year old B.M. who was getting ice cream at the open ice cream shop right there. And suddenly kids were running and saying the police are shooting, and so she and her cousin started running, too. And then eventually they walked around the corner, as directed, and then they asked the police "How do we leave," and they were told go

into 17th Street and be arrested.

The --

**THE COURT:** Okay.

**MS. LEDERMAN:** What counsel is recounting about the police were monitoring some group through the evening and monitored them going around the corner on 16th Street and coming back to 18th and Dolores and reported that to Captain Harvey, that is highly disputed. In fact, it's a fiction.

None of the evidence that is cited in counsel's brief actually supports any continuous monitoring after about 7:49 p.m. There were no reports to Captain Harvey indicating that the police were monitoring a group.

Lieutenant Sullivan did say over the radio they're going to come around 16th and go back to Dolores Street, but that was just a prediction by Lieutenant Sullivan. And perhaps some people did do that, but there were no reports over the radio or on body-camera video of these supposed scouts or anyone else actually monitoring a group consistently after 7:49 p.m. until the arrest at 8:41, or reporting to Captain Harvey that there was a cohesive group that was going a particular way.

And, in fact, in the video evidence, we see people are coming from every different direction. We can't have any confidence as to who might have been in the vicinity of earlier announcements 40 minutes earlier and who was not.

**THE COURT:** Okay. All right. We're coming up on an hour, and we've just focused on this part of the case. I just want to ask a couple more questions before we move on.

Should the Court consider that the crowd on 17th Street was many minors in determining whether or not there was probable cause as to the whole group? Like, is that a relevant factor?

**MR. STOLER:** No, Your Honor. I think this goes back to -- so two points to that.

The first is, this goes back to what Ms. Lederman said, which is that whether -- their contention that somehow probable cause could have dissipated at some point from 7:10 to 8:41 at the encirclement, and there's simply nothing and it's just -- there's nothing in the record to support some sort of dissipating of probable cause from 8:15 onward.

They -- the police --

**THE COURT:** Well, what about the fact that there's lots of people moving from the surrounding area in -- into these intersections --

**MR. STOLER:** Yeah.

**THE COURT:** -- and streets that are at issue? I mean, it almost seems like your position is: We know that some of these people were at 18th and Church when the Munis were defaced.

We have -- and that's disputed because plaintiffs are

saying that there wasn't continuous monitoring. But even if it were -- if you were able to show that and persuade a jury as to that, there's still -- the group wasn't exclusively comprised of those individuals who came down Dolores Street from 16st Street.

**MR. STOLER:** Yes, Your Honor. So --

**THE COURT:** It's sort of like we have some people and so it's enough to just round up all the other bystanders and pass --

**MR. STOLER:** Right. Yes, Your Honor. I'll address that directly.

So the group -- this -- the notion of group probable cause is that it applies to the group itself. Now, it -- it's not defendants' position that we accounted for every single one that turned the corner from 16th, and that we knew that those were the same ones that we then encircled at 17th and Dolores; but the law doesn't obligate us to do that.

The notion of probable cause is that under circumstances like this, and particularly a violent -- an undisputedly violent unlawful assembly, the Ninth Circuit has itself explicitly authorized the arrest of the whole group including bystanders. And that's the *Dubner* case.

**THE COURT:** Right. And I understand that, but I think that *Lyall* says that you've got to have some basis for seeing the group as acting as a unit. And right now, it seems like

the predominant argument is that they ran as a group around the corner.

**MR. STOLER:** In addition to --

**THE COURT:** And that's -- and they ended up at 17th.

**MR. STOLER:** So they were --

**THE COURT:** And that's -- what I have to decide is: Is that enough?

**MR. STOLER:** Well, let me expand on that.

There's a defined course of conduct that I think was the signature conduct of the group. It was not only skateboarding, throwing fireworks, vandalizing -- and I'd be happy to play some video of this just to demonstrate.

The -- throughout the unlawful assembly, and as particularly --

**THE COURT:** The fireworks were at 18th and Dolores at some point?

**MR. STOLER:** Oh, Your Honor, the fireworks were throughout --

**THE COURT:** At 18th and Church.

**MR. STOLER:** They were at 19th and Cumberland. They were at 19th and Dolores. Then, when the police were pursuing the group north on Church, they continued to receive firework fire. So these were -- and I'm happy to play some video here of what that looks like.

But the crowd was continuously attacking officers

throughout this process. The only time that the police weren't being attacked really by the officers was when --

**THE COURT:** Yeah, why don't you play the video with the fireworks.

Is there anything in the record that indicates that a barrel bomb is something other than a type of firework?

**MR. STOLER:** No, Your Honor.

**THE COURT:** Okay.

**MR. STOLER:** But fire -- I'll just say, "fireworks" is a pretty broad term.

**THE COURT:** I understand that. I'm not taking it as a concession that it wasn't something that was potentially dangerous.

(Video played but not reported.)

**THE COURT:** What time is this? Pause.

**MS. LEDERMAN:** That's 7:27.

**MR. STOLER:** 7:27, Your Honor.

**THE COURT:** Okay. And what's the intersection here?

**MR. STOLER:** So this is at Dolores and Cumberland.

**MS. LEDERMAN:** 19th.

**MR. STOLER:** No, 19th, Your Honor.

**THE COURT:** Dolores and 19th? Okay.

And that was what time?

**MR. STOLER:** So this --

**MS. LEDERMAN:** 7:27.

**MR. STOLER:** Yeah, 7:27, Your Honor. But I --

**THE COURT:** Okay.

**MR. STOLER:** I would encourage Your Honor to -- oh, sorry.

**THE COURT:** Is there any -- is this the end of the firework video or is there more?

**MR. STOLER:** That's -- that was -- it gives -- that gives you the gist of the fireworks. There's many more that we -- that are in the record but that we didn't bring to the hearing because we only had four minutes. But they were -- I will say -- I would encourage Your Honor to -- in the factual background section of your motion we discuss this specific period in which the police were pursuing the group and taking firework fire.

And this is -- this is in addition to, Your Honor, just being peppered by glass bottles throughout the process. I did --

**THE COURT:** Okay. I have another question because I do want to --

**MR. STOLER:** Yes, Your Honor.

**THE COURT:** -- move on from this part of case. But the group was Mirandized at 9:18. So, you know, that is about a half hour after -- or more than half an hour after the encirclement at 8:41.

Do -- does the Court need to assess whether or not there's

evidence to show probable cause at 9:18? I mean, because there was declarations from different people who were trying to tell the officers that they had nothing to do with the Dolores Hill Bomb, you know, or the destruction of the Munis. So this kind of goes to that question of is it -- once you have probable cause at 8:00 at Church and 18th, then you have probable cause for the rest of the night for any group that's rounded up?

Or, you know, what was the basis for probable cause for that group at 17th that was kept for an extended period of time under arrest?

**MR. STOLER:** Yes, Your Honor, to answer your first question, squarely, our position is that the Court does not need to conduct a renewed probable cause determination at 9:00 when they're Mirandized.

Our position is that the -- at 9:15, the predicate facts were in place to support probable cause and to support the arrest order.

After that point, facts could have changed -- facts could have changed that would have dissipated probable cause, Your Honor. For example, you know, had there been a parade down the street. You can think of other examples where it would become unreasonable to execute this mass arrest.

But on the facts we have, the undisputed facts we have here in this record, what we see is a hundred-officer operation that is monitoring the group as it moves, and then encircling

them there. They -- and I'll just harken back to the 122 number of the folks that turn there. Less people were, then, encircled at 17th and Dolores than took at that turn.

The argument that this was a constitutionally overbroad encirclement at 17th and Dolores just doesn't hold up to the math of that scenario. The police officers were seeking to execute on Captain Harvey's arrest order starting at 8:16 and all the way to 8:30, with the first failed encirclement, and then again at 17th. And there's nothing in the record that would dissipate probable cause.

**THE COURT:** But what do I look at in the record to understand that there was probable cause between the time period 8:41 and, like, 9:18?

I mean, is there -- is there information about what the officers were seeing in the way that the group conducted itself, how it was composed, or any other --

**MR. STOLER:** No, Your Honor. The -- at that point, at the encirclement, the -- I think -- I may be wrong but I think the parties agree that they had been arrested at 8:41. At that point, they were arrested. They had not been Mirandized but they were detained at that point and then were being processed.

It was ultimately a very large number of people that took a long time to process safely and then Mirandize.

**MS. LEDERMAN:** But, in addition to the lack of probable cause leading up to 8:41, after 8:41 numerous children

and adults came up to Lieutenant Sullivan and other officers to explain that they had no idea what was going on and were complete bystanders.

I listed a whole bunch of them in our statement of facts. There were a total of at least, that I know of, 17 people, when you include the little groups of companions who brought to the officers' attention that they were bystanders, had -- didn't know anything about what was going on, and had been, for example, about to be picked up by the dad, or out getting ice cream, or had been riding scooters and had the ride history available.

And, in fact, Lieutenant Sullivan even noted that in his report, but it should have been a huge red flag to the commanders that many people were saying that.

**THE COURT:** Okay. Thanks.

What is the defendants' response to that, like maybe the arrests should have been ended at that point once -- once that information came to the officers' attention?

**MR. STOLER:** I'm not sure I followed, but I think the -- the response would be that to the extent that people were claiming that they were innocent of the misconduct they were being arrested for, an officer's not obligated to just believe people's declaration of innocence.

And the probable cause determination that was made previously, the officers who were, I think Ms. Lederman is

referring to as hearing this, these protestations, they're executing an arrest; they're not there to make an independent determination of innocence.

**THE COURT:** I mean, this is -- this is a motion for summary judgment so the factual record has to be construed in favor of non-moving party, so that's one of the things that I've been kind of struggling with is a lot of this is -- argument is sort of asking the Court to construe a factual record that may be a bit more mixed in a direction that is squarely in favor of the defendants so that as a matter of law, you don't have to present the claims to a jury.

**MR. STOLER:** Thank you, Your Honor, for raising that. I want to address that directly.

So first things first. There's a great deal conceded in the briefing by plaintiffs. So when Ms. Lederman referred to a number of facts that are disputed, I think it's important just to note, here at page 25 of their opposition brief, quote [as read]:

> "Plaintiffs are not challenging the unlawful assembly declarations at Dolores and Cumberland or at 18th and Church issued at 7:59. They are challenging the 8:41 mass arrest."

There's nothing in their papers that disputes that there was an unlawful assembly, that Harvey properly declared it an unlawful assembly. And, again, this goes back to, I think, the

fundamental flaw in plaintiffs' position, which is that it is looking at the set of facts from the perspective of the arrestees and not a reasonable officer.

The core underlying facts --

**THE COURT:** Even focusing on the reasonable officer's perspective, I didn't see anything in the record beyond sort of proximity and the movement of people to evaluate how the group at 17th Street was acting as a whole to violate the law.

**MR. STOLER:** And our position, Your Honor, is not that they were -- that they were --

**THE COURT:** And I'm --

**MR. STOLER:** -- once they were detained --

**THE COURT:** And the jury might decide, hey, that's -- you know, that was not the reasonable.

**MR. STOLER:** Well, Your Honor, I think the first critical question would be to ask whether it was reasonable for Captain Harvey to have probable cause to issue his arrest order when he did, and that's at 8:16. Thereafter, the question becomes -- and I think where a lot of the argument has been happening today, is about whether or not the arrest was effectuated in a manner that made it so overbroad as to be unconstitutional.

Those are different inquiries. The second, as to whether it was unconstitutionally overbroad, again, Your Honor, we know that -- first things, we know that the group had been followed.

It was monitored. That's in the briefing and I'm happy to cite --

**THE COURT:** The 8:16 arrest order from Captain Harvey that you're referring to, was that part of the exchange with Lieutenant Sullivan where it says, "We need to pick a place. Okay, pick a place."

**MR. STOLER:** Correct.

**THE COURT:** And what was -- stood out to me about that -- that exchange is it's really about the location that would work for the officers to do the encirclement as opposed to something specific about what the group of people was doing in that location.

**MR. STOLER:** Absolutely, Your Honor. Thank you.

So the -- that's the distinction between *Barham*. In *Barham*, the officer says, "We've got to arrest everybody at this location," and that's -- that's not what happens here. What Harvey orders is the arrest of the group and the discussion of the location that you're referring to. That's a tactical discussion as to how they can do this safely, how they can get around the group in a way where they can -- what Sullivan says, the direct quote is, "We have to cut off the block."

And that's a tactical discussion because, again, they're -- they're watching the group, they're monitoring its movement. And what they need to do is figure out "How can we

effectively encircle them." And it's a difficult job, as demonstrated by the fact that their first one failed. They then needed to do it again. They made the logistical decision to do that.

**THE COURT:** All right. Thank you.

So this is just, then, a final question on this part of the case that's just for the plaintiffs.

Because you were arguing, based on a case called *Lopez* from the Ninth Circuit, that defendants have to believe that each individual at 17th Street intended to violate a dispersal order --

**MS. LEDERMAN:** Well, that's because defense counsel, in their briefing, mentioned a Penal Code section -- that they had probable cause to arrest the folks who were at 18th and Dolores for violating Penal Code Section 416. That's a specific intent crime and there has to be -- for probable cause -- there would have to be probable cause as to the element of specific intent. Obviously there wasn't probable cause to believe that the 117 people that were encircled on 17th Street had any specific intent to do any- -- anything.

And I just also want to respond about to --

**THE COURT:** Okay. Wait. Before you move on, though, I didn't -- *Lopez* is not a mass arrest case, so I don't -- how does that -- how do you reconcile that with *Lyall*, which says when you're arresting a group you don't need to have

individualized probable cause as to each person within that group?

**MS. LEDERMAN:** Well, you have to have a cohesive group and you have to -- the cohesive group has to be -- it has to be reasonable to believe that that group is committing a crime as a group. And all of that is just completely absent here.

**THE COURT:** And so -- but I don't -- I'm struggling with how specific intent would work for a group.

**MS. LEDERMAN:** I don't think it can apply. I think that the group probable cause under *Lyall*, arguably, it could apply to the Penal Code Section 409, failure to disperse, if you had a group that was lawfully ordered to disperse and then willfully disobeyed the dispersal order and you could -- you had indicia showing that that was a cohesive group acting together to disobey the dispersal order and you couldn't tell who was committing crimes and who wasn't, then *Lyall* would apply.

But here, none of that applies because there -- from the beginning, there is no cohesive group, there's just random youth who are -- some of whom are attending a skateboard event, some are participating, some are just passing through.

**THE COURT:** Okay.

**MS. LEDERMAN:** Yeah. And there was no monitoring of a cohesive group.

And then I just also want to respond about the 122 people

supposedly going around the corner. Those -- the people that got arrested on 17th Street include quite a number of people that were never at 18th and Dolores. Like, for example, the class representatives -- it turns out that four of the five class representatives didn't come from 18th and Dolores, so -- and of the declarations we submitted, a couple of those didn't come from 18th and Dolores either. Anybody who was walking down 17th Street are coming from the complete opposite direction, like L.R., was also arrested on 17th Street.

**THE COURT:** Okay. All right.

So now I'm moving on to the conditions of confinement claims.

The plaintiffs' brief did not address defendants' qualified immunity argument for this aspect of the Fourth Amendment claim.

So what's the binding precedent or the consensus of out-of-circuit cases that would have put defendants on notice that the conditions of confinement in this case violated the Fourth Amendment?

**MS. LEDERMAN:** Well, there's really not an identical case about these conditions of confinement, but we did cite case law regarding denial of bathrooms. And I think we have to look at all of the conditions of confinement as a whole as well as the fact that these were children and youth. And --

**THE COURT:** The bathroom case, was that a controlling

precedent or a district court case?

**MS. LEDERMAN:** I believe it's a district court case.

**THE COURT:** So I believe we need -- do you disagree that for purposes of qualified immunity, the Court needs to focus on binding precedent, so that would be Ninth Circuit, as opposed to district court cases?

**MS. LEDERMAN:** Unless it's just completely obvious that it's unreasonable to deny children a bathroom for up to six hours.

**THE COURT:** I mean, I'm dealing in the realm of qualified immunity, so it is what it is as a doctrine.

A district court judge or a magistrate judge in a district court could have some judgment about it but what I'm required to look for is binding precedent that's -- maybe doesn't need to be squarely identical, you know, and --

**MS. LEDERMAN:** Mm-hmm.

**THE COURT:** But the bathroom case is a district court case. So what's the best Ninth Circuit court case that would have alerted defendants that the conditions of confinement were unreasonable under the Fourth Amendment?

**MS. LEDERMAN:** Well, there's *Ganwich versus Knapp*, a Ninth Circuit case in which the Ninth Circuit recognized that denying bathroom breaks is not within the scope of a permissible detention.

And then we cited some out-of-circuit and district court

cases regarding lengthy denials of bathrooms. But, no, there's not an identical Ninth Circuit case like this one.

**THE COURT:** Okay. Does counsel for defendants want to respond to that Ninth Circuit bathroom case?

**MR. STOLER:** Yes, Your Honor. Very quickly.

The *Ganwich* case, they set it for the proposition that bathroom breaks -- denying bathroom breaks is impermissible. But *Ganwich* doesn't address bathroom breaks at all or hold as they claim. There's no -- I'll leave it to the Court. I'm sure you'll review the case, and I would encourage the Court to review the case. There's no established right that they've pointed to in the context of their conditions of confinement claim.

But there is, Your Honor, a very similar case to the facts we have here, and that's *Bates v. Arata*. And that's a Northern District of California case from 2008. It's cited in our papers, and I can provide the Westlaw cite if that's helpful.

But the key -- the key point there is that the district court found that under very similar circumstances a mass arrest, where hundreds of people are processed, that, quote [as read]:

"If certain plaintiffs were not allowed access to toilets upon request, the Court finds this was not unreasonable given the circumstances."

The circumstances cited there are trying to manage and

process over 100 people in an orderly fashion.

**THE COURT:** Okay. Yeah. I mean, I'm on the qualified immunity question, so Ninth Circuit cases where consensus about a circuit case is where I'm focused.

Is there -- are there Ninth Circuit cases other than bathroom -- involving issues other than the denial of bathroom access that address -- relate to conditions of confinement that violate the Fourth Amendment?

**MS. LEDERMAN:** Not exactly, but we did cite a Ninth Circuit case that the Court must consider the age of the detainees and the impact of these -- of these confinement conditions on children specifically.

The courts have increasingly recognized the differences between children and adults. So we cited *Hernandez Ortiz versus Gonzalez*, finding that persecution must be assessed from a child's perspective because children suffer more harm from these things than adults do. So --

**THE COURT:** What was that case about? I actually have not read it.

**MS. LOPEZ:** I can talk about it.

So that's actually an immigration case. It's --

(Reporter interruption for clarity of the record.)

**THE COURT:** Why don't you step forward and state your presence.

**MS. LOPEZ:** Hi, Gabrielle Lopez for the plaintiffs.

So that case is -- it's about a person who is applying for asylum, and the individual is from an indigenous community in Guatemala and his mother had been persecuted by the government at that time, when there was a genocide in Guatemala.

And he was a baby at the time of the persecution, but his mother suffered hunger, she was living -- I think they were living in the woods or something -- or in the mountains in Guatemala.

And so the -- he was denied asylum because the Court found that, well, he didn't actually experience anything, he was a baby, all the persecution happened to his mother. But the Ninth Circuit said that because he was a child, the effects that it had on his mother also affected him and the perspective of that person, of a child, of having a mother who was, you know, hiding, who was not able to access food, wasn't able to get resources, he wasn't able to get education, I believe --

**THE COURT:** Okay. Are there any qualified immunity cases that say the Court should look at precedents that arise outside of Fourth Amendment cases, you know, like asylum cases, to determine what officers would have been alert to as far as the constitutional rights that people have when they're detained?

I mean, you're asking me to draw on an asylum case for purposes of evaluating what -- what officers should have known about what their constitutional obligations are when detaining

people.

**MS. LOPEZ:** So I think, Your Honor, although this isn't police, this is like the government -- right? -- and it brings to light, and the reason why we cited this, is the fact that children have a particular different experience than adults.

And so when we're thinking about qualified immunity and an officer -- you know, and I know this isn't in here, but just from experience, I know that officers get special training on how to handle children. And so I think that there would be something from an officer's perspective that, "I'm dealing with children, that I have to treat this child differently than I would an adult"; right? And that's why there's laws for that that do protect children.

And so in terms of qualified immunity, if there are laws that give children these special protections, for example, welfare institution code lawsuits, then officers should be aware of that. But there isn't anything directly on point.

**THE COURT:** Yeah. I mean, I would feel more confident relying on such a case if I had a sense that as a matter of reasoning through a qualified immunity question that courts, district courts are permitted to look at cases outside of police cases to determine what police are on notice for as far as what their constitutional duties are, but it's -- it otherwise feels like a stretch for me to rely on that case.

So now let me move on. So there's also state law claims in this case. In the corrected second amended complaint in -- there's this theory of detention under abusive and unreasonable conditions. And the parties haven't specifically addressed this theory in the context of state law claims.

So this is the question for Ms. Lederman, is there authority for bringing conditions of confinement claims under the rubric of false arrest in California; and if so, what's the standards for such a claim?

**MS. LEDERMAN:** Well, I mean the inhumane conditions obviously go to the youth's damages from the false arrest. But we did also -- we did also mention under the Bane Act that there are statutes that require --

**THE COURT:** I will get to the Bane Act in a few minutes, but just...

**MS. LEDERMAN:** Okay.

**THE COURT:** This is paragraph 123 in the operative complaint. It's at ECF Number 208.

**MS. LEDERMAN:** Mm-hmm. The operative complaint is three --

**THE COURT:** There's a common law false --

**MS. LEDERMAN:** Oh, no, no. I'm sorry. You're looking at the complaint. Okay. Sorry about that.

**THE COURT:** Yeah, the complaint. This is your common law, false arrest, and fall imprisonment claim.

And the theory alleged there in that paragraph is that there was this -- a detention under, quote, under abusive and unreasonable conditions.

So it sounds like a condition of confinement claim, but it's styled and -- and pled as a state law claim. And I'm wondering what to do there because I understand the false immunity -- excuse me -- the qualified immunity arguments to be applicable to the Fourth Amendment claims but not necessarily the state law claims.

**MS. LEDERMAN:** Right. And so that would also include the -- the Bane Act claim. And all of the -- both the Bane Act and false arrest, false imprisonment claims are premised on --

**THE COURT:** So if this claim -- this isn't a Bane Act claim but it is a state law claim. So what would a jury have to -- what's the standard for showing a false arrest/false imprisonment claim, proving it up where it relates to -- where it's based on some abusive or unreasonable detention conditions?

**MS. LEDERMAN:** The main claim is the arrest itself, which would be based on lack of probable cause for the arrest.

**THE COURT:** I understand --

**MS. LEDERMAN:** Yeah.

**THE COURT:** -- that's -- I mean, we just spent more than an hour, you know, examining the record on that and various arguments, so now we're on conditions of confinement.

**MS. LEDERMAN:** Yeah.

**THE COURT:** Which I -- it may be something that the attorneys like to spend less time talking about it, but it's in the complaint, and so we have to figure out is this going to go to trial, you know, and there's a variety of claims.

So if that claim -- tell me more about that claim. What's the standard, if you know?

**MS. LEDERMAN:** We didn't have space to really argue that as an independent claim under state law. So I'm not prepared on that; but the main claim is the false arrest, which would be the same standard as under federal law.

**THE COURT:** Okay. All right. For Chief Scott -- and this is for you, Ms. Lederman -- for the purpose of any claim against Chief Scott, what conduct did Chief Scott do -- what is his conduct that plaintiffs believe caused or contributed to the violation of plaintiffs' rights?

**MS. LEDERMAN:** So Chief Scott was updated in real-time throughout the evening about what was going on but failed to intervene or even inquire further in any way. I don't think that the chief can claim that he didn't read his messages to escape liability.

The chief then ratified the arrest immediately afterwards, stating that the officers took action to hold those accountable who brazenly engaged in reckless and dangerous behavior and violated the law.

So this post -- post-event ratification under the case law has been sufficient, both for *Monell* and also for liability of the chief personally for the false arrest.

**THE COURT:** Okay. Do you want to respond to that, failure to intervene/failure to act as being the crux of what Chief Scott did to violate plaintiffs' rights?

**MS. LEDERMAN:** In addition, he failed to reprimand, investigate, take any corrective action, change policies, anything whatsoever in response.

**MR. STOLER:** So a great deal to respond to there.

This was not what was in the briefing, Your Honor. This is being raised for the first time here. The issue raised in the briefing was this notion that Chief Scott received text messages that were real-time status reports. That's not reflected in the record.

The -- and really critically, I think the plaintiffs rely on a ratification theory that what Chief Scott did here was that he said that -- you know, he thanked everyone for their hard work and said they did a good job. That doesn't demonstrate knowledge of the constitutional injury or an approval of it.

Certainly, on a case like this where we could have an hour-long discussion of whether or not it was a constitutional injury, there's nothing in the record to indicate that Chief Scott had a detailed, granular understanding of how this

would constitute a constitutional injury.

And it's -- saying that the people did a good job, I don't think is formally approving of such a constitutional injury.

And to Your Honor's question, it's certainly not a cause of the constitutional injury.

**MS. LEDERMAN:** Well, he didn't just say they did a good job. He said they held those accountable who brazenly engaged in reckless and dangerous behavior, meaning the class members who were arrested the 17th Street.

Chief Scott took it on himself to make a detailed presentation to the police commission about this event, and that just completely ratified the arrests.

**THE COURT:** What case says that a post-arrest ratification supports a claim against the police chief?

**MS. LEDERMAN:** Oh. Well, for example -- well, *Pembaur* and *Propotnick*, and then also *McRorie versus Shimoda*.

And we also cited a very recent case, *Black Unity versus City of Springfield*, which inferred a city policy or custom from the fact that officials took no steps to reprimand or discharge their subordinates and failed to admit that the subordinate's conduct was in error. Subsequent acceptance of dangerous recklessness by the policy-maker tends to prove his preexisting disposition and policy.

These officers knew that it was okay to make this probable cause-less arrest and, in fact, that's borne out by the actions

of the chief -- or inaction.

**THE COURT:** Okay.

**MR. STOLER:** Your Honor, very briefly, the response. The cited cases there, each of them refers to -- there's evidence -- in each of them there's evidence that there was routine conduct, similar instance that happened in the past that were happening habitually. That distinguishes, I think, this case.

But defendant's position is also that the -- there's just no evidence that Chief Scott knew of the constitutional injury, which is required.

**THE COURT:** Mm-hmm. Okay. Now --

**MS. LEDERMAN:** Well, the case law states that a single incident is sufficient to show *Monell* liability based on ratification or delegation and --

**THE COURT:** Which is a little bit different from what my question was.

**MS. LEDERMAN:** Okay.

**THE COURT:** Which was, you know, what case shows that post-arrest ratification of police conduct is sufficient to hold a police chief liable for a Fourth Amendment violation?

**MS. LEDERMAN:** Yeah, I focused on the *Monell* issue in my briefing.

**THE COURT:** Yeah.

**MS. LEDERMAN:** But I would say it's the same since he

did ratify this and he was aware as the event was happening. As a supervisor, he would be liable if he failed to intervene, and he could have intervened at any point, including after the class was encircled on 17th Street for hours and hours and he was fully informed.

**THE COURT:** Okay. Well, I've -- I understand qualified immunity as to be a doctrine that says, you know, police officers, chiefs cannot be held liable for constitutional violations if they don't have clear notice through controlling precedent or some consensus in out-of-circuit precedent that what they've done is a violation of constitutional rights.

So some more -- other theories, *Monell* or other types of cases that are not clear enough to give Chief Scott notice, to me would mean that there would be some problems with this equal -- with the claim pursuing given qualified immunity.

I'll take another look at it, but that's -- I want to move on to the *Monell* claim.

So for defendants, for the purpose of the *Monell* claim against the City, why couldn't a jury infer that Chief Scott's subsequent statements of approval that the mass arrest was carried out in accordance with police policies or practices, why couldn't a jury infer that Chief Scott approved of the -- of how the officers conducted the mass arrest?

**MR. STOLER:** Yeah. We touched on this briefly.

There's no evidence in the record that Chief Scott had any sort of granular knowledge that would be required for him to be aware of the constitutional injury. So whether or not a jury could infer from just the text of his statement that, you know, he was approving of it, there would not be sufficient evidence in the record for the jury to infer that he was approving specifically of -- of factual circumstances that created a constitutional injury.

**THE COURT:** Even if he was giving a presentation that described what was done and -- and he said, okay, this is -- this was a good handling of the -- a constitutional handling of -- of this mass arrest?

**MR. STOLER:** Well, I think the elephant in the room for this discussion is the QI issue for the mass -- for the false arrest claim.

So the question is whether there was any clearly established right that was violated by the arrest. So I think that that -- that would also inform this prong. We didn't touch on that but I'll just note that the plaintiffs only cite one controlling case for their false arrest QI opposition and that was the Ninth Circuit case *Collins*.

But in *Collins*, the Ninth Circuit didn't address a Fourth Amendment claim and explicitly reserved judgment on whether a Fourth Amendment claim would even arise from the facts it addressed. It instead explicitly cabined itself to First

Amendment questions. Those questions were whether it was lawful to prevent all demonstrations one day based on conduct from the day before.

It's not close to what we have here. And all concerns a first -- First Amendment injury.

The second question, just for the sake of completeness, was whether it was lawful to detain arrestees for 55 hours for the explicit purpose of keeping them from continuing to demonstrate.

So --

**THE COURT:** Yeah, I read *Collins* so I know what it was about.

**MR. STOLER:** *Collins* does not establish a Fourth Amendment right as plaintiffs -- it's their only cited authority for that proposition.

And I want to return now to your --

**THE COURT:** Yeah, but, I mean, we have *Lyall*, we have *Carr*, citing *Carr*, *Barham*. I mean, *Ibarra*. Anyhow, I --

**MS. LEDERMAN:** The *Collins* case, if you read it all the way through, the First Amendment is talked about with regard to the chief and the mayor, but the on-scene commander, similar to the captain and the lieutenant here, also argue that they had qualified immunity. And the Court found that that was precluded on summary judgment by triable issues of fact as to whether the folks that were arrested on various surrounding

blocks had disobeyed a dispersal order given at 24th and Mission, how many of the people at 23rd and Mission had been present and disobeyed that order, how many -- whether people who were arrested another block down.

Just like counsel is doing here, the -- San Francisco argued there was this group moment from the location of the dispersal announcements, but Judge Wilken found triable issues of fact, and the Ninth Circuit upheld that denial of qualified immunity for the -- the three on-scene commanders on the basis of those very similar triable issues as are presented here: How many people were present for a dispersal order or willfully disobeyed a dispersal order at this other location and this later time?

**THE COURT:** Okay. All right. I -- the Ninth Circuit ruled that it didn't have jurisdiction to consider certain rulings that Judge Wilken made because they were bound up in -- in factual questions.

It's the -- *Collins* is a bit of an old decision from the Ninth Circuit, and so I'm interested in more recent decisions, just in terms of making sure that I'm conducting the qualified immunity analysis in a correct way.

But this is back to this set of questions I had about Chief Scott.

So what is the evidence that Chief Scott knew that the arrests lacked probable cause?

I mean, you mentioned that he was receiving text communications, not -- but what's the evidence that he knew that -- that the mass arrest was not justified by way of probable cause for the group?

**MS. LEDERMAN:** Well, he was updated that a mass arrest was happening and he knew that this was 40 minutes after the dispersal order had been given and was at a different location.

The fact that he didn't inquire further, I think just -- he claims that he didn't even read the messages. So -- I think it's clear that he could have inquired and he could have intervened.

**THE COURT:** Okay. All right. Let's go to my last set of questions regarding the Bane Act claim.

So it's written in a -- it's alleged in a way that it, in part, rises and falls on this Fourth Amendment claim. But the allegations also base the claim on violations of a California code of regulation that addresses specific requirements for things like access to bathrooms; water for minors in, quote/unquote, temporary custody; as well as Welfare and Institutions Code 626 favoring -- I'm quoting -- "The alternative which least restricts the minor's freedom of movement provided that alternate -- that alternative is compatible with the best interests of the minor and the community."

So defendants don't address those laws.

Do you have any argument that those laws do not apply or that the requirements for this particular regulation, which is Section 1143, that they were satisfied?

**MR. STOLER:** Well, Your Honor, as to the general order, which I believe Your Honor cited there, did I get that right?

**THE COURT:** The Bane Act claim --

**MR. STOLER:** Yes.

**THE COURT:** -- it's got -- it has a theory that it's based on Fourth Amendment violations, but there's also a contention that there was the Bane Act violation because these state legal provisions were violated.

**MR. STOLER:** Yes, Your Honor.

So our contention is that they don't apply, the welfare code cited. They apply -- and this is also true of the general order which plaintiffs rely on a great deal -- they apply when the detainee is brought to a detention facility. That's -- that's not what we have here.

**THE COURT:** Do the buses count as a detention facility?

**MR. STOLER:** No, Your Honor. No. Detention facility, as used here, is a fairly formal term for a secure facility, I believe, where they are, I think -- I don't want to say "housed," but where they are securely detained.

**THE COURT:** Okay.

**MS. LEDERMAN:** So the defendants here just deliberately evaded these legal requirements by keeping the children outside, and then keeping them sitting on buses for hours, and then throwing some of the boys into this open air sally port that's just like a dirty garage area. That's definitely attached to the police station, so it's certainly a facility.

But even before -- this here's a picture of it. Even before they were put in that facility, the police shouldn't be allowed to circumvent statutes that have been developed to protect children by keeping them sitting on the pavement instead of holding them in a, quote/unquote, facility.

**THE COURT:** What part of the statute says that it only applies to detention facilities? This is Welfare and Institutions Code 626, or these -- or these reg- -- or this particular regulation, 1143. Does anyone know?

**MS. LEDERMAN:** The Welfare and Institutions Code doesn't have any exception like that.

**MR. STOLER:** The complaint does not allege a violation of the Welfare and Institution Code. The provision that I was referring to is also -- is the general order. And I don't have the number in front of me. 7. -- yeah, 7.01, I believe, which applies only in that context.

The -- and I -- is it -- is it plaintiffs' contention that the -- I don't know that it's plaintiff's contention that there

was a -- a predicate violation of the Welfare and Institutions code that supports --

**THE COURT:** It may be something that the regulation that's cited refers to.

**MR. STOLER:** Okay. I'm not -- I'm not prepared to discuss that regulation, Your Honor.

**MS. LEDERMAN:** Yeah. We -- we cited regulations that govern temporary detention of children and youth and protect them by providing that they must have continuous access to toilets and washing facilities, water, snacks, ways to keep warm.

The police simply tried to circumvent all of that by having them sitting on the pavement and then putting them in this makeshift garage area, which is clearly part of the police station. And then the Welfare and Institution Code is a state law. It doesn't have any exceptions. It prefers the least restrictive alternative to minors, which wouldn't include being handcuffed for hours sitting on a bus.

**THE COURT:** Okay. Yeah, I mean, the Welfare and Institutions Code was in the opposition brief, and it just wasn't addressed in the reply from the defendants.

**MR. STOLER:** Yes, Your Honor. I mean, on the -- on the Bane Act claim, I think the -- what's missing is any specific intent, which Ms. Lederman is alluding to that there was -- she's asserting that there was intention to keep youth

on the street or keep youth in the sally port so as to evade regulation. There's nothing in the record to indicate that this was intentionally done. It was a huge logistical project and --

**THE COURT:** It's about a block away; right? I mean, is there any dispute that the Mission Station is -- substation is a block away from where the arrest happened? Or maybe it was two blocks. I don't know.

**MR. STOLER:** Yes, Your Honor, it's nearby. It was decided that for safety it was -- that it was better to transport them there by bus than rather to walk all of the hundred or so of arrestees to the station. They would have needed to daisy-chain them, which means to bind them together. It was decided it was safer and -- and better to transport them from there.

The logistics related to transporting them in separate groups to separate facilities, it did take some time. There's nothing in the record to support the idea that police officers were engaged in some sort of intentional conspiracy to hold them outside and -- in the street. The officers were there, too.

**MS. LEDERMAN:** Well, you actually see it on the body-camera video where Lieutenant Sullivan and Captain Harvey are like, "Oh, these are minors, like, what are we going to do?"

And then Lieutenant Sullivan, I think, came up with this idea that in order to separate the youth and adults, as required by law, they would just have them sit in two different lines on the street next to each other.

And counsel alluded to the specific intent requirement for the Bane Act, but that under the California law, that's satisfied by reckless disregard for constitutional rights as shown by the lack of probable cause for the arrest.

**MR. STOLER:** Your Honor, I'll just note she referred to the false arrest, not the conditions of confinement there as supporting the Bane Act. I think your question was as to the conditions of confinement.

I agree the standard is reckless disregard and, you know, as we state in the briefing, there's no evidence that defendants were aware or, you know, recklessly disregarded the constitutional rights in terms of the conditions or as to the arrest.

**MS. LEDERMAN:** Well, they knew that under their own general order, they were required to do these various things, including provide restroom access, immediate phone calls, immediately notify the parents, which wasn't done. And they deliberately circumvented that by the way that they held the youth outdoors and in the buses and in this dirty garage.

**THE COURT:** And the particular exchange that you pointed to as far as Lieutenant Sullivan and Harvey, where in

the record -- I mean, there's voluminous body-worn camera footage -- do you have a cite for that?

I can provide it to the Court later. I don't have it off the top of my head. I'm sorry. But there's body-camera video of --

**THE COURT:** Yeah I just -- I mean, if it's argued -- counsel tends to spin, I mean, and -- some of the evidence. And so I'd like to just have the record cite so I can go back and look myself.

**MR. STOLER:** I'm not aware of evidence --

**MS. LEDERMAN:** It's on Lieutenant Sullivan's body-camera video Number 48 -- 48:43, I believe, and so this would be in the time period soon after 8:41. I can provide it to the Court afterwards.

**THE COURT:** Okay. Now, I think we're done. I don't have any more questions.

**MR. STOLER:** All right.

**THE COURT:** All right. Thank you. I'll take this under submission.

**MS. LEDERMAN:** Thank you.

**MR. STOLER:** Thank you, Your Honor.

**THE COURTROOM DEPUTY:** Court is now adjourned.

(Proceedings adjourned at 11:54 a.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Tuesday, June 23, 2026

Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court